John McGahren (JM 3568)
PATTON BOGGS LLP
One Riverfront, 6th Floor
Newark, New Jersey 07102
Telephone: 973.848.5600
Facsimile: 973.848.5601
Email: jmcgahren@pattonboggs.com

RECEIVED

DEC - 7 2009

AT 8:30_____M
WILLIAM T. WALSH
CLERK

*Attorneys for Plaintiffs*
Litgo New Jersey, Inc. and Sheldon Goldstein

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| LITGO NEW JERSEY, INC. and SHELDON GOLDSTEIN,<br><br>        Plaintiffs,<br><br>     v.<br><br>MARK MAURIELLO, in his official capacity as the Commissioner of the New Jersey Department of Environmental Protection, UNITED STATES OF AMERICA, UNITED STATES DEPARTMENT OF THE ARMY, UNITED STATES DEPARTMENT OF THE AIR FORCE, UNITED STATES DEPARTMENT OF THE NAVY, ALFRED SANZARI ENTERPRISES, MARY SANZARI, DAVID SANZARI, as Executor of the Estate of Alfred Sanzari, FRANK HUTTLE, as Executor of the Estate of Alfred Sanzari, MIAN REALTY, L.L.C., and KIRBY AVENUE REALTY HOLDINGS, L.L.C.,<br><br>        Defendants. | Civil Case No. 06-2891 (AET) (TB)<br><br><br><br>**JOINT FINAL PRETRIAL ORDER** |

     The following shall constitute the Final Pretrial Order pursuant to Rule 16 of the Federal Rules of Civil Procedure, and this Final Pretrial Order shall govern the Conduct of the trial of this case. Amendments to this order will be allowed only in exceptional circumstances to prevent manifest injustice.

**APPEARANCES:**

John McGahren, Esq
Daniel F. Mulvihill, Esq.
Andrew J. McNally, Esq.
Brendan W. Walsh, Esq.
Patton Boggs LLP
The Legal Center
One Riverfront Plaza
Newark, New Jersey, 07102
Phone: (973) 848-5600
Fax: (973) 848-5601
Attorneys for Litgo New Jersey, Inc., and Sheldon Goldstein

ANNE MILGRAM
ATTORNEY GENERAL OF NEW JERSEY
By:     Edward Devine, Deputy Attorney General
        A. Paul Stofa, Deputy Attorney General
R.J. Hughes Justice Complex
25 Market Street
P.O. Box 093
Trenton, New Jersey, 08625-0093
Phone: (609) 984-0214/5016
Fax: (609) 984-9315
Attorney for Defendant Mark Mauriello, in his official capacity as the Commissioner of the New Jersey Department of Environmental Protection

John Sullivan, Esq.
T. Monique Jones, Esq.
Christina Richmond, Esq.
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Defense Section
601 D Street N.W., Suite 8000
Washington, D.C. 20004
Tel:  (202) 305-0365
Fax: (202) 514-8865
Attorneys for the United States of America, United States Department of the Army, United States Department of the Air Force, and United States Department of the Navy

Kenneth K. Lehn
Michael G. Stingone, Esq. Michael G. Stingone
R.N. Tendai Richards, Esq.
Michael J. Cohen, Esq.
Winne, Banta, Hetherington, Baralian & Kahn, P.C.
21 Main Street
Court Plaza South – East Wing

Hackensack, New Jersey 07601
Phone: (201) 487-3800
Fax: (201) 487-8529
Attorneys for Alfred Sanzari Enterprises,
Mary Sanzari,and Frank Huttle and David Sanzari,
in their capacity as Executors of the Estate of Alfred Sanzari

Christopher R. Gibson, Esq.
David F. Edelstein, Esq.
Archer & Greiner, P.C.
One Centennial Square
Haddonfield, New Jersey 08033
Phone: 856-795-2121
Fax: 856-795-0574
Attorneys for Kirby Avenue Realty Holdings, L.L.C.

1.   **NATURE OF THE ACTION AND JURISDICTION OF THE COURT:**

   A.   **Plaintiffs' Statement of the Nature of the Action and Jurisdiction of the Court:**

   This is an action for: (a) injunctive relief under Section 7002(a)(1)(B) of the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as further amended by the Hazardous and Solid Waste Amendments of 1984 ("RCRA"), 42 U.S.C. § 6972(a)(1)(B); (b) contribution under Section 58:10-23.11f(a)(2) of the New Jersey Spill Compensation and Control Act ("Spill Act"), N.J.S.A. § 58:10-23.11f(a)(2); (c) cost recovery under section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. §9601 et seq. ("CERCLA"); and (d) rescission of the Agreement of Sale and Deed for property located at 40 Haynes Avenue, Somerville, New Jersey (the "F Sharp Screw Parcel") between Sheldon Goldstein ("Goldstein") and Alfred Sanzari, Mary Sanzari and Sanzari Enterprises pursuant to New Jersey Sanitary Landfill Facility Closure and Contingency Fund Act, N.J.S.A. 13:1E-100 et seq. (the "Closure Act"), as well as consequential damages.

   Plaintiffs' RCRA claim seeks an order compelling Defendant Mark Mauriello, in his official capacity as Commissioner of NJDEP ("Mauriello"), the United States of America, the United States Department of the Army, the United States Department of the Air Force, and the United States Department of the Navy (together the "United States Defendants"), Alfred Sanzari Enterprises ("Sanzari Enterprises"), Mary Sanzari, David Sanzari, as Executor of the Estate of Alfred Sanzari, Frank Huttle, as Executor of the Estate of Alfred Sanzari (together, the "Sanzari Defendants") to investigate, abate and remediate hazardous substances on and adjacent to the Somerville Iron Works Site in Somerville, New Jersey (the "Somerville Iron Works Site"), which may present an imminent and substantial endangerment to health or the environment. Plaintiffs also seek a declaratory judgment on the liability of Mauriello, the United States Defendants, and the Sanzari Defendants for their contribution to the past or present handling, storage, treatment, transportation, or disposal of solid or hazardous waste at the Somerville Iron

3

Works Site in accordance with 28 U.S.C. § 2201, which will be binding on any subsequent action or actions by the Plaintiffs against Mauriello, the United States Defendants, and the Sanzari Defendants for injunctive relief, and/or to recover further costs associated with, the release or threatened release of hazardous substances.

Plaintiffs' Spill Act claim seeks recovery in contribution from the Sanzari Defendants, Mian Realty, L.L.C. ("Mian") and Kirby Avenue Realty Holdings, L.L.C. ("Kirby") pursuant to Section 58:10-23.11f(a)(2) of the Spill Act, N.J.S.A. § 58:10-23.11f(a)(2) and consequential damages.

Plaintiffs' CERCLA claims seeks to recover from the United States Defendants, the Sanzari Defendants, Mian and Kirby the necessary costs of response Plaintiffs have incurred consistent with the National Contingency Plan, 40 C.F.R. Part 300 et seq., caused by the release or threatened release of hazardous substances at the Somerville Iron Works Site in accordance with Section 107(a)(4)(B) of CERCLA, 42 U.S.C. § 9607(a)(4)(B), and a declaratory judgment on liability for response costs, in accordance with Section 113(g)(2)(B) of CERCLA, 42 U.S.C. § 9613(g)(2)(B), that will be binding on any subsequent action or actions by Plaintiffs against the United States Defendants, the Sanzari Defendants, Mian and Kirby to recover further response costs.

Plaintiffs' Closure Act Claim seeks rescission of the Agreement of Sale between Plaintiffs and the Sanzari Defendants pursuant to Section 13:1E-116 of the Closure Act because the Sanzari Defendants failed to disclose the existence of a sanitary landfill facility at and beneath the Somerville Iron Works Site to Goldstein within the Agreement of Sale or the Deed granting title to the F Sharp Screw Parcel to Goldstein, dated February 14, 1990 (the "Deed"). Through this suit, Plaintiffs seek rescission of the Agreement of Sale, an order voiding the Deed, restitution of the purchase price plus interest, and consequential damages arising from the Sanzari Defendants' failure to disclose the presence of a sanitary landfill facility at and beneath the F Sharp Screw Parcel.

This Court has jurisdiction over this action under Section 7002(a)(1)(B) of RCRA, 42 U.S.C. § 6972(a)(1)(B); Sections 107(a) and 113(b) of CERCLA, 42 U.S.C. §§ 9607(a) and 9613(b); and 28 U.S.C. § 1331. In addition, the Declaratory Judgments Act, 28 U.S.C. § 2201 and Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), authorize this Court to grant Plaintiffs declaratory relief. This Court has supplemental jurisdiction over Plaintiffs' state law claim for relief pursuant to 28 U.S.C. §§ 1338 and 1367(a) for the additional reason that those claims are joined with substantially related claims and arise out of the same common nucleus of operative facts as Plaintiffs' federal law claims. Venue in this Court is proper pursuant to Section 7002(a) of RCRA, 42 U.S.C. § 6972(a), and Section 113(b) of CERCLA, 42 U.S.C. § 9613(b), because the United States Defendants, Mauriello, the Sanzari Defendants, Mian and Kirby may be found in the District of New Jersey, because the alleged endangerment may occur in the District of New Jersey, and because releases occurred in the District of New Jersey.

2.      **PLAINTIFFS' FACTUAL CONTENTIONS:**

     i.      **Commissioner Mauriello States the Following with Respect to Plaintiffs' Facts:**

It appearing to Defendant Mauriello that the Plaintiffs' proposed stipulated facts, submitted November 16, 2009, number over 300 statements and appear to be nothing more, nor less, than the reiteration of the Plaintiffs' six separate complaints. It is neither practicable nor reasonable for Defendant Mauriello to respond. The four fact statements added to that list on November 20 are not addressed to this defendant.

     ii.     **The United States Defendants Contest the Following of Plaintiffs' Facts:**

11.     The Somerville Iron Works Site consists of land in the Borough of Somerville in Somerset County, New Jersey, divided into the following three parcels:

     a.      the F Sharp Screw Parcel—approximately seven acres of vacant land situated at 40 Haynes Street, referred to on local tax maps as Block 50, Lots 3, 4, 13 and 14, bordered to the south by a New Jersey Transit rail line, to the west by a parcel owned by Truckform, Inc., to the north by several residential buildings and to the east by the 6 Kirby Avenue Parcel;

     b.      the 6 Kirby Avenue Parcel—approximately 2.5 acres situated at 6 Kirby Avenue, referred to on local tax maps as Block 1, Lot 4.02, bordered to the south by a New Jersey Transit rail line, to the west by the F Sharp Screw Parcel, to the north by Kirby Avenue and to the east by the 50 Kirby Avenue Parcel; and

     c.      the 50 Kirby Avenue Parcel—approximately 11.25 acres situated at 50 Kirby Avenue, referred to on local tax maps as Block 1, Lot 4.02, bordered to the south by a New Jersey Transit rail line, to the west by the 6 Kirby Avenue Parcel, to the north by Kirby Avenue and to the east by several residential parcels.

12.     Beginning in the early 1900s, two iron foundries known as Somerville Iron Works and Somerville Stove Works operated at the F Sharp Screw Parcel, with the Somerville Iron Works operating a foundry and support buildings on the western portion of the F Sharp Screw Parcel and the Somerville Stove Works operating a foundry, assembly area and warehouse on the eastern portion.

14.     From 1916 through 1929, Somerville Stove Works continued to operate in the foundry, assembly area, and warehouse on the eastern portion of the F Sharp Screw Parcel.

15.     Iron foundry operations generate wastes at least in the form of slag and contaminated sand from the molten bath and casting processes.

20.     Somerville Iron Works and/or its lessees and/or other third parties, including Somerville Stove Works, deposited waste materials at the Somerville Iron Works Site from in or about 1916 until in or about 1952.

21.     Aerial photographs identify waste disposal and waste disposal activities at the Somerville Iron Works Site from in or about 1940 through at least the 1970s.

22.     Aerial photographs show an access road at the Somerville Iron Works Site leading from what is now the F Sharp Screw Parcel through what is now the 6 Kirby Avenue Parcel owned by Mian and into what is now the 50 Kirby Avenue Parcel owned by Kirby.

23.     Aerial photographs taken in the 1940s show that the waste disposal increased the elevation of the land now constituting the 6 Kirby Avenue and 50 Kirby Avenue Parcels.

24.     Visual observation of the topography at the Somerville Iron Works Site indicates an unnatural drop in elevation from the Site to the lands to the east of the Site.

25.     In 1929, Somerville Iron Works ceased operations at the Somerville Iron Works Site.

26.     Between 1929 and 1941, no industrial operations were conducted at or in the buildings located on the eastern portion of the F Sharp Screw Parcel that had been operated by Somerville Stove Works.

27.     Columbia Aircraft Products, Inc. ("Columbia Aircraft") was incorporated in November 1940 as successor to Columbia Aircraft Products Corp. to manufacture precision aircraft parts, armament, and proprietary variable pitch propellers.

28.     Beginning in or about 1941, and until 1948, Columbia Aircraft leased the Somerville Iron Works Site and conducted operations thereon.

34.     In 1955, Edray Corp. transferred the Somerville Iron Works Site to Bonnie Realty Co.

35.     On January 4, 1966, Bonnie Realty Corp. transferred the property consisting of the 6 Kirby Avenue and 50 Kirby Avenue Parcels to Somerville Industries, Inc.

36.     On February 26, 1966, Somerville Industries, Inc. transferred property consisting of the 6 Kirby Avenue and 50 Kirby Avenue Parcels to Parents Magazine Enterprises, Inc. ("Parents").

37.     A building was erected on the property consisting of the 6 Kirby Avenue and 50 Kirby Avenue Parcels by March 1969, with entrance and parking facilities added thereafter.

38.     By March 1974, an office building and parking lot were also constructed on the far western portion of the tract consisting of the 6 Kirby Avenue and 50 Kirby Avenue Parcels, leaving about three acres of the former landfill vacant between the two commercial developments.

39.     On June 15, 1976, Defendant Alfred Sanzari and Defendant Mary Sanzari purchased the F Sharp Screw Parcel from Edwin Schwartz and the Estate of Raymond Schwartz (d/b/a Bonnie Realty Co.).

42.     At times from 1976 to 1990, Alfred Sanzari Enterprises "held itself out as the operator of the F Sharp Screw Parcel," and "was an operator of the F Sharp Screw Parcel at a time when hazardous substances and wastes were discharged, released, or disposed of on the property."

44.     Alfred Sanzari and/or Alfred Sanzari Enterprises were present at the F Sharp Screw Parcel during the relevant time periods, through their negligence, and that of Alfred Sanzari and other employees of the company, allowed hazardous substances and wastes to be stored on the property.

45.     At times between 1976 and 1990, Irving Allegar, on behalf of Alfred Sanzari Enterprises, Alfred Sanzari and/or Mary Sanzari, visited the F Sharp Screw Parcel in connection with the leasing of space to tenants at the property.

47.     Arnold Feldman, an employee of the Sanzari Defendants responsible for the F Sharp Screw Parcel was ultimately fired.

48.     The Sanzari Defendants by act or omission permitted hazardous substances to be stored at the JANR Warehouse.

51.     In 1987, WR Grace & Co. ("Grace") became successor to Parents via merger, and subdivided the property it owned into the 50 Kirby Avenue Parcel and the 6 Kirby Avenue Parcel.

53.     In or about December 1987, Bilal and Shakila Mian transferred the 6 Kirby Avenue Parcel to Mian Realty Partners, L.P.

55.     Mary Sanzari was an owner of the F Sharp Screw Parcel prior to the transfer of title to the property to Sheldon Goldstein pursuant to a deed dated February 14, 1990.

59.     On December 3, 1999, Baker & Taylor, Inc. sold the 50 Kirby Avenue Parcel to Defendant Kirby, such that Defendant Kirby is the present owner of the 50 Kirby Avenue Parcel.

60.     During the World War II era, the United States Defendants: (1) built and operated plants and facilities for the manufacture of war material; (2) bought, commandeered or otherwise controlled facilities, plants, material, equipment and supplies deemed by the United States Defendants to be strategic and critical to the war effort; (3) required private corporations to install machinery and equipment owned by the United States Defendants at various plants, and to operate such equipment to manufacture various products for the United States Defendants' use in the national defense; (4) supplied raw materials that they owned, some of which contained hazardous substances, to private industry for the manufacture of various products for the United States Defendants' use in the national defense; and (5) required private corporations to expand existing facilities and construct new facilities for the manufacture of various products for the United States Defendants' use in the national defense.

61.     The requirements imposed by the United States Defendants on private industry were memorialized in various agreements prepared by the United States Defendants, which private corporations were required to execute under threat of seizure by the United States

Defendants of their plants and businesses.

63.　　In or about 1940, the United States Defendants required that Columbia Aircraft acquire additional machinery and equipment for use at its facilities located at the Somerville Iron Works Site in order to expedite the manufacture and delivery of precision parts for military aircraft to the United States Defendants and/or the United States Defendants' contractors and suppliers.

64.　　In or about 1940, the United States Defendants declared that the expansion of Columbia Aircraft's existing capacity at the Somerville Iron Works Site for the production of precision parts for military aircraft required by the United States Defendants for national defense was essential to the national war effort.

65.　　In Columbia Aircraft's initial public financing, the company described a pending two-year contract for products worth $30,000 monthly.

66.　　On November 30, 1941, May 1, 1942 and April 12, 1943, Columbia Aircraft submitted Applications for Necessity Certificates covering its acquisition of machine tools and machinery, pursuant to which Columbia Aircraft was authorized to acquire production equipment valued at $285,209 under favorable tax treatment, based on 100% use for defense contracts.

69.　　The government-owned equipment leased by DPC to Columbia Aircraft was consolidated in the manufacturing buildings formerly occupied by Somerville Stove Works in the eastern portion of the F Sharp Screw property.

70.　　Parking facilities for the projected 250 employees required for the three shift plant operations were established adjacent to, and east of the manufacturing facility over portions of the foundry waste landfill.

71.　　In or about 1941, Columbia Aircraft commenced operations at the Somerville Iron Works Site, producing materiel for the United States Defendants.

72.　　Between about 1941 and September 1945, Columbia Aircraft manufactured aircraft piston pins, crankshafts, bearing covers flanges, connections and bolts, rocket motors, gun camera mounts, fuse bodies, fuse body assemblies, ordnance equipment, and modified 75 mm shells, pursuant to contracts with the United States Defendants, or pursuant to subcontracts with prime contractors of the United States Defendants.

73.　　The Plancor lease was terminated effective April 8, 1946, with "interim consent" granted for the company to use the Government-owned equipment under a lease agreement from October 16, 1945 until July 7, 1947.

75.　　At the time it filed for Chapter 11 bankruptcy protection, Columbia Aircraft possessed five vapor degreasing tanks and one drum of Triad Degreasing Solvent.

76.　　"Triad" was a trade name used by Detrex Corp. for trichloroethylene (also known as trichloroethene and TCE).

8

77.     Trichloroethylene was used in connection with Columbia Aircraft's activities and manufacturing processes at the Somerville Iron Works Site during the World War II era.

78.     Columbia Aircraft's activities and manufacturing processes at the Somerville Iron Works Site resulted in the release of hazardous substances and wastes (including trichloroethylene) into the environment at the Somerville Iron Works Site, contaminating the soil and groundwater.

79.     Plaintiffs have incurred response costs remediating the soil and groundwater at the Somerville Iron Works Site contaminated as a result of releases referred to in the preceding paragraph.

80.     During the World War II era, the United States Defendants seized plants manufacturing war materiel due to mismanagement, failure to maintain delivery schedules, poor quality output, and refusal to deliver items at fair and reasonable prices.

81.     During the World War II era, the United States Defendants sent inspectors to the Somerville Iron Works site to oversee work performed by Columbia Aircraft and exercised control over the facility.

82.     On or about July 23, 1942, an employee of Columbia Aircraft stole certain precision instruments from the plant, holding up government inspection of work at the plant for eight days.

83.     On October 19, 1982, Ferd Scaccetti of NJDEP inspected a warehouse located at 140 Thomas Street in Newark, New Jersey ("140 Thomas Street"), in response to a complaint by the Newark Fire Department alleging the illegal storage of hazardous waste.

84.     Mr. Scaccetti took no action against the owners or operators of 140 Thomas Street as a result of the October 19, 1982 inspection.

86.     On April 11, 1983, officials from the City of Newark and NJDEP personnel responded to a fire at 140 Thomas Street, discovering approximately 20,000 containers and 6,500 metal drums, illegally stored at the facility.

87.     Among the materials found at 140 Thomas Street were hazardous substances and wastes (including "flammables, oxidyzers [sic], corrosives, poisons and explosives").

88.     Among the substances found at 140 Thomas Street was trichloroethylene ("TCE").

89.     Materials (including hazardous substances and wastes) once owned or generated by the United States Defendants were among those found at 140 Thomas Street.

90.     Substances (including hazardous substances and wastes) once owned or generated by the United States Defendants were shipped to 140 Thomas Street by Resource Technology Services, Inc., Atlantic Coast Environmental, Inc. ("ACE") and Environmental Cleaning Service, Inc. ("ECS").

91.     Many of the containers at 140 Thomas Street were damaged and/or leaking, and haphazardly stored, creating a dangerous condition.

93.     On April 16, 1983, Bruce Comfort was appointed On-Scene Coordinator ("OSC") on behalf of NJDEP for purposes of supervising the removal of hazardous wastes and materials from 140 Thomas Street.

94.     By order dated September 2, 1983, Judge Reginald Stanton of the Superior Court of New Jersey ordered that all hazardous materials be removed from 140 Thomas Street, stating that "[t]he Department of Environmental Protection (DEP) by its Commissioner and/or his delegated representatives is responsible for the management and clean up at 140 Thomas Street, Newark, New Jersey, which shall include but not necessarily be limited to monitoring of all phases of the clean up, insuring compliance with all federal, state and local statutes and attendant regulations and providing adequate security at the site."

95.     Between October 1983 and February 1984, thousands of drums and other containers, many of which were damaged, rusted or leaking, containing hazardous substances and wastes, including TCE, were transported from a facility located at 140 Thomas Street, Newark, New Jersey to the JANR Warehouse.

96.     The Sanzari Defendants failed to prevent these materials from being brought to the F Sharp Screw Parcel.

97.     Persons hired by Signo to assist in the removal of containers from 140 Thomas Street purposefully removed and/or painted over hazardous waste labels from a number of containers stored there, as well as labels indicating the source of the containers.

99.     NJDEP encouraged this behavior by permitting all containers that did not bear a hazardous waste label to be removed from 140 Thomas Street.

100.     In or about September 1983, Signo contracted with JANR Transport, Inc. ("JANR") to remove containers stored at 140 Thomas Street.

101.     In September 1983, JANR entered into an agreement with Alfred Sanzari Enterprises to lease a portion of a warehouse located on the F Sharp Screw Parcel at the Somerville Iron Works Site (the "JANR Warehouse"), with a lease term beginning October 1, 1983.

102.     The F Sharp Screw Parcel and the JANR Warehouse were owned and operated by Defendant Alfred Sanzari.

103.     The F Sharp Screw Parcel and the JANR Warehouse were owned and operated by Defendant Mary Sanzari.

104.     The F Sharp Screw Parcel and the JANR Warehouse were owned and operated by Defendant Alfred Sanzari Enterprises.

105.     Beginning in the week of October 11, 1983, the rate of removal of containers

from 140 Thomas Street increased compared to the rate of removal prior to that time, with at least one truckload carrying containers from 140 Thomas Street per work day.

106.    Beginning on or about October 13, 1983, and continuing through February 1983, more than 12,000 containers were transported from 140 Thomas Street to the JANR Warehouse.

108.    These logs, as well as other documents, reflect the shipment of materials from 140 Thomas Street to the JANR Warehouse.

109.    These logs, as well other documents, also reflect that NJDEP knew or should have known that certain of the materials sent from 140 Thomas Street to the JANR Warehouse were hazardous wastes.

110.    By order dated January 19, 1984, Judge Stanton of the Superior Court of New Jersey ordered that:

> All hazardous material removed [from 140 Thomas Street] are to be stored at facilities licensed to accept such material for storage and all hazardous waste is to be disposed of at licensed hazardous waste treatment, storage or disposal facilities.
>
> . . .
>
> The NJDEP shall continue to supervise and monitor the cleanup and removal of materials at the facility located at 140 Thomas Street . . . . The NJDEP shall have the authority to direct, consistent with the protection of public health, safety and welfare, which materials, in what order and by what means are to be removed from the facility.

111.    By mid-December 1983, after at least two extensions of the Court ordered schedule for removal of the materials from 140 Thomas Street, it was estimated that less than half of the chemicals had been removed.

112.    When no further progress had been made under his third deadline of March 31, 1984, Judge Stanton directed the State to take full responsibility for completing the project.

113.    A State emergency service contractor inventoried the materials and an attempt was made to sell any usable products; approximately 17 tons of dry materials and 62 drums of miscellaneous chemicals were removed in that manner, about 1% of the materials present.

114.    NJDEP assigned two permanent OSCs from its Bureau of Site Operations to communicate cleanup progress to the Trenton headquarters, and mobilized qualified contractors to decontaminate the warehouse and to transport and dispose of the wastes at permitted facilities.

115.    Over 1700 tons of bulked wastes and nearly 1000 drums and 42 gas cylinders of miscellaneous wastes were disposed of during the removal action which was conducted over a 12-hour workday, six days per week to identify, consolidate and load wastes for off-site disposal.

116.    Among the materials transported from 140 Thomas Street to the JANR Warehouse: (1) were hazardous substances and wastes (including corrosive, reactive, toxic,

flammable and explosive compounds); (2)  military specification materials; (3) "off-spec" materials; and (4) containers marked "NJDEP BFO," indicating that they were inspected by NJDEP at 140 Thomas Street.

117.   The JANR Warehouse did not have a certificate of occupancy nor a permit to store hazardous substances or wastes.

118.   Nevertheless, the selection of the JANR Warehouse to store the hazardous wastes was sanctioned and assisted by the NJDEP.

119.   On January 22, 1983, Bruce Comfort of NJDEP visited the JANR Warehouse and took no action with respect to the storage of materials brought from 140 Thomas Street.

120.   On January 27, 1983, Jonathan Berg of NJDEP visited the JANR Warehouse, and subsequently contacted Bruce Wolf, the Borough of Somerville Health Officer, informing him that hazardous substances and wastes were stored in a haphazard and incompatible manner.

121.   On January 31, 1984, NJDEP and members of the Somerville Health Department, including Bruce Wolf, conducted an inspection of the JANR Warehouse.

122.   The containers transported from 140 Thomas Street to the JANR Warehouse constituted all or nearly all of the containers discovered at JANR Warehouse, and many were rusted, damaged, and leaking.

123.   NJDEP personnel working at 140 Thomas Street, including Bruce Comfort, knew that containers were being brought from 140 Thomas Street to the JANR Warehouse as the transfer occurred.

124.   NJDEP personnel working at 140 Thomas Street approved the shipment of containers from 140 Thomas Street to the JANR Warehouse.

125.   A Newark Police car escorted at least one shipment of materials from 140 Thomas Street to the JANR Warehouse.

126.   Many containers discovered at the JANR Warehouse were unlabeled or improperly labeled and many containers were damaged, leaking or rusted.

127.   Many containers at the JANR Warehouse were not segregated by type or classification, and were haphazardly stored, and many containers had leaked, spilled or overflowed onto the ground, creating an environmental risk to the soil, groundwater and air.

128.   Many containers at the JANR Warehouse contained hazardous waste.

129.   Conditions at and outside of the JANR Warehouse prompted the Somerville Health Department to contact NJDEP for technical and enforcement assistance to respond to the observed risks.

130.   In or about January 1984, an NJDEP employee informally tipped off the

12

Somerville Health Department of the fact that the thousands of containers of chemicals were being stored in a haphazard manner at the JANR Warehouse.

131.    An NJDEP official charged with overseeing operations at 140 Thomas Street visited the JANR Warehouse.  The official failed to report any issues.

132.    On or about February 8, 1984, Joseph Rogalski stated to Bruce Wolf that NJDEP "goofed up" in allowing materials to be transported from Newark to Somerville.

133.    NJDEP ordered Alfred Sanzari and/or Alfred Sanzari Enterprises, JANR and Signo to remove all materials from the warehouse by July 1, 1984.

134.    When that removal did not occur, Alfred Sanzari Enterprises filed suit in the Superior Court of New Jersey, Chancery Division, seeking an Order for Signo to remove the material or, in the alternative, allowing it to take ownership and sell the material.

135.    In August 1984, the Court denied Alfred Sanzari Enterprises' request and instead appointed a "receiver of materials" to sell the chemicals to satisfy the past due lease obligation of JANR.

136.    The receiver contracted for an inventory valuation report, which concluded that the majority of the materials were unmarketable and hazardous waste, and identified trichloroethylene as one of substances found inside the warehouse.

137.    The receiver then requested assistance from NJDEP to perform site stabilization, including removing and/or repackaging leaking containers.

138.    By October 1984, conditions at the JANR Warehouse were "just as dangerous" as 140 Thomas Street, and "constitute[d] an immediate danger to life, and public health," in part due to chemicals leaking from drums and the poor condition of the JANR Warehouse, including a leaking roof.

139.    The overall condition of the JANR Warehouse structure as well as its contents constituted improper storage of the materials therein.

140.    In or about March 1985, NJDEP requested proposals for work for staging, sampling and removing the hazardous substances and wastes stored and discharged at the JANR Warehouse, ultimately awarding the contract to Clean Ventures, Inc.

141.    Clean Ventures' work did not commence until October 1985, due to its inability to satisfy bonding criteria.

144.    NJDEP retained and exercised the authority to direct the disposal of hazardous substances and wastes located at the JANR Warehouse, including the authority to control the means, methods and locations for the treatment or disposal of wastes generated during the course of Clean Ventures' removal operations.

145.    The NJDEP-supervised cleanup was plagued by problems including untimely

submission of inadequate waste characterization data by Clean Ventures, numerous chemical spills, chemical reactions causing fuming and other releases, and expiration of waste disposal contracts.

146.    NJDEP blamed these deficiencies on Clean Venture's carelessness and inexperience, resulting in mistakes made during its learning process; these and other deficiencies, including alleged incompetence of the Clean Venture chemist, prompted NJDEP to consider a criminal investigation for intentional misconduct of their contractor.

147.    NJDEP and/or Clean Ventures personnel performed work at the JANR Warehouse at times other than normal working hours.

148.    Numerous spills of hazardous substances and wastes occurred inside and outside of the JANR Warehouses during NJDEP's and Clean Ventures' removal operations at the JANR Warehouse, including but not limited to seventeen significant releases occurring from February 5, 1986 through July 16, 1986.

149.    On or about April 25, 1986, 300 to 500 gallons of bulk hydrochloric acid spilled to the ground from a stainless steel tanker maintained at the F Sharp Screw Parcel.

150.    Clean Ventures attempted to avoid disclosing every release to NJDEP.

151.    Clean Ventures created two bulk solid waste piles, with leachate collection trenches, where Clean Ventures dumped bulked hazardous substances and wastes onto the waste piles and in the leachate trenches prior to final removal.

152.    NJDEP/Clean Ventures took samples of the waste piles, which revealed the presence of TCE.

153.    Clean Ventures also constructed a liquid pool on the ground, into which it dumped water-soluble hazardous substances.

156.    Firefighters from Somerville and surrounding communities responded and prevented spread of the fire to the adjacent JANR Warehouse, applying water to the JANR Warehouse to prevent the fire's spread.

157.    The firefighting efforts described in the previous paragraph caused flooding of the JANR Warehouse.

158.    The firefighting efforts resulted in the flow of water out from the JANR Warehouse, carrying with it hazardous substances and wastes that contaminated the soil and groundwater at the F Sharp Screw Parcel.

159.    During the time between the Superior Court's assignment of responsibility to the NJDEP and the fire of December 29, 1985, Signo employees had unlimited access to all floors of the JANR Warehouse, and during this time they altered and removed hazardous waste labels from many of the containers.  NJDEP employees were afraid to confront them and allowed the activities to continue.

160.    Prior to and during NJDEP's removal action, NJDEP indicated that it would perform environmental sampling after the completion of the removal action to ensure that no further environmental contamination had occurred during NJDEP's removal action, and it prepared sampling plans; NJDEP identified two areas of primary concern: the waste storage areas inside the warehouse; and the outside operations area where waste consolidation and loading had occurred, including numerous contaminant releases.

161.    The Somerville Board of Health was also concerned about soil and groundwater contamination due to runoff from the warehouse and noted that NJDEP had previously agreed to perform an investigation in key areas around the warehouse.

162.    Representatives of Alfred Sanzari Enterprises stated to NJDEP that if sampling identified contamination resulting from the removal action, NJDEP should assume responsibility for completing the job.

163.    In or about September 1987, NJDEP decided to waive post-removal sampling, the purpose of which would have been to ensure that the JANR Warehouse and its environs would be left in an acceptable condition, reasoning that waiver would save the department time and money, and because sampling would be performed as part of the ECRA program, to which the property was subject at the time.

164.    The sampling waived in or about September 1987 would have revealed environmental contamination caused to the property as a result of NJDEP's operations.

165.    The resulting post-decontamination verification plan provided that: it would be more expeditious to perform a second decontamination of visibly contaminated areas within the warehouse (floor drains, known spill areas) than to conduct sampling; that the future owners of the building should investigate building debris disposal options and necessary sampling; and that, although it may be necessary to sample areas outside the building where waste processing, storage and releases had occurred, it could be addressed through an expansion of the ECRA sampling plan, which had not yet been approved by the agency.

166.    NJDEP recommended sampling in the outdoor waste processing area, including a maximum of 8 soil borings with two samples obtained from each (at 0-6" and 6-12" below surface).

167.    NJDEP also emphasized that those samples could be added to the ECRA sampling protocol, which would save NJDEP at least three months of site oversight effort and security services.

169.    NJDEP's and its contractor's operations at the Somerville Iron Works Site during the 1980s caused releases of hazardous substances and wastes, including trichloroethylene, into the soil and groundwater.

170.    Plaintiffs have incurred response costs, consistent with the National Contingency Plan. 40 C.F.R. Part 300 *et seq.*, ("NCP"), in remediating soil and groundwater, contaminated as a result of the releases referred to in the previous paragraph.

171.    In or about 1986, the Office of the Attorney General of the State of New Jersey convened a grand jury to consider, among other things, the conduct of NJDEP officials with respect to the presence of hazardous substances and wastes at 140 Thomas Street and the transfer thereof to the JANR Warehouse, and the following persons provided testimony: Howard B. Epstein, Joseph Rogalski, Scott A. Santora, Bruce Comfort, George Smajda, Gary Allen, Ferdinand Scacetti, Joseph Hoyle, James Costanzo, Jonathan Berg, Bruce Wolf, William Grywalski, Gary Hoadley, Thomas Dalton, Vincent Matulewich, Donald Hodgson, Helen Curley, Wayne Smith, Eugene Ribas, Joyce Ribas, Alfred Stasium, Felipe Diaz, Alfred Lyons, Vince D'Agostino, Wayne Smith, Robert List, Richard Mancini, Robert Caron, Phillipe Diaz, Shirley Schiffman, James Schaefer, and Michael Catania.

173.    During the 1980s, RTS, ECS and ACE and/or other contractors brought hazardous substances and wastes owned and/or generated by the United States Defendants to 140 Thomas Street.

174.    RTS, ECS and ACE provided notice to the United States Defendants that it intended to bring or had brought the United States Defendants' hazardous substances and wastes to 140 Thomas Street.

175.    Among the United States Government locations/agencies that owned and/or generated hazardous substances and wastes present at 140 Thomas Street were: Defense General Supply Center (Norfolk, VA), Defense Reutilization and Marketing Service (f/k/a Defense Property Disposal Service (Norfolk, VA)), Groton Submarine Base, Norfolk Naval Base, New Cumberland Army Depot, United States Environmental Protection Agency—Region II, United States Department of Agriculture, Defense Personnel Support Center, United States Department of the Treasury, Federal Reserve, Veteran's Administration, and the United States Army.

176.    During the 1980s, Defendant United States Department of the Army contracted with RTS for the disposal of hazardous substances and waste, including, and specifically trichloroethylene, from the New Cumberland Army Depot in Pennsylvania.

177.    Following the chemical fire at 140 Thomas Street on or about April 11, 1983, hazardous substances and wastes owned and/or generated by the United States Defendants were transferred to the JANR Warehouse on the Somerville Iron Works Site, with the knowledge of NJDEP personnel.

180.    CRU-5 was shipped from 140 Thomas Street to the JANR Warehouse.

181.    CRU-5 was owned and/or generated by the United States Defendants.

182.    CRU-5 contained tetrachloroethylene.

183.    CRU-5 contained hazardous waste.

185.    CRU-154 was shipped from 140 Thomas Street to the JANR Warehouse.

186.    Before arriving at the JANR Warehouse, CRU-154 was once shipped from the Myrtle Beach Air Force Base to the Defense General Supply Center in Richmond, Virginia.

188.   CRU-154 was owned and/or generated by the United States Defendants.

189.   CRU-154 contained trichloroethylene.

190.   CRU-154 contained hazardous waste.

191.   Chloroform owned by the United States Defendants was stored at the JANR Warehouse.

192.   Chloroform generated by the United States Defendants was stored at the JANR Warehouse.

193.   Methylene chloride owned by the United States Defendants was stored at the JANR Warehouse.

194.   Methylene chloride generated by the United States Defendants was stored at the JANR Warehouse.

195.   Trichloroethylene owned by the United States Defendants was stored at the JANR Warehouse.

196.   Trichloroethylene generated by the United States Defendants was stored at the JANR Warehouse.

197.   Tetrachloroethylene owned by the United States Defendants was stored at the JANR Warehouse.

198.   Tetrachloroethylene generated by the United States Defendants was stored at the JANR Warehouse.

199.   Trichloroethane owned by the United States Defendants was stored at the JANR Warehouse.

200.   Trichloroethane generated by the United States Defendants was stored at the JANR Warehouse.

201.   The chloroform, methylene chloride, trichloroethylene, tetrachloroethylene, trichloroethane referred to in the preceding paragraphs constituted hazardous waste.

202.   The chloroform, methylene chloride, trichloroethylene, tetrachloroethylene, trichloroethane referred to in the preceding paragraphs were released into the environment at the F Sharp Screw Parcel, causing contamination to soil and groundwater.

203.   Plaintiffs have incurred response costs, consistent with the National Contingency Plan, remediating the soil and groundwater at the Somerville Iron Works Site contaminated as a result of releases referred to in the preceding paragraph.

204.   During the course of its investigations at the JANR Warehouse, NJDEP discovered hazardous substances and wastes generated by the United States Defendants were

stored at the JANR Warehouse.

205.   During the course of its investigations at the JANR Warehouse, NJDEP discovered that hazardous substances and wastes owned by the United States Defendants were stored at the JANR Warehouse.

206.   The hazardous substances and wastes referred to in the preceding paragraphs were released into the environment at the F Sharp Screw Parcel, causing contamination to soil and groundwater.

207.   Plaintiffs have incurred response costs, consistent with the National Contingency Plan, remediating the soil and groundwater at the Somerville Iron Works Site contaminated as a result of releases referred to in the preceding paragraph.

209.   Alfred Sanzari Enterprises held itself out as an owner of the F Sharp Screw Parcel at times when hazardous substances and wastes were released into the environment at the F Sharp Screw Parcel.

210.   Alfred Sanzari Enterprises was an owner of the F Sharp Screw Parcel at times when hazardous substances and wastes were released into the environment at the F Sharp Screw Parcel.

211.   Alfred Sanzari Enterprises was an operator of the F Sharp Screw Parcel at times when hazardous substances and wastes were released into the environment at the F Sharp Screw Parcel.

212.   Alfred Sanzari was an owner of the F Sharp Screw Parcel at times when hazardous substances and wastes were released into the environment at the F Sharp Screw Parcel.

213.   Alfred Sanzari was an operator of the F Sharp Screw Parcel at times when hazardous substances and wastes were released into the environment at the F Sharp Screw Parcel.

214.   Mary Sanzari was an owner of the F Sharp Screw Parcel at times when hazardous substances and wastes were released into the environment at the F Sharp Screw Parcel.

215.   While subject to an NJDEP Directive requiring them to conduct a cleanup and removal of the materials from the JANR Warehouse, Alfred Sanzari Enterprises did not fulfill this obligation, such that an NJDEP-coordinated removal was conducted instead.

217.   Neither Alfred Sanzari Enterprises, Alfred Sanzari, nor Mary Sanzari complied with the Directive Letter, instead bringing suit against JANR, Signo International Trading, Inc. and the Colberts to remove the containers from the JANR Warehouse.

219.   One of the "directive letters" was issued to "Arnold Feldman" of "Sanzari Enterprises, Inc.," not "Sanzari."

221.    Pursuant to a letter dated July 26, 1985 from counsel for Alfred Sanzari, Mary Sanzari and/or Alfred Sanzari Enterprises to counsel for Goldstein, counsel for the Sanzari Defendants stated: "Please note my client would not agree to a 'blank check' with respect to *ECRA liability*."

223.    Edward Schotz, counsel for Alfred Sanzari, drafted the Agreement of Sale.

225.    Pursuant to the Agreement of Sale, "[i]n order to induce [Goldstein] to enter into this Agreement of Sale, [Alfred Sanzari] warrant[ed] and represent[ed] that . . . [h]e has no knowledge or notice of any violation of a certificate of occupancy relating to the Property." Previously, on March 1, 1984, Alfred Sanzari Enterprises received a Notice of Violation referencing a violation of a Certificate of Occupancy requirement.

226.    The Agreement of Sale did not disclose the existence of a sanitary landfill facility on the F Sharp Screw Parcel.

227.    A sanitary landfill facility exists on the F Sharp Screw Parcel, and existed when the Agreement of Sale was executed.

228.    A sanitary landfill facility exists at the 6 Kirby Avenue Parcel.

229.    A sanitary landfill facility exists at the 50 Kirby Avenue Parcel.

230.    The Agreement of Sale triggered the requirements of ECRA.

231.    The Agreement of Sale does not transfer of environmental liabilities beyond ECRA liability.

232.    The Agreement of Sale does not specifically reference Resource Conservation and Recovery Act ("RCRA"), the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), New Jersey Spill Compensation and Control Act (the "Spill Act") or the New Jersey Sanitary Landfill Facility Closure and Contingency Fund Act (the "Closure Act").

234.    During the ECRA process, Earth Technology Corporation, retained by Alfred Sanzari and/or Alfred Sanzari Enterprises, stated to NJDEP, Bureau of Industrial Site Evaluations, that it had no chemical inventory, sample results or spill response documentation relating to the operations of JANR Transport because the JANR Warehouse was under the jurisdiction of NJDEP, Bureau of Site Operations.

235.    NJDEP Bureau of Site Evaluations sought to conduct an ECRA site inspection, but could not access the JANR Warehouse due to requirements for "level C" personal protection. When the inspector entered the Grist Moving and Storage area, he observed a strong odor and a plastic seal on the opening to the BSO cleanup area which had partially collapsed, and he decided to evacuate.  The deficiencies he reported at the property included:

    a)    stained areas on the concrete foundation and soil around the former building and the JANR Warehouse;

b)      drains and a hole in the floor of the former building foundation;

c)      foundry slag observed on the site and adjacent properties;

d)      water being pumped from the JANR Warehouse into the storm drainage system;

e)      additional potential sources of contamination not noted on the ECRA notice, including two fuel oil storage tanks, a boiler room, three transformers, a large hose and a pipe protruding through the north wall of the JANR Warehouse; and

f)      miscellaneous solid wastes in various areas of the site (plastic pellets, sand blast media, old piping and insulation).

236.    An additional NJDEP inspection identified pipes south of the JANR Warehouse draining oily liquid and a tar-like substance into the storm water ditch and an "orange substance" floating on its surface.

238.    At various points in 1987 Alfred Sanzari advised Goldstein that he expected ECRA costs would exceed $100,000.

239.    In November 1987, Goldstein brought suit against Alfred Sanzari in Superior Court, Morris County, of the Agreement of Sale.

240.    In the spring of 1987, Fred C. Hart Associates, Inc. ("Hart") was retained by Alfred Sanzari and/or Alfred Sanzari Enterprises to continue the ECRA program in order to complete the August 1985 proposed property sale.

241.    Hart proposed removal of an underground fuel storage tank and sampling of 14 areas of visibly contaminated surface soil and sediment on the area identified by NJDEP Bureau of Site Evaluations during previous site inspections.

242.    Based upon NJDEP comment, the Plan was further amended to include:

a)      properly sealing the former on-site groundwater production well installed by Dande Plastics in May 1981;

b)      adding six surface soil sampling locations in the area utilized by NJDEP and Clean Venture for waste treatment, consolidation and temporary storage during the JANR Warehouse cleanup; and

c)      evaluation of contamination surrounding the former septic tank system.

243.    The amended sampling plan was conditionally approved by NJDEP Bureau of Site Evaluations, and the proposed field work was performed between March and June 1988.

244.    A total of 39 soil samples were analyzed for specific groups of constituents as provided in the approved plan.

245.    Most samples were taken at the surface (0-6") or from shallow subsurface (18-

24") locations.

246.    The analytical results from those samples demonstrated that:

a)    the underground fuel storage tank removed during the investigation had not leaked and surrounding soils met ECRA guidelines;

b)    petroleum hydrocarbon contamination (total and polyaromatic) was excessive in several areas, especially those biased to evaluate stained soil and concrete;

c)    low levels of pesticide, PCBs and chlorinated solvents were identified sporadically around the site; and

d)    heavy metal concentrations, principally of cadmium, lead and zinc, exceeded ECRA guidelines for soil contamination.

247.    A cleanup plan was also attached, and an addendum proposed the installation of five bedrock groundwater monitoring wells to evaluate migration of soil contaminants as a guide to further remediation.

248.    NJDEP Bureau of Environmental Evaluation and Cleanup Responsibility Assessment ("BEECRA") conditionally approved those plans, and specified post-remediation sampling requirements to demonstrate successful cleanup.

249.    On behalf of Alfred Sanzari and/or Alfred Sanzari Enterprises, Hart installed the first groundwater monitoring wells at the F Sharp Screw Parcel to verify decontamination of heavy metals and petroleum constituents.

250.    The monitoring wells installed by Hart on behalf of Alfred Sanzari and/or Alfred Sanzari Enterprises included Monitoring Well No. 4 ("MW-4") and Monitoring Well No. 5 ("MW-5").

251.    Although low levels (less than 1 ppm) of chlorinated solvents had been detected sporadically in soils around the property, there was no known source of a solvent release at the Site which would have suggested groundwater contamination.

252.    NJDEP requested minor additions to Sanzari's soil verification testing plan and the installation of three off-site, downgradient monitor wells to resolve outstanding questions regarding the impact of Alfred Sanzari's and/or Alfred Sanzari Enterprises activities on groundwater.

253.    In their letter approving the plan, the agency also agreed to accept the required financial assurance in the amount of $335,000.00 from Sheldon Goldstein, the "contract purchaser of the site."

254.    Activities at the F Sharp Screw Parcel between approximately 1984 and 1987 designed to physically remove containers from the property did not adequately "cleanup" or "remove" the hazardous substances and wastes at the F Sharp Screw Parcel, and the property

remains contaminated.

255.    The Sanzari Defendants lobbied NJDEP to complete their operations on an expedited basis, and proposed that their employees be permitted to conduct the physical removal of certain containers from the property.

256.    On January 27, 1989, Alfred Sanzari Enterprises received a Partial Cleanup Plan Approval for the F Sharp Screw Parcel from NJDEP.

257.    In 1987, a suit between the parties was initiated in the Superior Court of New Jersey, Chancery Division, Somerset County, entitled *Goldstein v. Sanzari*, No. SOM-C-7898-87.

258.    In the *Goldstein v. Sanzari* litigation, the position taken by Goldstein was that pursuant to the Agreement of Sale, Goldstein only agreed to take on ECRA liability over $100,000 or accept Alfred Sanzari's attempted termination of the agreement "if and after it is determined that the actual net costs exceed[ed] $100,000."

259.    Neither Mary Sanzari nor Alfred Sanzari Enterprises were parties to the *Goldstein v. Sanzari* litigation.

260.    An attempt to resolve the aforementioned *Goldstein v. Sanzari* litigation resulted in a "Stenographic Settlement," which was read into the record during a hearing on April 10, 1989.

261.    The issue of whether the ECRA Clause in the Agreement of Sale precluded the Sanzari Defendants' alleged liability under RCRA, CERCLA, the Spill Act or the Closure Act was never put before nor resolved by the Court in *Goldstein v. Sanzari*.

262.    Pursuant to the Stenographic Settlement:

Goldstein shall elect to move forward with the transaction at issue by assuming all ECRA compliance costs in excess of $100,000 in writing delivered within 10 days of receipt by Goldstein's counsel of a copy of test results . . . from the five monitoring wells on the Site on April 7, 1989.

263.    Pursuant to the Stenographic Settlement, Goldstein "assume[d] all ECRA compliance costs in excess of $100,000."

264.    The Agreement of Sale and the Stenographic Settlement (the "Agreements") are devoid of a promise where Goldstein agreed to release, indemnify or hold harmless the Sanzari Defendants from anything.

265.    The Agreements do not indicate that *all* environmental liabilities, from whatever source derived, were to be allocated to Goldstein.

266.    The only parties to the Agreement of Sale and the Stenographic Settlement are Sheldon Goldstein and Alfred Sanzari.

267.    Absent from the Agreements are references to RCRA, CERCLA, the Spill Act or the Closure Act.

268.    RCRA, CERCLA, the Spill Act and the Closure Act were in effect at the time the Agreements were formed.

269.    Goldstein believed that the Agreements did not divest the Sanzari Defendants of any and all environmental liability as to the F Sharp Screw Parcel, such that the Sanzari Defendants would remain liable for any contamination they created.

270.    Pursuant to the Agreement of Sale:

> [Alfred Sanzari] assumes the risk of loss or damage to *the Property* beyond ordinary wear and tear until delivery of the deed to [Goldstein] at the closing of title, unless such loss or damage is required to be repaired by any tenant under the Leases. In the event of any insured casualty, [Alfred Sanzari] shall, at its sole option, either repair the damage to the Property out of the insurance proceeds prior to the closing of title or assign the entire proceeds to Purchaser at such closing. If there is any damage or injury of caused to the Property, beyond normal wear and tear, for which there is no insurance coverage and no tenant under a lease has assumed responsibility for the repair thereof, then [Alfred Sanzari] shall repair such damage or injury or make an appropriate reduction in the Purchase Price at closing of title, provided that aggregate costs of all repairs does not exceed Fifteen Thousand ($15,000) Dollars, and if such costs do exceed Fifteen Thousand ($15,000) Dollars, then [Alfred Sanzari] may elect to terminate this Agreement of Sale unless [Goldstein] elects to assume responsibility for the cost of all repairs (exclusive of those required pursuant to paragraph 15 below) in excess of the said Fifteen Thousand Dollars.

271.    Pursuant to the Stenographic Settlement: "[A]t the closing, Sanzari shall assign to Goldstein any and all of his rights to pursue reimbursement claims against tenants and others including insurance carriers, if any.

272.    On April 18, 1989, and pursuant to the Stenographic Settlement provision requiring that counsel for Alfred Sanzari provide Goldstein with "a copy of test results . . . from the five monitoring wells on the Site on April 7, 1989," counsel for Alfred Sanzari provided Goldstein with the results of Accutest testing performed at the property.

273.    The Accutest testing data transmitted to Goldstein via the April 18, 1989 correspondence referenced sampling performed on April 7, 1989, and included sampling performed at monitoring wells MW-2, MW-4 and MW-5.

274.    The Accutest test results received on April 18, 1989 do not identify the presence

of TCE contamination in groundwater in those wells, or anywhere else.

275.   Relying on the groundwater testing results that had been provided to him by Alfred Sanzari, and also relying upon advice he received from others, including EWMA—environmental consulting experts Goldstein had retained to provide advice concerning his purchase of the F Sharp Screw Parcel—Goldstein elected to proceed with the purchase of the F Sharp Screw Parcel under the terms of the April 10, 1989 Stenographic Settlement.

276.   EWMA informed Goldstein that, while there was some contamination on the property, "the clean-up costs were nominal and there were no problems."

277.   EWMA told Goldstein that he should "go ahead and buy the property."

278.   Subsequent to April 28, 1989, Alfred Sanzari demanded that closing of the sale of the F Sharp Screw Parcel occur prior to Alfred Sanzari's and/or Alfred Sanzari Enterprises' completion of the ECRA cleanup at the F Sharp Screw Parcel.

279.   Subsequently, Goldstein's counsel informed counsel for Alfred Sanzari that Goldstein intended to proceed with the transaction.

280.   However, Goldstein took the position that under the terms of the Agreement closing should only take place upon a "Negative Declaration" under ECRA as well as NJDEP's approval of a Clean Up Plan.

281.   Upon cross-motions by both parties, on June 12, 1989, the Superior Court in *Goldstein v. Sanzari* held that the closing would take place either upon receipt of a "Negative Declaration" under ECRA or upon NJDEP's approval of a Clean Up Plan.

282.   Pursuant to that June 12, 1989 Court Order, Goldstein was required to make an election as to whether he would proceed with the transaction. Goldstein had taken the position that the Agreement of Sale did not require him to make this election until after completion of a "Clean-up Plan" and issuance of a "Negative Declaration" by NJDEP. The Court disagreed, and required Goldstein to make his election within ten days of the Order.

283.   On or about June 21, 1989, Goldstein's attorney sent Alfred Sanzari's attorney a letter stating that Goldstein "has elected proceed with the transaction."

284.   On June 23, 1989, two days after Goldstein's election, Ken Horstman of Alfred Sanzari Enterprises received a report "[p]repared by Fred. C. Hart Associates," and "[p]repared for Alfred Sanzari Enterprises," and indicating the presence of TCE contamination at the Property.

285.   The June 1989 Hart Report detected the presence of TCE in groundwater at the F Sharp Screw Parcel, exceeding NJDEP guidelines at three monitoring wells on the property.

286.   Even the June 1989 Hart Report, however, stated that the TCE contamination could have come from "an off-site source," that "it was unlikely that the TCE could impact groundwater receptors," and that "[s]ince no potential groundwater receptors were identified in

24

the area of the site and the accuracy of the Round II groundwater data has not been confirmed, no further action is recommended."

287.   Alfred Sanzari Enterprises attempted to shade the findings of the June 1989 Hart Report.  Specifically, in Ken Horstman's letter to Hart following receipt of the June 1989 Hart Report, Mr. Horstman stated:

The only comments that I have as follows:

1.)   Technical Overview: Page 3, Para.2 – "due to inconsistencies in instrument calibration".

2.)   Summary & Recommends.: Page 23, para. 6 – "the accuracy of the Round II groundwater has not been confirmed."

My concern, from a layman's viewpoint, is that both of these statements sound incriminating.  Are they standard clauses?  Will they be considered acceptable by the DEP?  If they would possibly become problems, must they be addressed in this fashion?

288.   As of June 21, 1989, the date at which Goldstein elected to proceed with the transaction, Goldstein was *not* in receipt of the June 1989 Hart Report, such that Goldstein was unaware of the nature and extent of the contamination at the F Sharp Screw Parcel when he elected to proceed with the transaction.

289.   As a result of the new information regarding groundwater contamination contained in the June 1989 Hart Report, Goldstein declined to close on the property.

290.   The June 1989 Hart Report identifies groundwater sampling occurring on April 7, 1989, pursuant to which TCE contamination was detected at MW-2, MW-4 and MW-5, although this information was not contained within the April 17, 1989 transmittal from counsel for Alfred Sanzari to counsel for Goldstein, even though that transmittal purported to provide data gathered as a result of April 7, 1989 sampling.

291.   The Sanzari Defendants did not acquire the Hart report until June 23, 1989 (two days *after* Goldstein made his election), with Goldstein acquiring it thereafter.

292.   On October 31, 1989, NJDEP approved the Clean Up Plan for the F Sharp Screw Parcel, and noted that recent "groundwater data indicated that operations on [the F Sharp Screw Parcel] may have contributed to offsite contamination," and required additional groundwater remedial activity that was not contemplated by the parties as part of Clean Up Plan for the F Sharp Screw Parcel.

293.   On November 17, 1989, Alfred Sanzari moved the Superior Court to enforce the Settlement Agreement and order Goldstein to close on the F Sharp Screw Parcel.

294.   In a decision dated December 15, 1989, the Superior Court ordered Goldstein to

purchase the F Sharp Screw Parcel according to the Agreement of Sale and the April 10, 1989 settlement.

295.    On January 18, 1990, Alfred Sanzari filed a Motion to Enforce Litigant's Rights or, in the Alternative, to Establish Contempt, requesting that the Court find Goldstein in contempt unless he purchased the F Sharp Screw Parcel pursuant to the Agreement of Sale and the April 10, 1989 settlement.

296.    On February 14, 1990, Goldstein, facing contempt, involuntarily accepted title to the F Sharp Screw Parcel.

297.    Effectively, Goldstein's last chance to avoid taking title to the property was June 21, 1989—before Goldstein became aware of the findings set forth in the June 1989 Hart Report.

299.    The Deed did not disclose the existence or period of operation of a sanitary landfill facility on the F Sharp Screw Parcel.

300.    Plaintiffs' investigation of the property revealed the presence of an undisclosed sanitary landfill.

301.    Due to Sanzari Defendants' failure to disclose the existence of a landfill in the Agreement of Sale, Plaintiff Litgo was forced to retain consultants to undertake a forensic investigation of the Site, which involved aerial photography, as well as analysis of historical documents.

302.    Through these efforts, Plaintiffs did not learn that the property had housed landfill until 2006 at the earliest.

303.    Through recent dating analyses, it has been determined that the hazardous substances and wastes detected in groundwater at the F Sharp Screw Parcel were released during period that the Sanzari Defendants owned and operated the property.

304.    Recent dating analyses, coupled with information recently obtained from the Attorney General's Office as to the identity of the substances stored at the site, prove that the discharges and releases that Plaintiffs are now remediating were, in part, the fault of the Sanzari Defendants.

305.    JM Sorge, Inc.'s ("Sorge") January 20, 2006 Remedial Investigation Report ("RIR") discussed, among other things, the installation of thirteen new bedrock monitoring wells and presented the results of the geophysical and hydraulic conductivity testing to evaluate site geology.

306.    The January 20, 2006 RIR concluded that the eastern groundwater plume posed the most significant problem on the F Sharp Screw Parcel and, although a direct link between the contaminated soil removed in 2000 and the eastern groundwater plume could not be confirmed, determined that the area is likely the source of a dense, non-aqueous phase layer ("DNAPL") of TCE which continues to impact groundwater quality.

307.     The January 20, 2006 RIR also concluded that Plaintiffs' investigative efforts had provided it with "enough information to evaluate potential remedial alternatives for both the eastern and western groundwater plumes."

309.     The TCE contamination at the F Sharp Screw Parcel began in the soil, continued down into the bedrock, and is slowly dissolving into the groundwater.

310.     Plaintiffs' response activities at the Property to date have focused on a combination of TCE "source control" and "management of migration." This has included investigation, assessment, and evaluation of the soil, bedrock, and groundwater at the Property, as well as the excavation of soil for immediate reduction of the TCE source.

311.     Subsequent to the soil excavation on the Property in February and March of 2000, the removal action "has proceeded to further delineate the remainder of the TCE source, so as to evaluate the need to extend the response action for removal of remaining DNAPL source materials."

313.     Other than remedial activities pursuant to NJDEP's October 31, 1989 Clean Up Plan approval or required by the Borough of Somerville, Plaintiffs have never conducted any activities whatsoever on the F Sharp Screw Parcel or the Somerville Iron Works Site.

314.     Plaintiffs have never leased the F Sharp Screw Parcel to any company or person conducting industrial, chemical or manufacturing activities at the F Sharp Screw Parcel.

315.     Goldstein contracted EWMA in mid-1989 for technical advice concerning, among other things, the groundwater monitoring data then being developed by Hart.

316.     After purchasing the property under Order of the Court, EWMA continued consulting with Goldstein to resolve remaining requirements for response actions.

317.     Efforts continued to complete soil decontamination to NJDEP's satisfaction and to determine the potential source, distribution and impact of trichloroethylene in groundwater.

318.     NJDEP (BEECRA) required Plaintiffs to complete specific task assignments for investigating the interior of the former JANR Warehouse and outdoor areas to the south where NJDEP's removal operations had been conducted without verification sampling.

319.     Through the mid-1990s much of EWMA's investigation and remediation efforts focused on metals (arsenic, cadmium, copper, chromium, lead, zinc), polyaromatic hydrocarbons ("PAH") and low levels of pesticides and PCBs in soils, with an on-going removal action to excavate soils containing concentrations of those contaminants in excess of state cleanup levels, but was not "particularly" focused on soils..

320.     Based on information received from EWMA and the Sanzari Defendants, Goldstein believed that he would only be required to spend approximately $50,000 over the $100,000 spent by Alfred Sanzari to finish the cleanup at the property.

321.     In 1998, soil gas surveys and delineation soil sampling identified an on-site

source of trichloroethylene in soils that was likely impacting groundwater in the southeastern corner of the property.

322.    Plaintiffs' discovery of a potential on-site source of trichloroethylene in soils led to a soil gas survey below the slab of the former JANR Warehouse to determine if additional trichloroethylene sources existed on the property.

324.    Later in 2000, Sorge initiated further investigation of the source and extent of the TCE contamination discovered in the soil and groundwater on the F Sharp Screw Parcel.

325.    In a letter dated September 4, 2001, NJDEP purportedly agreed that all of "the sources of groundwater contamination in the soils beneath the Site have been removed" and accepted Plaintiffs' proposal of "No Further Action" for soils on the F Sharp Screw Parcel. However, NJDEP's letter indicated that there appeared to be two distinct groundwater contamination plumes beneath the property (the western groundwater plume and the eastern groundwater plume) and directed Litgo to provide work plans for "additional investigation" of these TCE plumes.

327.    Sorge conducted additional investigation, analysis, and monitoring of the contamination on the F Sharp Screw Parcel for an additional five years after the NJDEP sent its "No Further Action" letter.  These activities, summarized in Remedial Investigation Reports ("RIRs") issued on June 30, 2004 and January 20, 2006, sharpened the technical understanding of the contaminant movement in the complicated, fractured bedrock geology surrounding the property.

328.    On November 15, 2005, NJDEP sent a letter to Sorge, advising that "[i]t is likely that a soil sampling program in the vicinity of the [terra cotta pipe on the F Sharp Screw Parcel] will be required" in order to "determine the flow pattern, integrity of the system and potential for it to have acted as a conduit for contaminant migration," such that it is inaccurate to suggest that the September 4, 2001 letter provides soils are definitely of no further concern at the F Sharp Screw Parcel.

330.    As stated in the November 15, 2005 letter, NJDEP required Plaintiffs to implement a program addressing potential impacts to the Manville public supply wells for the first time in a separate letter of November 10, 2004.

331.    Plaintiffs commenced this action on June 26, 2006.

332.    In or about 2000, Sorge initiated further investigation of the source and extent of the groundwater plumes on behalf of Litgo.

333.    Remedial investigations conducted on behalf of Litgo indicate that hazardous substances, including but not limited to trichloroethylene, iron, polynuclear aromatic hydrocarbons, manganese, methylene chloride, 1,1-dichloroethene, 1,1-dichloroethane, 1,1,1-trichloroethane, 1,1,2-trichloroethane, cis-1,2-dichloroethene, trans-1,2-dichloroethane and carbon tetrachloride, are present in groundwater beneath or flowing from the Somerville Iron Works Site, and two Areas of Concern ("AOCs"): the Western Groundwater Plume and the Eastern Groundwater Plume.

28

334. The Western Groundwater Plume is located in the western portion of the Somerville Iron Works Site; groundwater sampling from this area shows elevated concentrations of volatile organic compounds ("VOCs"), including tetrachloroethylene, trichloroethylene and cis-1,2-dichloroethene, among others.

335. The Eastern Groundwater Plume is located in the southeastern portion of the F Sharp Screw Parcel, the 6 Kirby Avenue Parcel, and along the railroad tracks; groundwater sampling from this area shows elevated concentrations of VOCs, including trichloroethylene and cis-1,2-dichloroethene, among others.

336. The Eastern Groundwater Plume is migrating off the Somerville Iron Works Site toward the off-site Manville Borough municipal drinking water wells and toward the off-site Raritan River.

337. The Western Groundwater Plume is migrating off the Somerville Iron Works Site toward the off-site Manville Borough municipal drinking water wells, and toward the off-site Raritan River.

338. The Eastern Groundwater Plume was initially established via releases of VOCs at the F Sharp Screw Parcel in the mid-1940s.

339. The Western Groundwater Plume was initially established via releases of VOCs at the F Sharp Screw Parcel in the mid-1980s.

341. In February 2008, an investigation of the eastern boundary of the F Sharp Screw Parcel identified dark colored embers and slag in the upper two feet of soils at the F Sharp Screw Parcel.

343. In May 2009, Mian dug soil borings and conducted geoprobe sampling on the 6 Kirby Avenue Parcel.

344. The results of Mian's soil borings and geoprobe sampling identified cinders and slag throughout the southern half of 6 Kirby Avenue Parcel at depths of 3-6 feet.

345. Iron foundry slag waste is characterized by metals including arsenic, cadmium, chromium, lead, and zinc, all of which have been classified as hazardous substances under CERCLA.

346. The United States Environmental Protection Agency has specified that arsenic, cadmium, chromium, lead, and zinc are known or suspected carcinogens.

347. The results of Mian's soil borings identified, among other hazardous substances, concentrations of arsenic, cadmium, chromium, lead, and zinc.

348. Groundwater sampling by Mian identified concentrations of arsenic, cadmium, chromium, lead, and zinc at levels in exceedance of NJDEP's groundwater cleanup criteria.

349. Mian's soil sampling identified the presence of hazardous substances including

benzo(a)anthracene, benzo(a)pyrene, benzo(b)fluoroanthene, benzo(k)fluoroanthene, indeno(1,2,3-cd)pyrene, and dibenzo(a,h)anthracene, all in excess of NJDEP soil clean-up criteria,.

350. Certain of Mian's soil samples that identified hazardous substances were taken from a location proximate to the western boundary of the portion of the Somerville Ironworks Site owned by Defendant Kirby.

351. A children's playground is situated at the western section of the portion of the Somerville Iron Works Site owned by Defendant Kirby.

352. Aerial photographs identify waste disposal activity at and around the children's playground on the portion of the Somerville Ironworks Site owned by Defendant Kirby.

353. Aerial photographs identify waste disposal activity at and around the western section of Defendant Kirby's portion of the Somerville Ironworks Site where the children's playground is located.

354. The results of Mian's soil borings and geoprobe sampling also identified the presence of hazardous substances, including arsenic, cadmium, chromium, lead and zinc, in exceedance of NJDEP's groundwater quality criteria.

355. Plaintiffs have notified NJDEP, the United States Defendants, Alfred Sanzari Enterprises, Mary Sanzari, the Executors Mian and Kirby of the presence of hazardous substances at the Somerville Iron Works Site and the threats posed by the groundwater AOCs to the Manville Borough municipal wells, and have requested that these conditions be addressed.

356. Commissioner Mark Mauriello of NJDEP and his predecessors in office have not taken such actions as may be necessary to address the threats to human health or the environment.

357. The United States Defendants have not taken actions as may be necessary to address the threats to human health or the environment at the Somerville Iron Works Site.

358. Alfred Sanzari Enterprises has not taken actions as may be necessary to address the threats to human health or the environment at the Somerville Iron Works Site.

359. Mary Sanzari has not taken actions as may be necessary to address the threats to human health or the environment at the Somerville Iron Works Site.

360. The Executors have not taken actions as may be necessary to address the threats to human health or the environment at the Somerville Iron Works Site.

361. Mian Realty has not taken actions as may be necessary to address the threats to human health or the environment at the Somerville Iron Works Site.

362. Kirby Realty has not taken actions as may be necessary to address the threats to human health or the environment at the Somerville Iron Works Site.

363.    Since acquiring the F Sharp Screw Parcel, Plaintiffs have incurred response costs remediating the soil and groundwater at the property.

364.    Plaintiffs have incurred response costs in a manner consistent with the NCP, for petroleum releases at the F Sharp Screw Parcel, totaling $488,090, exclusive of interest.

365.    Plaintiffs have incurred response costs in a manner consistent with the NCP for releases of hazardous substances at the F Sharp Screw Parcel, totaling $2,322,196, exclusive of interest.

366.    Plaintiffs have incurred response costs in a manner consistent with the NCP for identifying parties potentially responsible for releases of hazardous substances at the Somerville Iron Works Site, including, among other costs, costs incurred by investigation of historical property ownership and title search, costs incurred for identification and acquisition of aerial photographs, and costs incurred to review such aerial photographs.

368.    Litgo will no longer be the owner of the F Sharp Screw Parcel if the Court enters judgment in favor of Plaintiffs on its Closure Act claim against the Sanzari Defendants.

372.    On July 28, 1997, Alfred Sanzari Enterprises entered into a Consent Order with the State of New Jersey and the Administrator of the New Jersey Spill Compensation Fund to settle Alfred Sanzari Enterprises' liability for $350,000. In that Consent Order, NJDEP forever released Alfred Sanzari Enterprises from liability to NJDEP pursuant to the Spill Act and any other applicable law or regulation as to claims that were brought or could have been brought by NJDEP in 1997.

373.    Neither Alfred Sanzari, Mary Sanzari nor Alfred Sanzari Enterprises informed Plaintiffs of the action or Alfred Sanzari Enterprises' settlement thereof.

377.    Hazardous substances or wastes, including TCE, are present in the soils and groundwater at the 6 Kirby Avenue Parcel.

378.    Hazardous substances or wastes, including TCE, are present in the soils and groundwater at the 50 Kirby Avenue Parcel.

379.    Columbia Aircraft activities at the Somerville Iron Works Site during the 1940s were performed at the direction and control of the United States.

380.    Columbia Aircraft's activities at the Somerville Iron Works Site during the 1940s included the use of hazardous substances, including TCE, which were disposed of at the property.

### iii.    The Sanzari Defendants Contest the Following of Plaintiffs' Facts:

The Sanzari Defendants contest Fact Nos. 20-25, 38, 44, 45, 47, 48, 55, 60, 61, 63-66, 69-73, 75-84, 86-91, 95-97, 99, 100, 102-106, 108, 109, 111-141, 145-153, 157-167, 169-171, 173-177, 180-183, 185, 186, 188-207, 209-215, 217, 219, 221, 223, 225, 227-232, 234-236, 238-

258, 260-265, 267, 269-297, 300-307, 309-311, 313-322, 324, 325, 327, 328, 330-339, 341, 343-366, 368, 372, 373, 377-380, above, and the following facts:

16.    In 1916, the 6 Kirby Avenue and 50 Kirby Avenue Parcels constituted one, undivided property owned by Gilbert Van Doren ("Van Doren").

17.    In 1916, Van Doren granted Somerville Iron Works a license extending it "the privileges of dumping slag and other waste materials" on land now constituting the 6 Kirby Avenue and 50 Kirby Avenue Parcels.

18.    In 1920, Somerville Iron Works purchased the 6 Kirby Avenue and 50 Kirby Avenue Parcels from Van Doren, consolidating operations and waste disposal activities of the Somerville Iron Works Site under common ownership.

19.    Between 1916 and 1929, Somerville Iron Works deposited "slag and other waste materials" on the 6 Kirby Avenue, 50 Kirby Avenue and F Sharp Screw Parcels.

30.    Some reclamation of usable materials from the foundry waste dump located at the Somerville Iron Works Site was conducted through at least April 1953.

31.    Wastes remaining from the reclamation activities were re-graded across the landfill waste disposal area at the Somerville Ironworks Site.

40.    From 1976 to 1990, Alfred Sanzari was an owner of the F Sharp Screw Parcel.

43.    From 1976 until 1990, Defendant Alfred Sanzari, Defendant Mary Sanzari and Defendant Alfred Sanzari Enterprises (together, the "Sanzari Defendants") leased portions of the F Sharp Screw Parcel to several commercial and industrial tenants, including tenants who operated within the two buildings at the F Sharp Screw Parcel known as the "Dande Plastics Warehouse" (located on the eastern portion of the F Sharp Screw Parcel) and the "JANR Warehouse" (located on the western portion of the F Sharp Screw Parcel).

46.    At times between 1976 and 1990, Arnold Feldman, on behalf of Alfred Sanzari Enterprises, Alfred Sanzari and/or Mary Sanzari, visited the F Sharp Screw Parcel in connection with the leasing of space to tenants at the property.

49.    The Sanzari Defendants leased portions the Dande Plastics Warehouse to tenants including Dande Plastics and F Sharp Screw.

50.    The Sanzari Defendants leased portions of the JANR Warehouse to tenants including JANR Transport, Inc. (a/k/a JANR Trucking, Inc.) ("JANR").

54.    On February 14, 1990, Defendant Alfred Sanzari and Defendant Mary Sanzari transferred the F Sharp Screw Parcel to Plaintiff Goldstein.

56.    On April 18, 1990, Plaintiff Goldstein transferred the F Sharp Screw Parcel to Plaintiff Litgo, such that Plaintiff Litgo is the present owner of the F Sharp Screw Parcel.

62.     In or about 1941, the United States Defendants deemed aircraft production a priority for national defense.

67.     By way of a lease agreement dated February 28, 1942, and subsequent amendments thereto dated April 13, 1942, June 11, 1942 and April 26, 1945, the United States' Defense Plant Corporation ("DPC") entered into a lease agreement with Columbia Aircraft to purchase and/or furnish government owned-equipment (including boring mills, grinding machines, lathers, milling machines and shapers) valued at $97,746.10 to supplement Columbia Aircraft's machine tool capacity for production of precision aircraft parts for the war effort for the purpose of enabling Columbia Aircraft to increase its capacity for the production of precision parts for military aircraft for use by the United States Defendants and/or the United States Defendants' contractors and suppliers.

68.     The DPC designated Columbia Aircraft's operations at the Somerville Iron Works Site as "Plancor 666."

74.     In 1947, Columbia Aircraft filed for Chapter 11 bankruptcy protection.

85.     Morton Springer, Inc. owned the 140 Thomas Street facility.

92.     The materials referred to in the preceding paragraphs were located at the 140 Thomas Street facility as a result of the acts of SCI Equipment & Technology Ltd. and Signo Trading International, Inc. (together, "Signo"), and the companies' principals, Jack and Charles Colbert (together, the "Colbert Brothers").

98.     Signo's business model was to purchase hazardous substances and resell them; because containers marked as hazardous waste could not be resold, Signo benefited by removing indications that the materials were in fact hazardous waste.

107.    Throughout the course of the NJDEP's presence at 140 Thomas Street, NJDEP personnel maintained logs setting forth daily activities and accomplishments.

142.    Throughout the course of the NJDEP's presence at the JANR Warehouse, NJDEP personnel maintained logs setting forth daily activities.

172.    During the 1980s, the United States Defendants contracted with Resource Technology Services ("RTS"), Environmental Cleaning Service ("ECS") and Atlantic Coast Environmental, Inc. ("ACE") and various other contractors for the disposal of hazardous substances and wastes generated and/or owned by the United States Defendants.

178.    During the course of the removal efforts conducted by NJDEP at the JANR Warehouse, the personnel from NJDEP's Cost Recovery Unit including Galen McCreary, photographed containers present at the JANR Warehouse, collected labels from those containers, and logged information about the containers in log books.

179.    Among the containers photographed by NJDEP Cost Recovery Unit was a 55-gallon drum identified by the NJDEP Cost Recovery Unit as "CRU-5."

184.    Among the containers photographed by NJDEP's Cost Recovery Unit was a pallet identified by the NJDEP Cost Recovery Unit as "CRU-154."

187.    Myrtle Beach Air Force Base and the Defense General Supply Center in Richmond, Virginia were, at all relevant times, owned and operated by one or more of the United States Defendants.

208.    On or about September 14, 1987, RTS pled guilty to conspiracy to illegally transport hazardous waste and making false statements in a hazardous waste manifest.  RTS president William Minnick, and employees David Cusumano and Russell Phifer, each pled guilty to mislabeling hazardous waste, for which Judge Anne Thompson of the United States District Court for the District of New Jersey imposed sentences of one year prison terms to each defendant (suspended), fines and community service.

216.    On October 12, 1984, NJDEP issued a Directive Letter to Alfred Sanzari Enterprises, in which NJDEP determined that conditions at the F Sharp Screw Parcel "constitute a danger to the environment and to the public health, safety and welfare and are violative of the laws of the State of New Jersey," and, pursuant to the Spill Act, directed Alfred Sanzari Enterprises to initiate remedial measures at the F Sharp Screw Parcel, including an order to "[c]lean up and properly dispose of all spilled material in accordance with all applicable federal, state, and local regulations."

218.    Ultimately, NJDEP took control over the effort to remove the containers from the JANR Warehouse.

220.    In or about 1985, Sheldon Goldstein and two business partners entered into negotiations with Alfred Sanzari to purchase the property.

233.    Since 1985, the F Sharp Screw Parcel has been and continues to be investigated pursuant to ECRA, now known as the Industrial Site Recovery Act ("ISRA"), N.J.S.A. 13:1K-6 et seq., under three ISRA/ECRA cases numbers assigned by NJDEP (Nos. 85647, 85648 and 85649).

237.    In September 1987, just after NJDEP released the JANR Warehouse property from their cleanup jurisdiction, Alfred Sanzari repudiated the Agreement, claiming his ECRA costs would likely exceed $100,000.00.

308.    However, a remedial action plan for remediating the contamination at the F Sharp Screw Parcel has not yet been submitted to NJDEP for comment because no such plan has been developed.

323.    In February and March 2000, Plaintiffs excavated approximately 5,600 tons of soil and/or historic fill from the southeastern portion of the F Sharp Screw Parcel, including fill and other waste materials.

326.    In a letter dated November 10, 2004, NJDEP stated that it "reserves the right to reopen soil issues if the results of ground water sampling indicate the possibility of a remaining source or if further soil investigation needs warrant it."

329.    That November 15, 2005 letter from NJDEP to Sorge also stated, in part, that "in the November 10, 2004 letter, the NJDEP advised Litgo that they had previously expressed concern about the potential for impacts to the Manville public supply wells. . . . Addressing the potential impact to the Manville public wells is considered a priority item by the NJDEP and this urgency was communicated to Litgo."

340.    Investigations have revealed the presence of iron foundry waste and its constituents at and around the Somerville Iron Works Site.

342.    In 2008, Sorge removed drums from the property, which contained drill cuttings and groundwater collected during development of the monitoring wells.

367.    Plaintiffs have filed suit against the Sanzari Defendants seeking, among other things, rescission of the Agreement of Sale and an order voiding the deed dated February 14, 1990 granting title to the F Sharp Screw Parcel to Goldstein. Plaintiffs' claim is premised on the Sanzari Defendants' failure to disclose the existence of a sanitary landfill facility at and beneath the Somerville Iron Works Site, in violation of the New Jersey Sanitary Landfill Facility Closure and Contingency Fund Act (the "Closure Act"), N.J.S.A. § 13:1E-100 et seq.

376.    Neither Alfred Sanzari, Mary Sanzari nor Alfred Sanzari Enterprises informed Plaintiffs of their FTCA claim.

### iv.    Kirby Contests the Following of Plaintiffs' Facts:

Kirby contests Fact Nos. 11, 14, 15-26, 28, 30, 31, 34, 38, 59, 64, 68, 70, 71, 77-79, 81, 101, 169, 170, 177, 203, 207, 226-229, 235, 251, 258, 269, 274-277, 284, 286-291, 296, 297, 299, 300-302, 310, 311, 317, 319, 320-323, 327,331-334, 336, 337, 340-342, 344-357, 359-368, 377-380, above, and the following facts:

3.    Defendant Mark Mauriello ("Commissioner Mauriello") is the Commissioner of the New Jersey Department of Environmental Protection ("NJDEP"), a principal department within the Executive Branch of the government of the State of New Jersey, and vested with the authority by the State of New Jersey as trustee to protect the State's natural resources.

29.    On November 26, 1952, Somerville Iron Works sold all three parcels of the Somerville Iron Works Site to the Johnson Bronze Company.

32.    In August 1953, Johnson Bronze Company transferred the Somerville Iron Works Site to the Wolfson Family.

33.    In March 1954, the Wolfson Family transferred the Somerville Iron Works Site to Edray Corp.

**3.     DEFENDANTS' FACTUAL CONTENTIONS:**

    **A.     Commissioner Mauriello's Factual Contentions:**

       1.     See ¶11 of Defendant Mark Mauriello's Answer to Plaintiffs' Fifth Amended Complaint.

       2.     See ¶28 of Defendant Mark Mauriello's Answer to Plaintiffs' Fifth Amended Complaint.

       3.     See ¶36 of Defendant Mark Mauriello's Answer to Plaintiffs' Fifth Amended Complaint.

       4.     See ¶82 of Defendant Mark Mauriello's Answer to Plaintiffs' Fifth Amended Complaint.

       5.     See ¶¶83 through 86 of Defendant Mark Mauriello's Answer to Plaintiffs' Fifth Amended Complaint.

       6.     See ¶¶90 through 91 of Defendant Mark Mauriello's Answer to Plaintiffs' Fifth Amended Complaint.

       7.     See ¶94 of Defendant Mark Mauriello's Answer to Plaintiffs' Fifth Amended Complaint.

       8.     See ¶96 of Defendant Mark Mauriello's Answer to Plaintiffs' Fifth Amended Complaint.

       9.     See ¶106 of Defendant Mark Mauriello's Answer to Plaintiffs' Fifth Amended Complaint.

       10.     See ¶108 of Defendant Mark Mauriello's Answer to Plaintiffs' Fifth Amended Complaint.

       11.     See ¶115 of Defendant Mark Mauriello's Answer to Plaintiffs' Fifth Amended Complaint.

       12.     See ¶132 of Defendant Mark Mauriello's Answer to Plaintiffs' Fifth Amended Complaint.

    **B.     The United States Defendants' Factual Contentions:**

       4.     The DPC financed and leased to Columbia 17 pieces of equipment for Columbia's operations.

       5.     The DPC did not finance the purchase of or lease a degreaser to Columbia.

       6.     None of the 17 pieces of equipment that the DPC leased to Columbia would have required the use or application of trichloroethene ("TCE") or any other chlorinated solvents.

8.      There is no evidence that the United States managed, directed, or controlled the day-to-day operations of Columbia or its manufacturing process, or participated in the management of Columbia.

9.      There is no proof that the United States hired, fired, or supervised Columbia's employees, or managed, directed, or controlled Columbia's disposal of waste.

12.     The Army Air Force did not loan Columbia a degreaser.

13.     None of the equipment that Columbia borrowed from the Army Air Force would have required the use or application of TCE or any other chlorinated solvents.

14.     There is no evidence that the United States provided Columbia with, or authorized Columbia to receive, TCE during World War II.

15.     Columbia's production for the United States had ceased by September 1945, as noted in the DPC Engineer's Closing Report that all "plancor work" had been completed and Columbia did not anticipate additional work.

16.     On December 24, 1945, Columbia signed a contract with Marchak Diesel Locomotives Company ("Marchak") to manufacture 75 diesel mine locomotives.

17.     As a result of financial problems that Columbia experienced while performing the contract with Marchak and other post-World War II contracts, Columbia filed for bankruptcy on March 4, 1947.

18.     Columbia occupied the space owned by the Somerville Stove Works until sometime in 1949.

19.     Hazardous materials, some of which may have been previously owned or generated by the United States, were present in the JANR Warehouse on the Litgo Parcel in the 1980s.

20.     There is no evidence that any hazardous materials that may have been previously owned or generated by the United States were stored in leaking containers, were released into the environment, or were disposed of at or on the Somerville Iron Works Site.

21.     NJDEP removed all materials from the JANR Warehouse, including any materials that may have been previously owned or generated by the United States, cleaned up any spills during the removal, and remediated the area surrounding the JANR Warehouse.

23.     Sheldon Goldstein intended to form a joint venture with Larry Seidman and Robert Kessler, have the Litgo Parcel zoned for single-family homes, and then sell it.

28.     Goldstein had never visited the Litgo Parcel as of January 27, 2009.

31.     Sheldon Goldstein purchased the Litgo Parcel in 1990 and transferred title to Litgo two months later.

37.     Since 1990, Sheldon Goldstein and Litgo have hired and overseen environmental remediation contractors they employ to investigate and remediate hazardous substances on the Litgo Parcel.    During this time, Sheldon Goldstein and Litgo have conducted drilling, excavating, grading, and clearing of soils containing hazardous substances at the Litgo Parcel. They also have made, and continue to make, decisions about compliance with environmental regulations at the Litgo Parcel.

39.     In March 2000, Litgo excavated and removed approximately 5,600 tons of contaminated soils from the southeastern portion of the Litgo Parcel.

41.     In 1989, groundwater monitoring well MW-4 was installed on the Litgo Parcel through soils that were contaminated with TCE.

42.     A faulty seal on MW-4 existed over a period of ten years and allowed TCE contamination to spread in the groundwater beneath the Somerville Iron Works Site.

43.     MW-4, and two other groundwater monitoring wells with faulty seals, MW-5 and MW-6, had to be replaced.

44.     There are two distinct groundwater plumes contaminated primarily with TCE on the Somerville Iron Works Site.

45.     Sheldon Goldstein and Litgo have not characterized or delineated the groundwater plumes and they have no remedial action plan to address them.

### C.     The Sanzari Defendants' Factual Contentions:

2.     During the approximately fourteen years of Sanzari's ownership, Sanzari utilized the parcel for rental income, serving as an absentee landlord to several commercial and industrial tenants.

3.     In or about 1984, the New Jersey Department of Environmental Protection ("DEP") discovered a stockpile of hazardous materials at one of the warehouses on the Property, which was operated by JANR Transport, Inc. ("JANR").  The materials were transported to the warehouse from a facility in Newark, New Jersey owned by Charles and Jack Colbert (as shareholders in a company called Signo Trading International, Ltd.).

4.     The DEP issued directive letters to Sanzari, JANR and the Colberts requiring them to remove the materials from the warehouse.

7.     JANR and the Colberts, as the parties ultimately responsible for the transport and storage of the materials in question failed to remove the hazardous materials.  As a result, between approximately 1984 and 1987, the DEP (and various contractors it retained) conducted a cleanup and removal of the materials from the warehouse.

8.     Sanzari was not in possession or control of the JANR warehouse during the DEP removal action, was not involved in the hiring of any contractors to perform the actual removal

of the hazardous materials, and was not involved in deciding where or how the materials would be transported and disposed of during the DEP removal action.

9.     On September 2, 1987, the DEP issued a letter to Sanzari Enterprises relinquishing control of the JANR warehouse following the completion of the DEP removal action. The letter specifically advised that the DEP would remove its security from the site on Friday September 4, 1987 at 4:30 p.m. and that "[a]t that time, Alfred Sanzari Associates [*sic*] will receive control of their property."

11.     When he signed the Contract, Goldstein was aware that hazardous substances and/or wastes had been stored at the Property, that the DEP was involved in a cleanup at the Property, and that the Property may be contaminated.

12.     According to the Contract, Goldstein "accepted conveyance of the Property and equipment and fixtures therein in their 'as is' condition" and agreed that Sanzari had "no duty to disclose any condition affecting the Property, whether such condition is apparent or latent, or known or unknown to Purchaser."

13.     The Contract also contained an extensive clause relating to the Environmental Cleanup Responsibility Act ("ECRA", now called the Industrial Site Recovery Act, or "ISRA") (the "ECRA Clause"). Pursuant thereto, Sanzari was required to obtain either a negative declaration or an approved clean up plan from the NJDEP prior to closing. Goldstein acknowledged that the Property was subject to ECRA, and might require significant remediation, that he reviewed correspondence between Sanzari's agents and the NJDEP reflecting as much, and agreed that if "the net cost to [Sanzari] of obtaining and processing a Clean Up Plan exceed[ed] the sum of One Hundred Thousand ($100,000.00) Dollars, [Sanzari] [would] have the option of terminating [the] Agreement of Sale, unless [Goldstein] agree[d] to pay such cost in excess of One Hundred Thousand ($100,000.00) Dollars . . . ."

14.     This cap on Sanzari's liability was a material term of the contract; indeed, Sanzari's real estate attorney at the time made clear in a letter to Goldstein's counsel that he would not agree to a "blank check" as to environmental liability.

16.     In furtherance of his contractual obligations, Sanzari retained the services of environmental consultant Earth Technologies Corporation, and subsequently Hart Associates (now McLaren/Hart). Reports produced by these companies were provided to Goldstein and his attorneys to assist them in determining whether the costs of remediation would exceed the $100,000.00 threshold and    whether or not to proceed with the transaction.

17.     By letter dated February 10, 1987, Sanzari's real estate attorney, Ed Schotz, notified Goldstein's attorney that the environmental work on the Property was more extensive than originally anticipated, and that it had become clear that the environmental cleanup costs would greatly exceed the $100,000.00 cap. With his correspondence Schotz, forwarded to Goldstein's attorney a January 1987 letter from the DEP indicating the need for a potentially costly groundwater investigation.

18.     Schotz therefore informed Goldstein's attorney that Sanzari was terminating the Contract and that there was no need to proceed with the transaction unless Goldstein was prepared to exercise his option pay the costs in excess of $100,000.00.

19.     However, Goldstein declined to make his election to proceed with the transaction until Sanzari's costs actually crossed the $100,000 threshold.

20.     In light of Goldstein's refusal to commit to payment of the costs exceeding the $100,000 and how evident it was to Sanzari that the costs of remediation would far-exceed that threshold, Sanzari attempted to terminate the Contract.

21.     Goldstein declared the termination invalid and claimed that he did not yet have to make an election to proceed under the Contract arguing, among other things, that he did not have to elect to proceed until Sanzari actually spent $100,000 after deduction of amounts recoverable from tenants and the DEP, and that he did not have to elect until he had a precise estimate of all costs of clean up and remediation.

22.     As a result of this dispute, Goldstein filed an action in the Superior Court of New Jersey, Chancery Division, Somerset County captioned Goldstein v. Sanzari (Docket No. SOM-C-7898-87) seeking a declaration establishing the rights of the parties as to the termination of the Contract and specific performance thereof.

23.     As the litigation continued, Sanzari worked on the cleanup, and by November 1988 advised Goldstein that he spent more than $100,000.00.  However, Goldstein still refused to make his election, contending that before Sanzari could rightfully terminate the total net cost of the cleanup to Sanzari had to be determined.

24.     On April 10, 1989 (the day of trial), the case settled after extensive negotiations between the parties and their attorneys.  A handwritten draft settlement agreement was originally prepared and was then placed on the record by the attorneys.

25.     The settlement agreement provided that Goldstein would elect whether to proceed with the transaction by assuming all ECRA compliance costs in excess of $100,000 within 10 days of receiving test results of groundwater samples from five monitoring wells on the Property. The parties "expressly understood" that Goldstein would make his election to proceed after those results were received and "not on any subsequent testing or sampling," and that Goldstein's 10 day clock started once Sanzari provided results for all five of the monitoring wells at issue.  The settlement also provided that except as modified therein, the Contract remained in full force and effect.

26.     By letter dated May 1, 1989, after receiving the aforementioned test results, Goldstein elected to proceed with the transaction and purchase the Property.

27.     The Settlement Agreement did not specifically address when Goldstein was required to close, and this issue became the subject of post-settlement litigation.  Goldstein contended that the ECRA Clause provided that closing would not take place until after completion of a cleanup and issuance of a negative declaration by the DEP.  Sanzari argued that

the plain language of the Contract expressly required Goldstein to close upon issuance of a Negative Declaration or DEP's approval of a clean up plan.

28.    Sanzari moved in aid of litigant's rights and Goldstein cross-moved. The Court treated the cross-motions as seeking declaratory judgment. In its June 12, 1989 Letter Opinion, the Court held that Contractual trigger for closing was either a negative declaration or DEP approval of a clean up plan, and that the Contract did not impose an obligation on Sanzari to actually complete a cleanup. As such, the Court ruled that Goldstein had to close "upon receipt of a Negative Declaration or approval of a clean up plan by the DEP." The Court then granted Goldstein an additional ten days to re-affirm his election to proceed with the transaction.

29.    By letter dated June 21, 1989, Goldstein reaffirmed his election to proceed with the purchase of the Property.

30.    In October 1989, Sanzari again moved to enforce litigant's rights after Goldstein failed to reimburse him for the ECRA costs already incurred in excess of $100,000 and for his refusal to discharge a lis pendens he had filed. The Court granted Sanzari's motion, and on November 17, 1989 ordered the lis pendens discharged and entered judgment for $32,977.56 in favor of Sanzari (the amount Sanzari had already spent in excess of the $100,000 cap).

31.    By letter dated October 31, 1989, the DEP granted approval of a cleanup plan. In its approval letter, DEP also set forth a series of 21 post-approval conditions relating to, among other things, both soil and groundwater. With regard to soil, the DEP required additional sampling. With regard to groundwater, the DEP stated:

> The groundwater data indicates that operations on Sanzari Enterprises property may have contributed to offsite contamination. The Department has concluded that remediation for this contamination is not warranted at this time due to the concentrations of the contaminants found in the groundwater and the expected extent of the problem. However, before final Department sign-off on this issue and the issuance of a letter of full compliance, Sanzari Enterprises shall undertake the additional investigative requirements outlined below, as a condition of this Cleanup Plan approval in order to resolve any questions regarding the impact of Sanzari Enterprises' activities on groundwater. In the event that remediation is necessary, Sanzari Enterprises financial assurances and cost estimate shall be adjusted and maintained to meet that contingency. The NJDEP will accept any required instrument(s) of financial assurance, in proper form, from Sheldon Goldstein, contract purchaser of the property.

33.    Despite receipt of the cleanup plan, Goldstein refused to close. Accordingly, Sanzari moved yet again in aid of litigant's rights based on Goldstein's failure to reimburse Sanzari for its cleanup expenditures in excess of the $100,000 cap (including the increase in the amount over the intervening month since the earlier motion), and based on his refusal to close even after the DEP's approval of a cleanup plan. By Order dated December 15, 1989 the Court

granted Sanzari's motion, ordered Goldstein to specifically perform his obligations pursuant to the Contract by accepting title and paying to Sanzari the balance of the agreed upon purchase price, and awarded costs.

35.     Although Mary Sanzari was identified as a seller on the deed transferring the Property to Goldstein, no documents produced in discovery reflect title being transferred to Mary Sanzari.

36.     Additionally, and in accordance with the terms of the settlement agreement, Sanzari and his wife, Mary, executed an assignment dated February 13, 1990, pursuant to which they assigned to Goldstein "any and all rights [they] may have, if any, to pursue reimbursements for environmental cleanup claims against tenants, and others including insurance companies."

39.     The DEP asserted, *inter alia*, that hazardous materials were transported to the JANR warehouse from the Signo Trading facility located at 140 Thomas Street in Newark, New Jersey, and that the named defendants were either responsible for the transfer of hazardous materials to the JANR warehouse, owned or operated the JANR warehouse, or owned the hazardous materials stored therein.   Alfred Sanzari Enterprises was named as a defendant because it allegedly owned the JANR warehouse.

40.     Alfred Sanzari Enterprises and the DEP eventually entered into an agreement memorialized in a consent order executed by then-Judge Hoens on July 28, 1997 whereby the company agreed to pay DEP $350,000.00 "in full settlement of Sanzari's alleged liability to DEP."

46.     Sanzari Enterprises paid $350,000 to the DEP as required by Paragraph 4 of the 1997 Consent Order and the DEP has not asserted any cross claims against the Sanzari defendants in the current action.

48.     In 1996, Goldstein instituted another lawsuit relating to the costs of the environmental cleanup of the Property.   The lawsuit, captioned Goldstein v. Wausau Ins. Co., et al. (Docket No. SOM-L-2262-96), named the following defendants:

- Wausau Insurance Companies and Employer's Insurance of Wausau (collectively "Wausau"), Sanzari's former insurance carrier;

- Alfred Sanzari, Mary Sanzari, Alfred Sanzari Enterprises;

- Earth Technology Corporation ("Earth Tech"), the Sanzari Defendants' former environmental consultant at the Property;

- McLaren/Hart Environmental Engineering f/k/a Hart Associates ("Hart"), another of the Sanzari Defendants' former environmental consultants at the Property; and

- Dande Plastics, Inc. ("Dande"), one of Sanzari's former tenants at the Property.

49.     The 1989 settlement agreement and subsequent assignment of rights included language assigning to Goldstein rights to pursue "environmental cleanup claims against tenants, and others including insurance companies." Goldstein interpreted this to include his right to pursue claims against the Sanzari Defendants' own insurance company, Wausau, as opposed to just tenants' insurance companies, which was the Sanzari Defendants' understanding of the settlement.

50.     Accordingly, Goldstein instituted his second lawsuit against the Sanzari Defendants alleging that they breached their obligations under the 1989 settlement agreement and assignment by failing to cooperate with him in his efforts to seek reimbursement from the Property's insurers. Goldstein also contended that the Sanzari Defendants' failure to cooperate in pursuit of reimbursement under the Sanzari Defendants' Wausau insurance policy constituted a breach of the settlement and the terms of the assignment, entitling Goldstein to declaratory relief and relief from his obligation to assume all ECRA/ISRA costs in excess of $100,000.

51.     Additionally, in or about early 1998, while the Wausau lawsuit was pending, Goldstein moved to enforce the 1989 settlement agreement on similar grounds before Judge Diana, who presided over the original Goldstein v. Sanzari litigation in the late 1980s. In a March 20, 1998 opinion, Judge Diana denied Goldstein's motion, holding that the plenary action filed in the Law Division against Wausau, Sanzari, and the other defendants was the appropriate forum for disposition of issues relating to the interpretation of the assignment.

52.     In or about the Spring of 1998, Wausau moved in the plenary lawsuit for summary judgment, which the Court granted on the limited issue of whether the 1989 settlement and subsequent assignment limited Sanzari's (and consequently Wausau's) liability to $100,000.00. In its June 2, 1998 opinion, the Court recognized that "the most Sanzari may be required to pay for the cleanup at the site is $100,000," and, accordingly, held that "to the extent [Goldstein's] claim against Wausau are [*sic*] based upon an assignment from Sanzari, the amount of coverage available is limited to $100,000..."

53.     After extensive negotiations between Wausau, Goldstein and the Sanzari Defendants, on or about September 25, 2000, Goldstein stipulated to the dismissal of all claims against the Sanzari Defendants without prejudice.

55.     Goldstein's claims against Earth Tech and Hart (both former Sanzari environmental consultants) stemmed from reports that indicated potential TCE contamination at the Property. According to Goldstein, Earth Tech's Soil Sampling and Analysis Program received by the DEP on April 23, 1986 identified TCE use at the Property, and a Hart report identified TCE in the septic tank area of the Property following sampling conducted on May 2, 1988. Goldstein contended that both companies failed to investigate the sources or extent of potential TCE contamination at the Property.

56.     Goldstein contended that both companies intentionally failed to investigate other potential areas of TCE contamination, failed to properly remediate the contamination, concealed the extent of the contamination, or otherwise prevented Goldstein from accurately determining the costs necessary to remediate the contamination.

57.     Goldstein's own environmental consultant, Environmental Waste Management Associates ("EWMA"), also reviewed a series of Earth Tech and Hart reports and submissions to DEP well in advance of the closing.

58.     In a February 16, 1989 report, EWMA deemed the work performed by both contractors unsatisfactory, stating "This writer also finds the current cleanup proposal deficient in aspects ranging from horizontal delineation to not addressing groundwater issues."

59.     Regarding the potential costs of the cleanup, the EWMA report states:

> The actual cost of cleanup cannot yet be accurately estimated because there was no groundwater sampling performed on the site, therefore if the groundwater is actually contaminated, the cleanup cost for this cleanup would greatly exceed the total estimated cost [for] cleanup at the site. Additionally, there has been no complete horizontal and vertical delineation of contaminated areas sampled, therefore it is difficult to state whether the contamination is as isolated as assumed in the cleanup proposal submitted. In addition to this, there was no realistic provision for any obstacles that may become apparent as the cleanup is undertaken. Therefore, the estimated cost could actually fall far short of the real cost involved in cleanup of the site.

60.     Notwithstanding the concerns expressed by EWMA nearly a year before he closed title, Goldstein asserted that he "did in fact rely on the information" contained in the Earth Tech and Hart reports in deciding to purchase the Property.

61.     Earth Tech and Hart both moved for summary judgment. The Court granted both motions, and noted in the Hart opinion:

> [Goldstein] was aware, through [his] own environmental consultant and expert, that Defendant's Sampling Plan was both incomplete and inadequate well before [Goldstein] actually chose to purchase the property. Additionally, [Goldstein's] expert investigated the property and issued its own report after Defendant's investigation and prior to [Goldstein's] purchase of the Property. Furthermore, Defendant's report indicated the presence of the very toxin, trichloroethylene, which [Goldstein] now claims the existence of as the basis of for his causes of action against the Defendants.

62.     Goldstein also asserted certain environmental and common law claims against Dande including a claim under the Spill Act.

63.     Dande moved to dismiss the claims against it, relying in part on Goldstein's knowledge of the Hart and Earth Tech reports. The Court granted Dande's motion in part, stating:

44

The Court agrees that, at the very least, Plaintiff should have known of the presence of TCE on the subject property and that such contamination may have come from an on-site source. Defendants Earth Tech and [Hart] issued reports on April 23, 1986 and May 2, 1988 respectively indicate the presence of TCE and other hazardous substances at the Property. According to Plaintiff, he "did in fact rely" upon these reports when he acquired title to the property as part of the April 10, 1989 settlement.

65.    In or about 1987, Goldstein retained EWMA to assess Sanzari's ECRA compliance at the Property and to provide advice regarding the nature and extent of the contamination and the cost to complete remediation thereof. EWMA issued a report dated February 16, 1989 which set forth the conclusions described above.

66.    After the 1989 settlement of the original Goldstein v. Sanzari lawsuit, Greenberg and EWMA remained involved in monitoring the status of investigatory and remedial activities at the Property with the understanding that EWMA would carry out the anticipated DEP-approved cleanup plan and remediation after the transfer of title.

67.    Between approximately 1990 and 2000, EWMA conducted extensive site investigation and remediation, particularly with regard to soils, and additional investigation at the direction of the DEP to ascertain the extent of groundwater contamination, all pursuant to the approved 1989 clean-up plan.

68.    EWMA's remedial activities at the Property included, but were not limited to:

- Cleaning and removal of a 10,000 gallon above-ground storage tank including excavation of an area 13' x 22' to a depth of four feet, post removal sampling and construction of a test pit and backfilling same with clean fill;

- Excavation of a 8' x 10' area of soil at the Truck and Equipment Storage Area to a depth of four feet with post excavation sampling from area test pits;

- Excavation of soil areas measuring 63' x 20' and 81' x 9' until encountering bedrock near the on-site railroad behind the JANR warehouse with post excavation sampling;

- Excavation of soil near the drainpipes adjacent to the railroad with post excavation sampling;

- Excavation of a 19' x 9' area of soil in the Morgan Discharge Pipe Area;

- Excavation of three separate 6' x 6' areas of soil in the Richie's Tire Service Area each to a depth of two feet with post excavation sampling;

- Excavation of a 23' x 8' area of soil in the Water Well Area to a depth of four feet with post excavation sampling;

- Excavation of additional soils and suspected contaminating piping in the area of Quality Tube, the Septic Tank, and the Loading Dock; and,

- Excavation and removal of 5,582 tons of soil down to the bedrock from the Property's southeastern quadrant. The excavation area was backfilled with crushed concrete.

69.   In 2001, however, after repeated demands for payment, EWMA sued Goldstein and Litgo seeking $239,583.99 plus interest for services rendered.

70.   Goldstein and Litgo counterclaimed, among other things, for breach of contract, negligence, and malpractice, asserting that Goldstein relied on EWMA's advice and the results of its investigations in deciding to purchase the Property, and that it rendered consultation, investigation, and remediation services in a negligent and   substandard manner.

71.   EWMA moved for summary judgment, which motion was partially granted in a September 27, 2002 Order entered by Judge Dangler in Morris County. The Court specifically declared that Goldstein and Litgo were liable for payment of $138,484.49 to EWMA, but denied summary judgment on the portion of EWMA's motion seeking dismissal of Goldstein's counterclaims.

74.   Plaintiffs received a DEP no further action letter for soils in or about August 2001.

75.   Thereafter, Sorge began work to delineate the extent of the groundwater contamination on the Property.

77.   Kirby Avenue Realty's Phase I Environmental Site Assessment did not identify any solid waste facility or landfill facility within approximately ½ mile of the Kirby parcel. The report identified no long term fill activity.

78.   According to the same Phase I Assessment, the Litgo Property is less than 1/8 of a mile from the Kirby parcel.

79.   Plaintiffs allege that Somerville Iron Works operated a landfill on the adjacent properties (i.e., those now belonging to Mian and Kirby) between approximately 1916 and 1952.

**D.      Kirby's Factual Contentions:**

6.      The Mian Property separates the Litgo Property from the Kirby Property.

7.      Sheldon Goldstein ("Goldstein") entered into negotiations with Alfred Sanzari ("Sanzari") for the purchase of the Litgo Property in or around July 1985.

8.      At the time he entered into the negotiations, Goldstein was an experienced real estate developer who owned at least one hotel and had successfully developed numerous residential developments.

9.      During the course of the negotiations between Goldstein and Sanzari, Goldstein was advised that toxic wastes had been stored on the Litgo Property and that the property was the subject of an environmental clean-up.

10.      Specifically, Goldstein was provided with a letter from the DEP describing an investigation of a warehouse on the Litgo Property (the "JANR Warehouse") that had revealed containers of "hydrofluoric acid, oil, sulfuric acid, naptha, sodium hydroxide, nitric acid, perchloric acid, picric acid, lab paks, arsenic trichloride, and radioactive thorium nitrate."

11.      The DEP letter further advised that these containers were in poor condition and had not been satisfactorily stored, presenting "a substantial risk of imminent danger to the public health or safety or damage to the environment."

13.      Goldstein was given an opportunity to inspect the property prior to signing the contract.

15.      At the time Goldstein contracted to acquire the Litgo Property, the Litgo Property housed several industrial warehouses.

16.      The Litgo Property was historically leased to a number of industrial tenants.

17.      Goldstein did not inquire as to who the past or present tenants of the Litgo Property were before he entered the contract with Sanzari.

18.      Because the Litgo Property was an industrial property, its sale was subject to the terms of the Environmental Cleanup Responsibility Act, NJS.A 13:1K-6, et seq., now known as the Industrial Site Recovery Act ("ISRA").

19.      The contract between Goldstein and Sanzari included an extensive clause relating to responsibility for the environmental investigation and remediation of the Property.

20.      Pursuant to that provision, Sanzari was required to obtain either a negative declaration or an approved clean-up plan from the DEP prior to closing title.

21.      If the costs of obtaining and processing a clean-up plan were going to exceed $100,000, however, Sanzari was given an option to terminate the contract unless Goldstein agreed to pay all clean-up costs in excess of $100,000.

47

23.     The Dande Plastics Warehouse had been used by Dande Plastics, Inc. to manufacture plastic molds, which involved the storage and use of numerous hazardous substances, including TCE.

27.     In a letter to Goldstein's attorney dated February 10, 1987, Sanzari cited the above-referenced letter from the NJDEP and explained that he was "encountering severe problems with regard to the [Litgo Property]" and that the DEP was "now requiring a great deal more work" that could cost millions of dollars.

28.     In addition to the DEP's demand for further investigation, the Somerville Board of Health repeatedly expressed concern about potential impacts to groundwater at the Litgo Property due to the storage of hazardous wastes in the JANR Warehouse.

29.     In a letter dated February 10, 1987, Sanzari informed Goldstein that the costs of the clean-up would exceed $100,000 and, therefore, there was no need for Goldstein to proceed with the purchase of the property.

30.     In subsequent letters to Goldstein, Sanzari reiterated that the total costs of the cleanup were unknown but could be in the millions.

31.     Rather than accept Sanzari's efforts to terminate the contract, Goldstein filed a lawsuit, claiming that he was entitled to specific performance of the contract.

32.     In support of his claims, Goldstein retained Richard S. Greenberg, Ph.D. of Environmental Waste Management Associates ("EWMA") to review the documents relating to Sanzari's cleanup activities and offer an opinion as to whether Sanzari had diligently pursued a clean-up plan.

33.     Greenberg issued a report to Goldstein on February 16, 1989, in which Greenberg acknowledged:

> The actual cost of cleanup cannot yet be accurately estimated because there was no groundwater sampling performed on the site, therefore, if the groundwater is actually contaminated, the cleanup cost for this cleanup would greatly exceed the total estimated cost of cleanup for the site. Additionally, there has been no complete horizontal and vertical delineation of contaminated areas sampled, therefore it is difficult to state whether the contamination is as isolated as assumed in the cleanup proposal submitted ... Therefore, [Sanzari' s] estimated cost could actually fall far short of the real cost involved in cleanup of the site.

35.     Pursuant to the April 10, 1989 settlement, Goldstein was given 10 days from the date he received the results of groundwater samples taken at the Litgo Property to decide whether or not he wanted to proceed with the purchase of the Litgo Property and thereby assume all cleanup costs in excess of $100,000.

36.    The groundwater samples provided to Goldstein in accordance with the settlement agreement indicated that "levels of volatile organic compounds, and most significantly TCE, exceeded NJDEP guidelines in MW-2, MW-4 and MW-5, located on the western and eastern boundaries of the site."

37.    Goldstein's business partner, Lawrence Seidman, elected not to proceed with the acquisition of the Litgo Property.

38.    Goldstein responded to Seidman's decision by telling Seidman that "[he] was always going to be a failure because [he] had no balls."

39.    Goldstein subsequently claimed that he did not need to take title until Sanzari obtained a Negative Declaration from the DEP indicating that the cleanup had been completed.

40.    Finding that Goldstein's claim was "inconsonant with the express intention of the parties" and was "completely at variance with the clear intent" of the contract, including the parties' intent to pass the cleanup costs in excess of $100,000 to Goldstein, the court found that closing would take place after either the issuance of a Negative Declaration or the approval of a clean-up plan.

41.    The court gave Goldstein another opportunity to decide whether or not he wanted to proceed with the acquisition of the Litgo Property.

42.    Goldstein once again exercised his option and eventually took title to the Litgo Property in February 1990.

43.    After taking title to the Litgo Property, Goldstein and his consultant, Richard Greenberg, attempted to convince the DEP that the groundwater contamination at the Litgo Property was attributable to an off-site source.

44.    Greenberg conducted paper record searches, well record searches and installed numerous groundwater monitoring wells in an effort to identify an off-site source.

45.    Likewise, Greenberg proposed another round of groundwater sampling.

46.    Greenberg testified that he proposed additional sampling because " ... by doing that, you buy more time for a client that doesn't want to address the groundwater issue, so you can put work off."

47.    Greenberg further testified that "Mr. Goldstein wasn't interested in performing any groundwater work. You know, most of the work that went forward from this point on was driven by Mr. Goldstein's development concerns."

48.    When Goldstein was not able to obtain the approvals necessary to develop the property due to the presence of groundwater contamination, he abandoned his cleanup efforts altogether for a period of time.

49.    By letter dated November 8, 1995, the DEP advised Goldstein:

> Additional delineation of the horizontal and vertical extent of groundwater contamination was deferred pending resolution of the on-site vs. off-site contaminant source dispute. If F-Sharp had been successful in demonstrating an off-site source, no further ground water investigation would have been required. Since ground water contamination does not originate from off-site sources, the horizontal and vertical extent of contamination must be delineated pursuant to the Technical Requirements of Site Remediation (N.J.A.C. 7:26E). Furthermore, it appears that ground water contamination originating at the [Litgo Property] may have migrated off-site.

51.     In May 1998, DEP wrote to Goldstein to indicate that it was "very concerned about the high levels of contamination reported in results of recent soils and ground water sampling at [the Litgo Property]."

52.     DEP further noted that "[Litgo] has taken an excessively long time to identify this contamination and has been told numerous times by the NJDEP that a source of volatile organic contamination may be present."

53.     In a letter dated September 18, 1998, Goldstein cautioned his then attorney: "If my attorneys and my consultants feel they cannot handle this matter, I have to find new attorneys and consultants and take whatever steps may be necessary to recoup my losses."

54.     Shortly thereafter, Goldstein filed third and fourth amended complaints in which he added Sanzari's prior environmental consultants and Dande Plastics, Inc. as defendants.

55.     Goldstein subsequently admitted that Sanzari's consultants confirmed the presence of TCE contamination at the Litgo Property prior to his purchase of the property.

57.     On January 29, 2001, EWMA sued Goldstein to recover outstanding balances it was owed in connection with the services Greenberg had provided to Goldstein in connection with the Litgo Property.

58.     Goldstein filed a counterclaim against EWMA, alleging that Greenberg committed malpractice by delaying the cleanup to look for off-site sources of contamination when the contamination clearly originated on-site.

60.     Sorge testified that it would be impossible for groundwater contamination at the Litgo Property to be attributable to an off-site source to the east, such as the Mian Property or the Kirby Property, because such a scenario would require groundwater to flow uphill.

61.     Likewise, Dorrier opined that the contamination at the Litgo Property could not be attributable to an off-site source to the east because it "would not be possible" for contamination to "flow up dip, or up gradient, or uphill."

64.     Sorge opined that there was not "any rationale" that would support an argument that the contamination at the Litgo Property was from an off-site source.

65.    Dorrier also attributed the contamination to historical discharges at the Litgo Property.

66.    Prior to issuing his opinion, Dorrier visited the Litgo Property, observed the topography and drainage system, and conducted an extensive review of historical records, Sanborn Maps, aerial photos, boring and well logs and all of the available analytical data files.

67.    Dorrier did not identify a landfill at the Litgo Property or any of the adjacent properties.

68.    Groundwater flow at the Litgo Property is towards the southeast.

69.    During his deposition in this matter, Goldstein testified that he did not have any knowledge of any remedial activities at the Kirby Property.

70.    Litgo produced Jeff Goldstein as its corporate designee pursuant to Fed R. Civ. P. 30(b)(6) to testify regarding Litgo's remediation activities; the costs Litgo has incurred, and expects to incur, in connection with historical contamination at and around the Litgo Property; and Litgo's knowledge of the environmental conditions at the Litgo Property and the neighboring properties.

71.    Jeff Goldstein testified that he did not know of any activities that Litgo may have conducted to investigate or remediate alleged contamination at the Kirby Property. Nor did Jeff Goldstein know of any directive or obligation requiring Litgo to conduct any investigation or remediation of the Kirby Property.

72.    In response to an interrogatory asking Plaintiffs to describe all activities that they have undertaken and costs they have incurred in order to investigate and/or remediate hazardous substances at the Kirby Property, Plaintiffs certified that they "have not undertaken any relevant activities directed specifically at the Kirby [Property]."

73.    Plaintiffs' expert Robert Zoch ("Zoch") was retained by Plaintiffs solely for the purposes of this litigation. His retention did not include any responsibility for the remediation of the Litgo Property.

74.    Zoch performed his aerial photo review at the request of counsel in this litigation and not pursuant to any directive from any governmental agency or any remedial workplan.

75.    The last environmental report that Plaintiffs submitted to the DEP was a 2006 Remedial Investigation Report ("RIR") that was prepared by Sorge and certified as true and accurate by Goldstein. The RIR did not describe any remedial activities at the Kirby Property and did not propose any future remedial activities at the Kirby Property.

76.    Sorge has never spoken to anybody at the DEP or Plaintiffs about a need to conduct any remedial activities at the Kirby Property and has never developed any workplans addressing the Kirby Property.

77.     In response to an interrogatory asking Plaintiffs to identify all inspections, testing, sampling, monitoring, environmental evaluations, environmental investigations or site surveys relating to any alleged contamination at the Kirby Property, Plaintiffs certified that "they do not have in their possession any such documents specifically concerning the Kirby Property."

78.     As Litgo's corporate designee, Jeff Goldstein testified that he did not even know what the Kirby Property was and, therefore, could not identify any evidence of contamination at the Kirby Property.

79.     Sorge testified that he was not aware of any data from the Kirby Property indicating that TCE, any of TCE's daughter or breakdown products, or any other hazardous substances were present in the soil or groundwater at the Kirby Property.

80.     There are no groundwater samples from the Kirby Property confirming the presence of any hazardous substances in groundwater at the Kirby Property.

81.     There are no soil samples from the Kirby Property confirming the presence of any hazardous substances in soil at the Kirby Property.

87.     Plaintiffs have not conducted any other removal activities on the Kirby Property.

91.     No conditions at the Kirby Property are causing or contributing to any groundwater contamination at the Litgo Property.

92.     No conditions at the Kirby Property are causing or contributing to any soil contamination at the Litgo Property.

93.     No conditions at the Kirby Property are causing or contributing to any groundwater contamination at the Mian Property.

94.     No conditions at the Kirby Property are causing or contributing to any soil contamination at the Mian Property.

95.     Defendant Kirby Avenue Realty Holdings, LLC ("Kirby") does not own, and has never owned, the Litgo Property.

96.     Kirby has never conducted any business operations at the Litgo Property.

97.     Kirby has never transported any hazardous substances to the Litgo Property.

98.     Kirby has never arranged for the transport, handling or disposal of hazardous substances at the Litgo Property.

99.     Kirby has never discharged any hazardous substances at the Litgo Property.

100.    Kirby has never managed, directed, or conducted any operations or activities that related to the acquisition, storage, use or disposal of hazardous substances at the Litgo Property.

101.    Kirby does not own, and has never owned, the Mian Property.

102.    Kirby has never conducted any business operations at the Mian Property.

103.    Kirby has never transported any hazardous substances to the Mian Property.

104.    Kirby has never arranged for the transport, handling or disposal of hazardous substances at the Mian Property.

105.    Kirby has never discharged any hazardous substances at the Mian Property.

106.    Kirby has never managed, directed, or conducted any operations or activities that related to the acquisition, storage, use or disposal of hazardous substances at the Mian Property.

107.    Kirby acquired the Kirby Property on or about March 9, 2000.

108.    Kirby has never transported any hazardous substances to the Kirby Property.

109.    Kirby has never arranged for the transport, handling or disposal of hazardous substances at the Kirby Property.

110.    Kirby has never discharged any hazardous substances at the Kirby Property.

111.    Kirby has never managed, directed, or conducted any operations or activities that related to the acquisition, storage, use or disposal of hazardous substances at the Kirby Property.

## 4.    **STIPULATED FACTS:**

A.    **Plaintiffs and Commissioner Mauriello Stipulate to the Following Facts:**

i.    **Plaintiffs' Stipulate to the Following of Commissioner Mauriello's Facts:**

None.  Commissioner Mauriello's "proposed stipulated facts" are vague and improper. Plaintiffs are unable to respond to Commissioner Mauriello's proposed stipulated facts as drafted.

ii.    **Commissioner Mauriello States the Following with Respect to Plaintiffs' Facts:**

It appearing to Defendant Mauriello that the Plaintiffs' proposed stipulated facts, submitted November 16, 2009, number over 300 statements and appear to be nothing more, nor less, than the reiteration of the Plaintiffs' six separate complaints.  It is neither practicable nor reasonable for Defendant Mauriello to respond.  The four fact statements added to that list on November 20 are not addressed to this defendant.

**B.**     **Plaintiffs and United States Defendants Stipulate to the Following Facts:**

     **i.**     **Plaintiffs' Stipulate to the Following of the United States Defendants' Facts:**

1.     In 1941, Columbia Aircraft Products, Inc. ("Columbia") began leasing space from the Somerville Stove Works on a portion of property that is currently owned by Plaintiffs Sheldon Goldstein and Litgo New Jersey, Inc. ("Litgo") ("the Litgo Parcel")

2.     In February 1942, the United States and Columbia executed an Agreement of Lease and subsequently executed three amendments to the lease in April 1942, June 1942, and May 1945. Under these agreements, the Defense Plant Corporation ("DPC") provided a total of $98,115 in funds that Columbia used to purchase equipment for production of aircraft parts and ammunition during World War II.

3.     The DPC retained title to the equipment Columbia purchased with DPC funds and leased the equipment to Columbia.

7.     Neither the Agreement of Lease nor its amendments contained any provision concerning waste disposal.

10.     The United States never owned any land or buildings at or on the Somerville Iron Works Site.11.During War II, Columbia engaged in experimental work for a test auxiliary engine. In 1943 and 1944, Columbia borrowed 14 pieces of equipment from the Army Air Force at Wright Field so that Columbia could perform the engine test.

22.     Sheldon Goldstein first learned about the Litgo Parcel through an associate named Lawrence Seidman.

24.     Environmental Waste Management Associates ("EWMA") is an environmental engineering firm that performed work at the Litgo Parcel for Alfred Sanzari and Litgo, both before Sheldon Goldstein took title to the Litgo Parcel and afterward.

25.     EWMA was retained on behalf of Sheldon Goldstein and Larry Seidman "to provide advice regarding the anticipated cost to complete the remediation of the Property."

26.     Sheldon Goldstein testified that he relied on assurances by EWMA and Larry Seidman that the contamination at the Litgo Parcel would not be a problem.

27.     Before Sheldon Goldstein took title to the Litgo Parcel, Larry Seidman and Robert Kessler backed out of the venture.

29.     Alfred Sanzari refused to sell the Litgo Parcel and Sheldon Goldstein subsequently sued him for specific performance in New Jersey Superior Court, Morris County.

30.     On December 15, 1989, a New Jersey Superior Court ordered Sheldon Goldstein to purchase the Litgo Parcel according to the Agreement of Sale and a settlement agreement made between Sanzari and Goldstein in April 1989.

32.     Sheldon Goldstein formed Litgo on advice of counsel.

33.     Litgo is the current owner of the Litgo Parcel.

34.     Sheldon Goldstein is the president of Litgo.

35.     Sheldon Goldstein is the only person who owns an interest in Litgo and is the only shareholder.

36.     Jeffrey Goldstein, Sheldon Goldstein's son, is a director of Litgo.

38.     Litgo hired J.M. Sorge, Inc. ("Sorge") to replace EWMA as an environmental remediation consultant at the Property.

40.     On September 4, 2001, NJDEP sent Litgo a letter stating that "no further action for soils on the Litgo site is acceptable."

46.     Sheldon Goldstein and Litgo initiated the present action by filing a Complaint on June 26, 2006.

47.     Sheldon Goldstein and Litgo filed a First Amended Complaint on August 31, 2007 that added several parties as defendants, including the United States of America, the United States Department of the Air Force, United States Department of the Navy, and United States Department of the Army ("United States" or "United States Defendants").

**ii.     United States Defendants Stipulate to the Following of Plaintiffs' Facts:**

In response to Plaintiffs' Proposed Stipulated Facts, the United States Defendants do not dispute Fact Nos.: 3, 16, 17, 18, 19, 29, 30, 31, 32, 40, 43, 46, 49, 50, 54, 56, 62, 67, 68, 74, 85, 92, 98, 107, 142, 172, 179, 184, 208, 216, 218, 220, 233, 237, 308, 323, 326, 329, 340, 342 and 367 from Section 2, above, and list below those additional paragraphs that the United States Defendants do not dispute:

1.     Plaintiff Litgo New Jersey, Inc. ("Litgo") is a corporation organized and existing under the laws of the State of New Jersey, with its principal place of business in Suffern, New York.

2.     Plaintiff Sheldon Goldstein ("Goldstein") is a citizen of the State of Florida.

4.     Defendant United States Department of the Army, Defendant United States Department of the Navy, and Defendant United States Department of the Air Force are principal departments within the Executive branch of the government of Defendant United States of America (hereinafter, the "United States Defendants").

5.     Alfred Sanzari Enterprises is a company organized under the laws of the State of New Jersey with its principal place of business in Hackensack, New Jersey.

6.     Mary Sanzari is a citizen of the State of New Jersey.

7.     Alfred Sanzari died on December 11, 2005, and was a citizen of the State of New Jersey at times relevant to this action.

8.     David Sanzari and Frank Huttle are citizens of the State of New Jersey and are the Executors of the Estate of Alfred Sanzari (hereinafter, the "Executors").

9.     Mian Realty, L.L.C. ("Mian") is a limited liability corporation organized under the laws of the State of New Jersey with its principal place of business in Bridgewater, New Jersey.

10.    Kirby Avenue Realty Holdings, L.L.C. ("Kirby") is a limited liability corporation organized under the laws of the State of New Jersey with its principal place of business in Morristown, New Jersey.

13.    The Somerville Iron Works purchased the F Sharp Screw Parcel in 1916.

41.    At times between 1976 and 1990, Alfred Sanzari Enterprises held itself out as owner of the F Sharp Screw Parcel.

52.    On July 29, 1987, Grace transferred the 6 Kirby Avenue Parcel to Bilal and Shakila Mian.

57.    On March 19, 1997, Mian Realty Partners, L.P. transferred the 6 Kirby Avenue Parcel to Defendant Mian, such that Defendant Mian is the present owner of the 6 Kirby Avenue Parcel.

58.    In 1997, Grace transferred the 50 Kirby Avenue Parcel, including the building and parking facilities, to Baker & Taylor, Inc.

143.   NJDEP mandated that Clean Ventures implement security measures at the F Sharp Screw Parcel, including the selecting and deploying of private security guard services, mandating the use of protective fencing and lighting, and controlling access to the F Sharp Screw Parcel in a manner that limited access to persons approved by NJDEP.

154.   On December 29, 1985, during NJDEP's removal work at the F Sharp Screw Parcel, a fire destroyed the Dande Plastics Warehouse.

155.   Investigators suspected that the fire was purposefully set.

168.   In or about September 1987, NJDEP concluded its operations and released the property to Alfred Sanzari Enterprises.

222.   On August 6, 1985, Alfred Sanzari and Goldstein entered into an Agreement of Sale for the sale of the F Sharp Screw Parcel.

224.   The Agreement of Sale contained, *inter alia*, the following provision:

15.   **ECRA.**   The parties acknowledge that the Property is subject to the provisions of ECRA. . . . [Alfred Sanzari] agrees to comply with all of the provisions of ECRA by obtaining a negative Declaration or a Clean-Up Plan from the DEP. . . . In the event, however, that the net cost to [Alfred Sanzari] in obtaining and processing a Clean-Up Plan exceeds the sum of One Hundred Thousand ($100,000.00) Dollars, [Alfred Sanzari] shall have the option of terminating this Agreement of Sale, unless [Goldstein] agrees to pay such cost in excess of One Hundred Thousand ($100,000.00) Dollars.

298.   The Deed transferring ownership of the F Sharp Screw Parcel from Alfred Sanzari and Mary Sanzari to Goldstein states: "Grantee assuming Grantor's obligations under the Partial Clean Up Plan approved by the NJDEP dated January 27, 1989 and the Clean Up Plan for the property approved by the NJDEP with conditions dated October 31, 1989."

312.   Goldstein transferred title to the F Sharp Screw Parcel to Litgo on April 18, 1990.

369.   In or about 1994, the State of New Jersey brought an action against Alfred Sanzari Enterprises, among others, to recover sums expended in removing materials from the JANR Warehouse, entitled *State of New Jersey, Department of Environmental Protection et al. v. Ace Service Corp.*, SOM-L-247-94.

370.   Neither Plaintiff Sheldon Goldstein nor Plaintiff Litgo were named as defendants in that lawsuit.

371.   Neither the United States of America, nor any of its constituent agencies or departments, were named as defendants in that lawsuit.

374.   In or about 1996, Alfred Sanzari Enterprises submitted a Federal Tort Claims Act claim ("FTCA claim") to the Secretary of Defense, the Secretary of the Army and the Office of General Counsel for the Department of the Navy.

375.   In or about 2000, the United States denied Alfred Sanzari Enterprises' FTCA claim.

C.   **Plaintiffs and the Sanzari Defendants Agree to Stipulate to the Following Facts:**

i.   **Plaintiffs' Stipulate to the Following of the Sanzari Defendants' Facts:**

1.   Alfred Sanzari purchased the Property commonly known as 40 Haynes Street, Somerville, New Jersey (the "Property") from Edwin B. Schwartz and the Estate of Raymond L. Schwartz trading as Bonnie Realty Co. in 1976. No other purchaser besides Alfred Sanzari is identified on the deed.

5.   Sanzari filed an action in the Superior Court of New Jersey, Landlord Tenant Division seeking the eviction of JANR. Sanzari obtained a judgment of possession as a result.

6.      Sanzari also filed an order to show cause demanding that the Colberts remove the allegedly hazardous materials.   In response to Sanzari's application, the Court appointed a receiver for the materials.

10.      On August 6, 1985, Sanzari entered into an Agreement of Sale (the "Contract") with Goldstein.

15.      The ECRA Clause also granted Goldstein the right to terminate anytime after August 1, 1986 if the cleanup plan was not completed and the ECRA approval was not obtained from DEP by that date.

32.      The cleanup plan approval letter further provides that the approval "shall not limit, restrict or prohibit NJDEP from directing on-site or off-site cleanup, if deemed necessary by NJDEP, under any other statute, rule or regulation."

34.      On February 14, 1990, approximately four and a half years after executing the Contract, Goldstein closed title.   The deed specified that the conveyance was made subject to "Grantee assuming Grantor's obligations under the Partial Cleanup Plan approved by the NJDEP dated January 27, 1989 and the Cleanup Plan for the Property approved by the NJDEP with conditions dated October 31, 1989."

37.      On April 18, 1990, Goldstein transferred his interest in the Property to his entity, Litgo New Jersey, Inc. ("Litgo").

38.      In 1994, the DEP initiated an action against Alfred Sanzari Enterprises and approximately 30 other individuals or entities entitled Dept. of Environmental Protection v. ACE Service Corp., et al. (Docket No. SOM-L-247-94) in which the DEP sought reimbursement of costs incurred by the State for the cleanup and removal of certain hazardous substances from the JANR warehouse located on the Property.

41.      Pursuant to paragraph 7.a. of the 1997 Consent Order the DEP released Sanzari Enterprises "from all claims, actions, causes of action, and administrative actions, whether known or unknown, whether asserted or unasserted, contingent or otherwise, arising out of, or in any way relating to, any discharge, release, threatened discharge or threatened release of Hazardous Substance(s) and/or removal or disposal of Solid or Hazardous Waste(s) and/or other materials at the [JANR warehouse] Site, including but not limited to any and all claims under the Spill Act and the regulations promulgated thereunder, [and] the SWMA and the regulations promulgated thereunder."

42.      Pursuant to paragraph 7.a. of the 1997 Consent Order the DEP further released Sanzari Enterprises from "any other applicable law or regulation which were or could have been asserted by the [DEP] in the ACE Litigation or which could in the future be asserted by the [DEP] in litigation or administrative actions related to the discharge, release, threatened discharge or threatened release of Hazardous Substance(s) and/or removal or disposal of Solid or Hazardous Waste(s) and/or any other materials at the [JANR warehouse site]."

43.      The first paragraph of Paragraph 9 of the 1997 Consent Order states that "[t]he [DEP] agrees that the payment made by [Sanzari Enterprises] pursuant to Paragraph 4 of this

Consent Order shall constitute full satisfaction of any and all of [the DEP's] claims against [Sanzari Enterprises].

44.     The second paragraph of Paragraph 9 of the 1997 Consent Order states that "[i]t is the intent of the Parties to this Consent Order to fully resolve [Sanzari Enterprise's] alleged liability for the discharge, release, threatened discharge or threatened release, cleanup and removal of hazardous Substances and/or Solid or Hazardous wastes and/or other materials at the [JANR warehouse] Site and any and all costs associated with such discharge, release, threatened discharge, threatened release, cleanup and removal."

45.     Paragraph 9 of the 1997 Consent Order then concludes with the following ORDERED sentence: "It is, therefore, ORDERED that, by entering into this Consent order and fully performing all obligations contained herein, [Sanzari Enterprises]' liability, whether direct or by the assertion of a cross-claim or third party claim, shall be fully extinguished, and [Sanzari Enterprises] shall be immune from claims for contribution which may be initiated by any entity, whether or not such entity is a party to this action."

47.     The Consent Order is between the DEP and Alfred Sanzari Enterprises, with the term "Settling Defendant" to include "its assigns, agents, heirs, and any trusts created (including executors, trustees, administrators, and beneficiaries), and all of its past and present officers, partners, directors, employees, shareholders, representatives and attorneys and their predecessors, successors, parents, subsidiaries, affiliates, divisions and related companies and insurers."

54.     Wausau paid $30,000 to Goldstein in full settlement of the claims against it.

64.     Following that decision, Dande and Goldstein settled the remaining claims for $105,000.00.

72.     In or about June 2003, EWMA, Goldstein and Litgo filed with the Court a stipulation of dismissal by virtue of which the complaint and counterclaim were both dismissed with prejudice.

73.     In or about 2000, Goldstein retained JM Sorge, Inc. ("Sorge") to review the work performed by EWMA and to perform the investigation and remediation necessary to satisfy the DEP's concerns relating to both soil and groundwater prior to Goldstein's anticipated development of the Property.  Pursuant to a separate agreement, Sorge also served as Litgo's expert in its counterclaim against EWMA in the 2001 lawsuit.

76.     Neither the Contract nor the Deed between Sanzari and Goldstein referenced the existence of a sanitary landfill on the Property.

80.     Plaintiffs allege that a portion of the Somerville Iron Works sanitary landfill was situated on the Litgo Property.

81.     Somerville Iron Works sold the Property to the Johnson Bronze Company in or about 1952.