NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

LITGO NEW JERSEY, INC, and
Sheldon GOLDSTEIN,

      Plaintiffs,

      v.

Bob MARTIN, in his official capacity as the
Commissioner of the New Jersey
Department of Environmental Protection, et
al.,

      Defendants.

06-2891(AET)

**MEMORANDUM OPINION**

THOMPSON, U.S.D.J.

### Table of Contents

**I.**    **Background** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

**II.**   **Findings of Fact** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    *A.*     *Groundwater Contamination* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    *B.*     *Historical Operations* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

    *C.*     *JANR Warehouse* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    *D.*     *Other Proposed Sources of Contamination* . . . . . . . . . . . . . . . . . . . . . . 27

    *E.*     *Plaintiffs' Acquisition of the Litgo Property* . . . . . . . . . . . . . . . . . . . . . 29

    *F.*     *Remedial Actions at the Litgo Property* . . . . . . . . . . . . . . . . . . . . . . . . 34

    *G.*     *Other Related Litigation.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

**III.**  **Conclusions of Law** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .38

    *A.*     *CERCLA* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

    *B.*     *RCRA* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .58

    *C.*     *Spill Act* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .63

D.      *Counterclaims Based on the 1985 Agreement of Sale and 1989 Settlement Agreement* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .67

E.      *Common Law Contribution and Indemnification Claims* . . . . . . . . . . . . . . . . . . .69

F.      *Closure Act* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

IV.    **Damages / Injunctive Relief** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .70

A.      *CERCLA* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

B.      *RCRA* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .78

C.      *Spill Act* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .78

V.     **Attorney's Fees** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

VI.    **Conclusion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .80

2

## I.   Background

This matter has come before the Court after a seventeen-day bench trial which began on January 19, 2010 and ended on February 12, 2010.  Plaintiffs are Litgo New Jersey, Inc. and Sheldon Goldstein (together, "Plaintiffs").  Defendants included: Bob Martin ("Commissioner"), in his official capacity as the Commissioner of the New Jersey Department of Environmental Protection ("NJDEP"); United States of America, United States Department of the Army, United States Department of the Air Force, and United States Department of the Navy (together, "United States Defendants"); Alfred Sanzari Enterprises, Mary Sanzari, David Sanzari, as Executor of the Estate of Alfred Sanzari, and Frank Huttle, as Executor of the Estate of Alfred Sanzari (together, "Sanzari Defendants"); Mian Realty, L.L.C. ("Mian"), and; Kirby Avenue Realty Holdings, L.L.C. ("Kirby Avenue").

At issue in this matter is the presence of trichloroethylene ("TCE") and other hazardous substances in two groundwater plumes emanating off of 40 Haynes Avenue, Somerville, New Jersey ("Litgo Property") and the Defendants' alleged responsibility for the hazardous substances found in these plumes and already-removed contaminated soils.  Plaintiffs assert that manufacturing operations at Columbia Aircraft, Inc. ("Columbia Aircraft") in the 1940's and the storage and subsequent negligent cleanup of hazardous materials in a warehouse on the Litgo Property ("JANR Warehouse") in the 1980's caused or contributed to the contamination.

A quick summary of Plaintiffs' theory of the case is as follows: The United States Defendants are partially responsible for the contamination because they owned equipment which was used by Columbia Aircraft and because they owned and generated some of the hazardous substances in the JANR Warehouse.  The Sanzari Defendants are partially responsible because

they owned the property on which the JANR Warehouse was located at the time that hazardous substances were disposed there.  The Commissioner is responsible because he oversaw the transport of hazardous substances to the JANR Warehouse and the removal of hazardous substances from the JANR Warehouse.  Mian and Kirby Avenue are responsible persons based on their current ownership of adjacent properties, which Plaintiffs allege are part of the same overall contaminated site.

Plaintiffs seek injunctive relief under the Resource Conservation and Recovery Act of 1976, as amended by the Hazardous and Solid Waste Amendments of 1985 ("RCRA"), 42 U.S.C. § 6972(a)(1)(B), contribution to costs under the New Jersey Spill Compensation and Control Act ("Spill Act"), N.J.S.A. § 58:10-23.11f(a)(2), cost recovery and declaratory relief under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601 et seq., and rescission of the contract by which they purchased the Litgo Property and consequential damages pursuant to the New Jersey Sanitary Landfill Facility Closure and Contingency Fund Act ("Closure Act"), N.J.S.A. § 13:1E-100.

Mian settled with Plaintiffs before trial began and only remains in this suit to the extent that the United States Defendants and the Sanzari Defendants have valid crossclaims against it. Following the close of trial, all claims against Kirby Avenue and Mary Sanzari were dismissed by order of the Court.[1]  (2/17/10 Order [docket # 339]; 2/18/10 Order [docket # 341].)  In

--------

[1]Since Mary Sanzari has been terminated as a party, all future references to the Sanzari Defendants refer only to the Executors of the Estate of Alfred Sanzari and Alfred Sanzari Enterprises.

4

addition, the Court dismissed Plaintiffs' Closure Act claim against the Sanzari Defendants.[2]

2/12/10 Tr. 113:14-115:1.  The Court has decided the remaining claims based upon the

submissions of the parties and presentation of evidence during trial from January 19, 2010

through February 12, 2010.

## II.    Findings of Fact

### A.    *Groundwater Contamination*

1.  Trichloroethylene ("TCE"), tetrachloroethylene ("PCE") and other hazardous

substances are present at levels above the NJDEP maximum acceptable contaminant levels in the

groundwater beneath and emanating from the Litgo Property in two areas of concern—the

Western Groundwater Plume and the Eastern Groundwater Plume.  1/26/10 Tr. 31:7-23.

Groundwater in the vicinity of the Litgo Property generally flows in a north to south or

northwest to southeast direction.  1/26/10 Tr. 29:12-30:4**.**  The two groundwater plumes have

migrated and may continue to migrate off the Litgo Property, potentially impacting the nearby

Manville Borough municipal drinking water wells or the Raritan River.  *Id.* at 31:24-32:15; Ex.

P-466 at LITGO-RCRA006525 [5/27/03 NJDEP Letter to Sorge].

2.  TCE, PCE, and the other hazardous substances identified in the two groundwater

plumes are volatile organic compounds ("VOCs").  *See* 1/28/10 Tr. 121:13-16; Ex. P-382 at

LITGO-RCRA0002272 [Addendum to June 1989 Hart Report].  TCE is the primary contaminant

---

[2]Although the Closure Act claim was dismissed at the close of evidence, because the
Court has not yet entered an order to that effect it has included the findings of fact and
conclusions of law which underlie its dismissal of the claim in this opinion.  *See* 2/12/10 Tr.
115:1-115:3.

of concern in the groundwater.[3]  1/26/10 Tr. 31:2-23.  TCE was historically used as a common degreasing solvent in machining operations, with widespread use dating back to the early 1930's. 1/28/10 Tr. 125:13-126:3.  TCE was a favored degreasing agent because it was relatively inflammable, making it safer to use than other solvents.  *Id.* at 127:12-19.  In addition, TCE was more effective at removing mineral oils and less likely to scratch the surface of or leave undesired residue on precision parts than alkaline cleaners, the primary alternative.  *Id.* at 131:7-16; 1/29/10 Tr. 46:2-14.  The use of TCE was phased out in the 1960's and 1970's due to concerns about smog and the discovery that it was a carcinogen.  1/28/10 Tr. 128:4-15.

3.  The Western Groundwater Plume is located on the western edge of the Litgo Property and runs offsite to the south.  The source area of the Western Groundwater Plume has been identified to be near Monitoring Well ("MW")-6 and MW-8.  1/26/10 Tr. 33:21-34:16.  MW-6 is located in the northwest corner of the Litgo Property while MW-8 is northwest of the Litgo Property and east of 50 James Street, Somerville, New Jersey ("Truckform Property").  *Id.*  The Truckform Property is directly to the west of the Litgo Property and currently operated by Truckform, Inc.  *See* Ex. US-697 [3/27/52 Aerial Photo with Well Locations].  The Western Groundwater Plume extends to the south approximately 750 feet, ending to the north or northwest of MW-1A.  1/26/10 Tr. 41:6-17; 44:25-45:2.  MW-1A is south of the Litgo Property's western boundary.  Ex. US-697.

4.  The Eastern Groundwater Plume underlies the southeastern portion of the Litgo Property and the western portion of 6 Kirby Avenue, Somerville NJ ("Mian Property"), which is

---

[3]A number of other contaminants have been identified in both groundwater plumes. Many of these are products that are naturally created as TCE and PCE degrade.  2/8/10 Tr. 61:13-63:11 [Kavanaugh Direct].

directly to the east of the Litgo Property and currently owned by Mian.  1/26/10 Tr. 43:6-10.

The Eastern Groundwater Plume extends offsite to the southeast.  *Id.*  The source area of the

Eastern Groundwater Plume has been identified to be near MW-11, MW-5 and MW-23.  *Id.* at

41:21-43:1.  MW-5 and MW-23 are located in the southeast portion of the Litgo Property, while

MW-11 is in the southwest portion of the Mian Property.  *Id*;1/29/10 Tr. 35:14-16; 2/4/10 Tr.

30:11-24; Ex. US-697.  The full extent of the Eastern Groundwater Plume has not been

accurately delineated, as efforts to identify the length of the plume have been confounded by the

potential existence of an intermingled plume emanating from what was referred to at trial as the

Egan Property, which is located to the southeast of the Litgo Property.  2/4/10 Tr. 7:7-23, 16:2-

17:14.

     5.  A dense non-aqueous phase layer ("DNAPL") of TCE is present in the source area of

the Eastern Groundwater Plume and is feeding the plume.  1/26/10 Tr. 41:23-43:5; 2/9/10 Tr.

34:9-35:22.  DNAPL occurs when a product is present in the groundwater or soil in a non-

dissolved state.  1/26/10 Tr. 42:15-19.  DNAPL is indicated by the presence of a contaminant at

more than one percent times the solubility of that contaminant.  *Id.* at 42:19-22.  The

concentrations of TCE at MW-11 are many times above one percent of the solubility of TCE.  *Id.*

at 42:12-43:1.  The presence of DNAPL indicates that the Eastern Plume originated from a large-

scale release of TCE, which would most likely be associated with industrial activities or an

underground TCE-storage tank.  2/8/10 Tr: 48:6-18**.**

     6.  Although attempts have been made to estimate the age of the two groundwater

plumes, accurate dating is impossible given the nature of the fractured bedrock underlying the

area.[4]  2/4/10 Tr. 5:14-24.  All that is known for sure is that the plumes originated at some time between the early 1900's (when TCE came into common use) and the environmental investigation at the Litgo Property in 1989.  2/2/10 Tr. 95:15-17.  In addition, there was disagreement among the expert witnesses as to whether the contaminants in the Western Groundwater Plume came from one historic source and were continuing to migrate in a normal manner, whether the plume was not migrating but rather was in a "steady state" with a source that continued to feed into the plume, or whether increasing concentrations of TCE in MW-8 indicated a more recent source.  *Compare* 1/26/10 Tr. 47:2-12, 54:9-56:4; 2/2/10 Tr. 28:17-32:25; 2/8/10 Tr. 77:9-79:5.

### B.  Historical Operations

#### 1.  Somerville Iron Works

7.  The Litgo Property was once part of a larger site, known as the Somerville Iron Works Site.  The Somerville Iron Works Site encompassed the operations of both the Somerville Iron Works and the Somerville Stove Works.  Plaintiffs' Closure Act claim against the Sanzari Defendants is based on the theory that the Somerville Iron Works operated a sanitary landfill facility on the Litgo Property.  In addition, Defendants have suggested that the Somerville Iron Works was the source of the contamination in the Eastern and Western Groundwater Plumes.

---

[4]Getchell estimated that the Western Groundwater Plume originated sometime in the mid-1980's, while he dated the Eastern Groundwater Plume back to the mid-1940's.  1/26/10 Tr. 54:9-55:9**.**  To estimate the dates of the plumes, Getchell used a variation of what is referred to as Darcy's equation.  *Id.* at 47:6-12. Getchell's variation of the equation used estimates of the hydraulic conductivity of the geologic formation, the hydraulic gradient, and the porosity of the geologic formation to determine the average velocity of groundwater in the area and thus the approximate age of the groundwater plumes.  *Id.* at 47:6-58:8.  The problem with the use of this equation in this context is that in a fractured bedrock there is no one accurate value for groundwater velocity.  2/4/10 Tr. 5:14-24.

8.  The Somerville Iron Works at one time owned and had operations on the following three contiguous parcels of land: (1) the Litgo Property, (2) the Mian Property, and (3) 50 Kirby Avenue, Somerville New Jersey ("Kirby Property"), which is currently owned by Kirby Avenue. Somerville Iron Works purchased the Mian and Kirby Properties in 1920. Ex. P-2 [Deed from Van Doren to Somerville Iron Works].  In addition, Somerville Iron Works had some operations on the Truckform Property.  1/29/10 Tr. 125:2-10; 2/4/10 Tr. 120:4-21.

a.        Potential Sources of TCE at Somerville Iron Works

9.  By 1910, the Somerville Iron Works and Somerville Stove Works had begun operating on the Litgo Property.  Ex. P-494 [1910 Sanborn Map].  The Somerville Iron Works manufactured pipes and fittings on the central and western portions of the Litgo Property.  *Id.*  Its operations included foundry buildings and a machine shop.  *Id.*; 2/3/10 Tr. 134:4-135:3.  By 1924, the foundry had been expanded and the Somerville Iron Works was operating a machine shop on the eastern portion of the Truckform Property.  Ex. U.S.-1006 at MCLANE005418 [1924 Sanborn Map].  The Somerville Iron Works continued to operate through at least 1948. *Id.* at MCLANE005417.

10.  The Somerville Stove Works manufactured stoves on the eastern portion of the Litgo Property.  Ex. P-494.  Its early operations included a foundry and a warehouse.  *Id.*  As of 1924, the Somerville Stove Works operations included a machine shop.  Ex. US-1006 at MCLANE005418.  The Somerville Stove Works ceased operations in the late 1920's.  1/28/10 Tr. 38:12-38:16.

11.  Both Somerville Iron Works and Somerville Stove Works contained machine shops. *Id.* at 125:13-125:3.  In addition, the Somerville Iron Works' and Somerville Stove Works'

9

buildings had earthen floors, which would have allowed spilled TCE or other VOCs to be absorbed into the soil and filter into the groundwater.  1/29/10 Tr. 122:13-23; 127:10-17, 128:18-129:21.  However, TCE was not yet in use when Somerville Stove Works was in business.  *See* 1/28/10 Tr. 125:13-126:3; 2/8/10 Tr. 154:7-8.  Therefore, Somerville Stove Works is not a plausible source for the TCE contamination at the Litgo Property.

12.  Somerville Iron Works continued to operate a machine shop, which could have used TCE as a degreaser, through the 1930's and 1940's and therefore is a possible source for TCE contamination.  However, there is no evidence that Somerville Iron Works actually used TCE.  In addition, due to Somerville Iron Works' location—on the central and western portion of the Litgo Property—it is not a likely source of the Eastern Groundwater Plume.  The Somerville Iron Works thus has not been established to be a cause of the contamination in the groundwater.

b.      Existence of a Sanitary Landfill Facility

13.  In 1916, Somerville Iron Works was granted the right to dump slag and other waste material onto the adjacent Mian and Kirby Properties.[5]  Ex. P-1 [1916 Indenture].  From approximately 1916 until sometime before 1959, iron foundry slag and other waste materials were disposed of on the Mian and Kirby Properties.  2/3/10 Tr. 206:13-25.  Aerial photographs taken in 1963, 1969 and 1970 also indicate disposal areas on the Mian and Kirby Properties.  *Id.*  Thus, the Court finds that there was a sanitary landfill facility on the Mian and Kirby Properties.

14.  In contrast, there is insufficient evidence to support a finding that the Litgo Property

---

[5]In 1916, Somerville Iron Works owned the Litgo Property but not the Mian Property or the Kirby Property.  As previously mentioned, the Somerville Iron Works would go on to purchase the Mian and Kirby Properties in 1920.  Ex. P-2.

was used as a sanitary landfill.  The 1916 indenture does not mention the Litgo Property.  *Id.*

Soil borings on the Litgo Property showed only small amounts of slag, which is more consistent

with incidental deposits from foundry operations than with use of the land for disposal of

foundry wastes.  2/8/10 Tr. 209:7-19.  In addition, the existence of a small building on the

eastern edge of the Litgo Property as early as 1924 plus the later construction of the Dande

Plastics building on the eastern side of the property suggest that there was little space for a

sanitary landfill facility without impeding access to the buildings.  *Id.* at 206:25-208:22**.**  Finally,

soil samples and borings show that bedrock at the Litgo Property was typically only four to five

feet below the surface, which is not optimal for the creation of a landfill.  *Id.* at 208:17-209:6.

The Court concludes that Plaintiffs have not established the existence of a historical sanitary

landfill on the Litgo Property.

### 2.   Columbia Aircraft

15.  In 1941, Columbia Aircraft leased portions of the Litgo Property that were

previously occupied by Somerville Stove Works.  1/28/10 Tr. at 99:10-21, 100:20-24.  Plaintiffs'

claims against the United States Defendants are based in part on their assertions that the United

States Defendants are responsible for the use and release of TCE at Columbia Aircraft during

WWII.

### a.   Columbia Aircraft's use of TCE

16.  Columbia Aircraft's primary business was machining precision parts for military

aircraft.  *Id.* at 117:9-16.  TCE could have been used and disposed of during Columbia Aircraft's

operations in several ways.  First, degreasing would have been a necessary stage in the finishing

process when manufacturing precision aircraft components.  1/29/10 Tr. 46:2-8.  TCE would

have been the preferred degreasing agent for Columbia Aircraft because it would have been more effective and less likely to etch the surface or stain precision parts than an alkaline-based cleaner. *Id.* at 46:2-14; 1/28/10 Tr. 131:10-16; Ex. P-55 at LITGO-RCRA0001727, 1738 [1944 Methods of Cleaning and Drying Metal Parts and Equipment]. Inadvertent releases of TCE would have been common in the degreasing process. 1/29/10 Tr. 32:6-14.

17. Second, Columbia Aircraft would have also used some sort of degreasing agent for maintenance purposes on its machine tools. *Id.* at 47:1-7. Some incidental releases of TCE could have occurred if TCE was used to maintain Columbia Aircraft's machine tools.

18. Third, it was standard practice in the 1940's, at least as of 1948, to dispose of TCE by dumping it onto the ground and allowing it to evaporate. Ex. P-76 at US0002190 [1948 Chemical Safety Data Sheet for TCE]. Columbia Aircraft would have dumped waste TCE in the southeast corner of the Litgo Property, as this was the portion of the property that was the furthest from any occupied structures or residences. 1/29/10 Tr. 34:9-35:8. The dumping of waste TCE on the southeast corner of the property is the best explanation put forth by any of the parties at trial for the DNAPL found to be feeding the Eastern Groundwater Plume as it is the only likely source of the sort of large-scale release necessary to form an area of DNAPL. *See* 2/8/10 Tr: 48:6-18**.**

19. Columbia Aircraft's operations ended after it declared bankruptcy in 1947. 2/2/10 Tr. 156:17-24. At the time it declared bankruptcy, Columbia Aircraft owned five "Steel Tanks with Steam Heating Coils" and one "Drum Triad Degreasing Solvent." Ex. P-598 at MORGAN000684-85 [Columbia Aircraft Bankruptcy Appraisal]. "Triad" was the trademark used by the Detroit Rex Corporation for degreasing solvents, including a TCE-based solvent for

12

dry cleaning and metal degreasing.  Ex. P-77 [U.S. Patent Office Trademark Registration].  Five "Degrease Tanks," were recorded as having been sold at the bankruptcy auction and appear to be the same five "Steel Tanks" listed in the bankruptcy appraisal documents.  *See Id.*; Ex. P-610 at MORGAN000710 [Columbia Aircraft Bankruptcy Auction Results]; 2/2/10 Tr. 158:23-159:9.

20.  Given the evidence presented regarding the particular suitability of vapor degreasing for precision aircraft parts, the common use of vapor degreasers during the relevant time period, the presence of what is likely a TCE-based degreasing solvent in the bankruptcy inventory, and the presence of TCE in DNAPL form in the area in which Columbia Aircraft operated, the Court finds that it is likely that the five tanks were vapor degreasers and that Columbia Aircraft use and disposal of TCE resulted in a release of TCE into the soil and groundwater at the site.  1/29/10 Tr.. at 17:22-18:16, 21:13-18, 22:25-23:8**,** 31:8-10.[6]

> b.    The United States Defendants' Involvement with Columbia Aircraft

21.  During WWII, the federal government, through the United States Defense Plant Corporation ("DPC") purchased land, buildings, machinery, and equipment that it would then lease to private organizations for use in the war effort.  2/2/10 Tr. 124:22-125:1.  In the early 1940's, the DPC leased Columbia Aircraft seventeen pieces of equipment, including boring mills, grinding machines, lathers, milling machines, and a shaper.  *Id.* at 111:14-18; Ex. US-477 at

---

[6]The Court notes that Dr. Brigham testified that the five steel tanks were not vapor degreasers.  His testimony focused on the absence of any mention in the bankruptcy appraisal of condensing coils or cooling jackets, which are a necessary element in a vapor degreaser, and the low cost at which the tanks were sold at auction.  2/2/10 Tr. 159:21-168:8.  Brigham's conclusions also relied on the listing of an "electric drying machine," which could be the type of drying oven commonly used at the end of the alkaline cleaning process, in the bankruptcy inventory.  *Id.* at 207:7-24.  While recognizing that some uncertainty exists on this issue, the Court believes the evidence weighs in favor of finding that the five tanks are vapor degreasers.

US0003772, 3775 [Plancor No. 666 Factual Appendix].  The equipment leased to Columbia

Aircraft by the DPC was owned by the United States.  1/28/10 Tr. 111:1-13.  However,

Columbia also owned its own equipment which it used in its manufacturing operations.  *Id.* at

130:25-131:18.  The DPC did not lease a vapor degreaser to Columbia Aircraft.  *See* Ex. US-477

at US003775.  The United States Defendants never owned or leased any land or buildings at or

on the Litgo Property.  1/29/10 Tr. 130:25-131:8.

22.  During WWII the United States granted "Necessity Certificates" to private

companies, which allowed them to accelerate depreciation on tools and equipment purchased to

manufacture parts in connection with the war effort.  1/28/10 112:8-25; 2/2/10 Tr. 120:23-

121:24.  Columbia applied for and received three Necessity Certificates.  2/2/10 Tr 122:8-11.

None of the Necessity Certificates list a vapor degreaser as one of the pieces of equipment for

which Columbia Aircraft was seeking accelerated depreciation.  *Id.* at 122:22-24.

23.  The United States did conduct inspections of Columbia Aircraft's operations.  2/2/10

Tr. 128:5-130:8.  These inspections were intended to ensure that Columbia Aircraft was

"maintained properly in accordance with good industrial practices" due to concerns about fire

prevention and sabotage.  *Id.*  The inspector was not involved in Columbia Aircraft's day-to-day

operations or policy-making.  *Id.*

24.  In addition, during WWII the United States regulated the distribution and allocation

of chemicals, including TCE and PCE.  *Id.* at 141:16-145:2.  In order to ensure the success of the

war efforts, the United States set a priority scheme for what types of manufacturers could receive

TCE.  *Id.*  However, the United States did not furnish or supply Columbia Aircraft with TCE or

any other chlorinated solvent.  *Id.* at 147:7-10; 141:13-15.

### C.     JANR Warehouse

25.  At some point prior to 1976, the Somerville Iron Works buildings were converted to warehouses.  In the early 1980's, hazardous substances, including TCE, were stored in the JANR Warehouse.  Plaintiffs' assert that the Sanzari Defendants are liable under CERCLA and the Spill Act based on their ownership of the Litgo Property at the time that hazardous substances were stored at the JANR Warehouse.  Plaintiffs claims against the Commissioner are based on his role in sending and removing the hazardous materials to and from the JANR Warehouse.  In addition, the United States Defendants are alleged to be responsible in part as the generator of some of the hazardous materials at the warehouse.

### 1.     The SIGNO Warehouse

26.  Jack and Charles Colbert, the principals of Signo Trading International ("Signo"), stored hazardous substances and wastes at 140 Thomas Street, Newark, New Jersey ("Signo Warehouse").  Signo was in the business of acquiring and reselling chemicals, including surplus government materials.  1/22/10 Tr. 16:4-17:7; Ex. P-97 at COMM010339 [10/19/82 Signo Warehouse Hazardous Waste Investigation].  The Colberts, as the principals of Signo, were the owners of the hazardous substances at the Signo Warehouse.   Ex. P-97 at COMM010337, 10339; 1/22/10 Tr. 150:15-20.

27.  Aerosol cans of TCE were among the materials stored at the Signo Warehouse.  Ex. P-105 at NJDEP003631 [4/14/1983 Memo re Signo Warehouse Chemical Fire].  Many of the containers at the Signo Warehouse originated from properties owned and operated by the United States Defendants.  P-617 [8/1/83 Memo re RTS Inventory at Signo].  Containers that originated from the United States Defendants had been brought to the Signo Warehouse by Resource

Technology Services ("RTS") and Atlantic Coast Environmental ("ACE"), hazardous waste transporters with whom the United States Defendants contracted to dispose of some of their hazardous substances and wastes.  1/22/10 Tr. 43:15-44:24, 64:12-22; Ex. P-593A [RTS Bill of Lading from Norfolk Naval Base to Signo]; Pls.' Findings of Fact Ex. B ¶¶ 74-75, 77-78 [U.S. Resps. to Pls.' RFAs].

28. In April 1983, a fire at the Signo Warehouse forced the NJDEP to supervise the cleanup and removal of containers of hazardous waste from that site.  *See* Ex. P-105; 1/22/10 Tr. 31:22-32:19.  In September 1983, the New Jersey Superior Court ordered Signo to remove from the Signo Warehouse all materials not removed by ACE or RTS.  Ex. P-124 at COMM017818 [9/2/83 Order in *NJDEP v. Signo Trading International, Inc.*].  The Superior Court's Order stated that the NJDEP "is responsible for the management and cleanup at [the Signo Warehouse] which shall include but not necessarily be limited to a monitoring of all phases of the cleanup, insuring compliance with all federal, state and local statutes and attendant regulations and providing adequate security at the site."  *Id.*

29. The Colberts were responsible for removing the majority of the materials from the Signo Warehouse.  1/22/10 Tr. 19:5-19; 156:9-14.  The Colberts were free to ship non-hazardous substances to a location of their choice.  Ex. P-108 at COMM025554 [4/28/83 Letter re Signo Warehouse].  Hazardous wastes, however, had to be moved by a licensed hauler to a licensed facility, and the NJDEP was responsible for ensuring that this was done.  *Id.;* 1/22/10 Tr. 157:5-12; 158:14-19; P-183 [9/19/84 Memo re Somerville warehouse].

30. NJDEP employees inspected materials before they were shipped out to ensure that they were not hazardous wastes.  1/22/10 Tr. 158:17-21.  This inspection was insufficient to

accurately identify and separate out the hazardous wastes at the site.  The inspection was limited to checking for hazardous waste labels, even though NJDEP employees knew materials at the Signo Warehouse were not always accurately labeled.  *Id.* at 161:2-19, 162:21-163:5, 170:3-171:10.  NJDEP employees also knew that Signo personnel had painted over or removed labels from some containers.  *Id.* at 171:17-24; 173:12-174:13.

31. Thousands of containers of materials were shipped from the Signo Warehouse to the JANR Warehouse at the direction of Signo and the Colberts.  Ex. Sanzari-42 at LITGO-RCRA0004854 [2003 Sorge Historical Data Review]; Ex. P-133 at COMM004146 [1/31/84 Memo re JANR Trucking]; Ex. P-183; 1/22/10 Tr. 181:7-187:8; 1/20/10 Tr. 32:1-6.  Included among the containers shipped from the Signo Warehouse to the JANR Warehouse were photographic materials, which often contain VOCs, and at least three skids of "aircraft cleaning compound," which could have been a TCE-based degreaser.  *See* 1/22/10 Tr. 181:7-187:8.

### 2.    The JANR Warehouse

32.  Alfred Sanzari purchased the Litgo Property on June 15, 1976.  Ex. Sanzari-7 [Deed from Schwartz to Sanzari].  Alfred Sanzari Enterprises was a trade name used by Alfred Sanzari.  1/26/10 Tr. 97:24-98:4.  Alfred Sanzari Enterprises held itself out as the owner of the Litgo Property and managed and directed operations on the Litgo Property.  Ex. P-632 at LITGO-RCRA0000020-21 [1985 Agreement of Sale]; Ex. Sanzari-208 at SANZARI008414.  From 1976 to 1990, Alfred Sanzari Enterprises leased space at the Litgo Property to a number of commercial and industrial tenants.  Ex. P-585 [Tenant Location Map].

33.  In September 1983, Alfred Sanzari Enterprises leased a warehouse, referred to as the JANR Warehouse, on the Litgo Property to JANR Transport, Inc. ("JANR") for a five-year

period beginning October 1, 1983.  Ex. P-123 [Lease between Sanzari and JANR Transport].

The JANR Warehouse was located in the original Somerville Iron Works building on the

western portion of the Litgo Property.  Ex. P-585.

34.  The JANR Warehouse was connected to a sanitary sewer line which ran along the

western edge of the Litgo Property.  2/4/10 Tr. 18:12-2; 21:10-18.  The sanitary sewer line ran

north towards Fairview Ave.  *Id.*  Inspections showed the sewer system to have been in poor

condition and potentially leaking in the vicinity of the northwest corner of the Litgo Property,

near the source area of the Western Groundwater Plume.  *Id*. at 22:23-23:8; 1/27/10 Tr. 54:17-

56:2. Hazardous substances improperly disposed of in a sink or toilet in the JANR Warehouse

would have flowed through the sanitary sewer line towards the source of the Western

Groundwater Plume.

35.  The JANR Warehouse also had a storm drainage system, which included floor drains

that discharged to local drainage ditches.  *See* Ex. P-637 at LITGO-RCRA0000623 [1/29/87

Memo re JANR Transport Meeting].  There is a catch basin for the drainage ditches  in the

northwest corner of the Litgo Property, near the source area of the Western Groundwater Plume.

1/26/10 Tr. 58:18-59:16.  Witnesses testified to the existence of holes in the windows and roof of

the JANR Warehouse which allowed water to enter the building.  1/19/10 Tr. 164:18-25.  Rain

water and puddles were observed on the floor of the JANR Warehouse on several different

occasions.  *See, e.g.*, Ex. P-236 at NJDE003936 [JANR Site Log Vol. 1]; Ex. P-245 at

NJDEP004321 [JANR Site Log Vol. 2]; Ex. P-275 at NJDEP004602-03 [JANR Site Log Vol.

4]; Ex. P-324 at NJDEP005172 [JANR Site Log Vol. 8].  Water that reached the floor of the

JANR Warehouse would have entered the storm drainage system and flowed towards the source

area of the Western Groundwater Plume.

### 3. Cleanup of the JANR Warehouse

#### a. Initial Remedial Activities

36.   In January 1984, the Borough of Somerville became aware that toxic and hazardous materials were being improperly stored in the JANR Warehouse.  1/19/10 Tr. 129:23-130:22.[7] The majority of the materials at the JANR Warehouse came from the Signo Warehouse.  *Id.* at 157:21-158:25.  Inspections revealed that many of the containers in the JANR Warehouse were damaged or improperly labeled and spilling or leaking, creating dangerous conditions.  Ex. P-175 at SANZARI001382 [AETC JANR Warehouse Inventory];  1/19/10 Tr. 162:6-12); Ex. P-543 [Photograph of JANR Warehouse Interior]; Ex. P-148 at COMM009734 [3/1/84 Allen Memo re JANR Warehouse]; Ex. P-173 [8/3/84 Letter from Health Officer]; Ex. P-189 at LITGO-RCRA000639 [1984 Dalton Hazardous Waste Site Inspection].  The improper storage of the materials in corroded, leaking, and spilling containers created, at a minimum, a threat of release of hazardous substances.

37.   In February 1984, the Borough of Somerville and the NJDEP began efforts to get JANR and/or Alfred Sanzari Enterprises to alleviate conditions at the JANR Warehouse.  Ex. P-140 [2/8/84 Borough Letter to Ribas's]; Ex. P-146 [2/24/84 NJDEP Letter to Alfred Sanzari Enterprises].  The Sanzari Defendants attempted to get JANR to remove the materials from the JANR Warehouse.  2/3/10 Tr 64:18-21.  When JANR didn't comply with their requests, Alfred

---

[7]An initial NJDEP inspection concluded that the materials at the JANR Warehouse were largely unused, saleable materials as opposed to hazardous waste.  1/22/10 Tr. 97:4-98:5. However, all later inspections found hazardous wastes present at the site and the NJDEP and Clean Venture treated the materials as hazardous waste in its later cleanup and removal action. 1/19/10 Tr. 192:2-21 [Wolf Direct].

Sanzari Enterprises sued JANR and obtained a judgment evicting them on May 3, 1984. *Id.* at

58:24-60:14. JANR left all the materials in the warehouse when it vacated the premises. *Id.* at

67:22-68:9.

38. In July 1984, Alfred Sanzari Enterprises sued Signo and the Colbert Brothers, the

owners of the material in the JANR Warehouse. Ex. Sanzari-208 [Verified Complaint in *Alfred*

*Sanzari Enterprises v. Signo Trading International, Inc., et. al*]. As a result of this suit, the

Superior Court of New Jersey ordered that Signo and the Colbert Brothers had forfeited their

ownership interest in the materials in the JANR Warehouse and appointed Leo Motiuk, Esq. to

serve as the "custodial receiver" of the material. Ex. Sanzari-206A at SANZARI000806-

07[Order Appointing Receiver]. The Sanzari Defendants took no further action to ameliorate

conditions at the JANR Warehouse. 2/3/10 Tr. 91:15-20.

39. Motiuk hired Advanced Environmental Technology Corporation ("AETC") to serve

as an environmental and chemical consultant. Ex. P-183; Ex. P-175 at SANZARI 001381.

AETC conducted an inspection and inventory of the JANR Warehouse. *Id.* at SANZARI001381-

82. AETC categorized the majority (over 80%) of the materials in the JANR Warehouse as used

or waste, in deteriorating shipping containers and spilling and/or leaking. *Id.* at

SANZARI001382. Included in the inventory put together by AETC were 106 gallons of TCE.

*Id.* at SANZARI001406. After the AETC inspection and inventory, Motiuk contacted the NJDEP

for assistance.

40. In October 1984, the NJDEP hired Clean Venture, Inc. ("Clean Venture") to stabilize

the situation in the JANR Warehouse by segregating and removing materials. Ex. Sanzari-15 at

LITGO-RCRA0000676 [NJDEP Close-Out Report]. Following Clean Venture's stabilization

efforts, the NJDEP put out a bid for an environmental contractor to clean up and remove the materials from the JANR Warehouse.  Clean Venture was selected for the task.  1/19/10 Tr. 222:14-24; 1/25/10 Tr. 21:15-22:2.

41.  Beginning in October 1985, Clean Venture identified, sampled, and prepared the materials for removal from the JANR Warehouse to a proper off-site disposal facility.  Ex. Sanzari-15 at LITGO-RCRA000679.  Clean Venture and the NJDEP maintained an "exclusion zone" in the area of the cleanup.  1/25/10 Tr. 179:9-183:11, 195:14-196:11**.**  The Sanzari Defendants did not have access to or control of this area during Clean Venture's cleanup operation.  *Id.*  The exclusion zone included the JANR Warehouse, the area where liquid and solid wastes were bulked for disposal, and the loading dock for the warehouse.  *Id.*

42.  During Clean Venture's operations, the NJDEP maintained the authority to direct the disposal of materials at the JANR Warehouse and to supervise Clean Venture's work.  Pls.' Proposed Findings of Fact. Ex. A ¶ 20 [Comm.'s Resps. To Pls. RFAs]; 1/25/10 Tr. 23:11-17. The NJDEP had several employees on site to supervise and maintain records regarding the removal activities.  *See* 1/25/10 Tr. 25:6-19.

       b.     TCE and the United States Defendants' Materials at the JANR Warehouse

43.  In November 1985, the NJDEP sent several members of its Cost Recovery Unit [CRU] to the JANR Warehouse to find out who generated the hazardous wastes.  1/21/10 Tr. 116:14-21.  The CRU team only collected evidence for the containers where there was visible information that indicated where it had come from or who had generated it.  *Id.* at 119:2-13.  A large number of the drums and containers of materials that ended up in the JANR Warehouse

originated with the United States Defendants.  Ex. P-246 [10/28/85 Memo re RTS material at the JANR Warehouse]; 1/21/10 Tr. 156:19-169:5.  The CRU team identified two specific items which contained contaminants found in the groundwater plumes and which originated with the United States Defendants.

44.  First, the CRU team identified a 55-gallon drum of Kodak Developer ("CRU-5") that contained PCE and was generated by the United States Navy.  *Id.* at 133:20-136:10.  CRU-5 had been transported to the Signo Warehouse by RTS.  Ex. P-515 [Label for CRU-5].  CRU-5 was labeled with a hazardous waste label, and the bottles of PCE it contained were marked as "used" and lab-packed.  *Id.*; 1/21/10 Tr. 138:18-139:17; 143:20-144:10.  The Court thus finds that CRU-5 contained waste PCE.  An earlier FBI inspection of a drum that was more likely than not CRU-5 noted that it contained at least one broken bottle.  Ex. US-218 [FBI Memorandum].

45.  Second, the CRU team identified a pallet containing approximately 106 one-gallon glass bottles of TCE ("CRU-154") that originated with the United States Air Force.  Ex. P-247 at COMM020070-71; 1/21/10 Tr. 147:16-148:25.  The bottles appeared to be in their original packaging but were labeled with a "rejected or condemned tag" with a handwritten notation that the "lot is no good."  1/21/10 Tr. 153:11-154:17; 188:22-190:23.  Thus, the Court finds that CRU-154 contained waste TCE.  There was no evidence that any of the one-gallon glass bottles in CRU-154 were broken or leaking.

46.  In addition, a NJDEP employee identified aerosol cans containing TCE which originated with the United States Defendants as being among the materials at the JANR Warehouse.  2/4/10 59:1-61:1; 1/25/10 Tr. 133:10-16; *see also* Ex. US-49 [Letter from NJDEP to Defense General Supply Center].  There was no evidence that any of the aerosol cans was broken

or leaking.

                c.        Releases of TCE during the JANR Warehouse Cleanup

47.  There is no record of CRU-5, CRU-154 or the aerosol cans being removed from or disposed of at the JANR Warehouse.  *See* Ex. MM-112 [Hazardous Waste Manifests]; 2/8/10 Tr. 162:4-15.  Priit Pals, an on-site coordinator for the NJDEP, testified that the most likely method of disposal for one-gallon bottles or aerosol cans of TCE or PCE would be lab-packing prior to placement in a landfill.  1/25/10 Tr. 46:5-23; 187:13-188:14; 192:5-194:9.  Clean Venture lab-packed a number of materials and had them removed from the JANR Warehouse.

48.  Lab-packing is not the only method that can be used to dispose of TCE and PCE.  Liquid TCE, such as that in CRU-154, can be solidified and disposed of as a solid.  1/25/10 Tr. 187:13-25.  Clean Venture created two bulk solid waste piles outside of the JANR Warehouse.  *Id.* at 38:5-39:23.  Sampling of the bulk solid waste pile indicated the presence of VOCs, including chloroform, TCE, and PCE.  Ex. P-329 at NJDEP006305-09 [11/24/86 Memo re Disposal of Bulk Solid Wastes].  Leachate, a liquid which drains from landfills and solid waste piles, pooled on the ground near the solid bulk waste piles.  Ex. P-324 at NJDEP005172.

49.  It is also possible that the liquid TCE and PCE was bulked with other liquids for disposal.  Clean Venture created a bulking pool behind the JANR Warehouse where liquid wastes were combined before being pumped into tanker trucks for removal from the site.  1/25/10 Tr. 26:18-31:3.  Materials to be bulked were moved to the loading dock of the JANR Warehouse and pumped into the pool via a hose inserted into the container.  *Id.*  The NJDEP employees testified that the majority of liquids that went into the bulking pool were aqueous-based.  *Id.* at 26:19-25.  TCE is not aqueous-based.  *Id* at 29:24-30:6.  However, the NJDEP Close-Out Report noted that

23

Clean Venture had "difficulty in determining which wastes were compatible for blending for bulk disposal." Sanzari-15 at LITGO-RCRA0000713.

50.  Although bulking would not have been the preferred method of disposal for the materials in CRU-5, CRU-154 and the aerosol cans, the evidence supports a finding that some TCE and PCE was bulked rather than lab-packed. Twelve hundred pounds of "empty crushed glassware"—like the one-gallon bottles in CRU-154—that "formerly contain[ed] various organics and inorganics" were removed from the JANR Warehouse at the end of the cleanup. Ex. MM-112 [Hazardous Waste Manifests]; 2/8/10 Tr. 162:4-15. Given the evidence of TCE in the solid bulk waste piles, the large quantities of crushed glassware, and the fact that there is no evidence that CRU-5, CRU-154, and the aerosol cans were lab-packed and removed, the Court finds that some TCE and PCE was solidified and disposed of in the bulk solid waste piles or emptied into the bulking pools.

51.  Clean Venture's inexperience resulted in many problems during the cleanup of the JANR Warehouse, including numerous spills. Ex. P-320 at LITGO-RCRA0000583-86 [Summary of Notable Incidents]; Ex. Sanzari-15 at LITGO-RCRA0000680, 712. TCE was not identified as a substance in any of the spills. *See* Ex. P-320 at LITGO-RCRA000538-86. However, one incident did involve a leaking five-gallon pail of "airplane cleaner solvent," which could have been a TCE-based solvent. 1/25/10 Tr. 87:13-88:5. In addition, in February 1986, approximately 1,200 gallons of waste leaked from the bulking pool onto the railroad south of the JANR Warehouse. *Id*. at 55:12-57:12. In December 1986, a leaking fire hydrant spilled approximately 10,000 gallons of water into the area near the JANR Warehouse loading dock, where Clean Venture had been sorting and preparing materials for removal. *Id*. at 114:13-117:3.

This water was removed from the area by pumping it into the sewer system.  *Id.*

52.  The NJDEP/Clean Venture cleanup of the JANR Warehouse was completed in August 1987.  Before the area was released back to the Sanzari Defendants, Clean Venture removed all visibly contaminated soil and decontaminated the areas involved in the cleanup, including the outdoor loading dock and the inside of the JANR Warehouse.  Ex. Sanzari-15 at LITGO-RCRA0000698.  The NJDEP did not do any post-removal sampling because sampling was going to be performed as part of the ECRA process, which had been triggered by the pending sale of the Litgo Property to Goldstein.  1/27/10 Tr. 26:18-27:18.  The NJDEP released the area to the Sanzari Defendants on September 4, 1987.  Ex. Sanzari-15 at LITGO-RCRA0000698.[8]

53.  Sanzari Defendants' environmental consultants took a number of soils samples from the area where Clean Venture had processed wastes and found TCE in one only sample, and that at very low levels.  2/4/10 Tr. 65:3-66:24.  At the time of that sampling, however, Clean Venture had already removed all of the obviously contaminated soil from the area.  Ex. Sanzari-15 at LITGO-RCRA0000698.  Initial groundwater sampling conducted in April 1989 revealed TCE in MW-2, which is located on the southern edge of the Litgo Property adjacent to the area used by Clean Venture for the solid waste bulk piles and the liquid bulking pools.  Ex. P-382 at LITGO-RCRA0002270; Ex. US-791 [Clean Venture cleanup Site Map]; Ex. US-697.

54.  The Court finds that during the cleanup of the JANR Warehouse, TCE and PCE were likely released into the soil and groundwater at the Litgo Property, contributing to the contamination in the Western Groundwater Plume and/or Eastern Groundwater Plume.  This

---

[8]There is no evidence of use of the JANR Warehouse after the Clean Venture/NJDEP cleanup was completed.  The JANR Warehouse was eventually demolished in 1997 after a severe storm caused the building to partially collapse.  1/19/10 Tr. 84:7-85:16.

finding is based on the documented presence of TCE and PCE within the warehouse, the likely bulking of TCE and PCE for removal, and the numerous spills which occurred during the cleanup which could have involved TCE or PCE.  Leaked or spilled TCE and PCE could have been carried through the drainage system to the Western Groundwater Plume.  In addition, leaks and spills from the bulking pools, solid waste bulking piles, or loading dock to the south of the JANR Warehouse could have contributed to the Eastern Groundwater Plume.

d.      Dande Plastics Fire

55.  Plaintiffs allege that a fire at an adjacent warehouse, the "Dande Plastics Warehouse," could have caused the release of TCE and other hazardous substances from the JANR Warehouse into the environment.  On December 29, 1985, a fire destroyed the Dande Plastics Warehouse, which was  located on the eastern portion of the Litgo Property.  1/19/10 Tr. 37:3-19.  Fire trucks that were there to control the fire sprayed water over much of the Litgo property throughout the course of the night.  1/19/10 Tr. 37:9-19, 112:1-8.

56.  The majority of the water was directed at the Dande Plastics Warehouse.  *Id.* However, water was sprayed on the exterior and roof of the JANR Warehouse to prevent the fire from spreading.  *Id.*  This caused "minor flooding" within the JANR Warehouse.  Ex. P-269 **at** MAURIELLO000045 [1/8/86 Memo re Work Performed at JANR Warehouse].  Bruce Wolf, who was present the night of the fire, testified that he saw some water flow from the JANR Warehouse out of the main loading door on the southern side of the building.  1/20/10 Tr. 34:3-18.  Although a sample of the "firewater" was taken, it was not analyzed.  Ex. Sanzari-162 at LITGO-RCRA040523-24.

57.  The fire did not cause any significant damage to the JANR Warehouse, as the NJDEP

26

team was able to enter the warehouse and continue its work two days after the fire.  1/21/10 Tr. 183:20-184:4.  There was no obvious charring or water damage to materials within the JANR Warehouse.  *Id.* at 183:20-184:12.  Although the conditions in the JANR Warehouse were generally very poor, there were no documented instances of TCE spills or leaks or deteriorating containers holding TCE.[9]  The fire did not reach the JANR Warehouse and thus could not have caused any additional damage to containers or new spills within the warehouse.  The Court believes there is insufficient evidence to support a finding that TCE was released into the soil or groundwater at the Litgo Property during the Dande Plastics Fire.

### D.   *Other Proposed Sources of Contamination*

58.  The Sanzari Defendants, the United States Defendants, and the Commissioner all assert that the sources of the contamination in the groundwater plumes is something other than the activities at Columbia Aircraft or the JANR Warehouse.  The United States Defendants' and the Sanzari Defendants' crossclaims against Mian are based on their assertion that the contamination is due at least in part to the disposal of TCE on the Mian Property.

### 1.   The Dande Plastics Building

59.  Machining and manufacturing operations in the Dande Plastics building have been posited as a source of the contamination at the Litgo Property.  Plaintiffs previously made a similar assertion, arguing in an earlier lawsuit that Dande Plastics was a source of the contamination.[10]  Ex. US-231 at LITGO23284-85 [Fourth Amended Complaint in *Goldstein v.*

---

[9]The evidence regarding the broken bottle of PCE in CRU-5 did not state whether or not any of the PCE had spilled or leaked outside of the drum.  It is more likely than not that the spill from the glass bottle was contained at that time within CRU-5.

[10]This lawsuit is discussed *infra* section II.E.2.

*Wausau*].  At the time of the Dande Plastics fire, the Dande Plastics building housed Dande

Plastics' plastics extrusion business as well as F Sharp Screw's and Trolstar's machine shops.

1/19/10 Tr. 99:8-100:22; 1/26/10 Tr. 84:16-23.

60.  Any of the businesses operating within the Dande Plastics building could have

possessed and used VOCs, including TCE.  Further, witnesses of the Dande Plastics fire heard

containers inside the building exploding.  2/4/10 Tr. 45:1-46:5.  If the businesses within the

Dande Plastics building had TCE on site, the large quantities of water poured onto the building

during the fire could have mixed with TCE from the exploding containers and been released into

the soil and groundwater.  However, there was no hard evidence that the business operating in the

Dande Plastics building actually used or owned any TCE.  Therefore, the Court cannot make a

finding that the Dande Plastics building was a source of the contaminants at the Litgo Property.

2.    <u>The Truckform Property</u>

61.  The Truckform Property has also been suggested as an alternative source for the

contamination in the groundwater plumes.  Plaintiffs' own environmental expert originally

posited that the source for the Western Groundwater Plume was located on the Truckform

Property.  Ex. US-1007A at LITGO-RCRA0017-02 [2001 Sorge Report].  TCE has been

identified in the soil and groundwater on the eastern edge of the Truckform Property.  2/4/10 Tr.

23:19-25:19, 26:2-17.  A sewer line that runs along the eastern edge of the Truckform property

and cuts into the source area of the Western Groundwater Plume could have been the route by

which TCE moved from the Truckform Property to the source area.  *Id.* at 21:19-23:10; 2/8/10 Tr.

156:14-156:17.

62.  However, there is no evidence of TCE ever being used on the Truckform Property.

28

*Id.* at 119:10-13.  In addition, the NJDEP repeatedly rejected Plaintiffs' theory that the Truckform Property was the source of the Western Groundwater Plume for lack of convincing data.  Ex. P-466 at LITGO-RCRA0006519.  The Court finds that there is insufficient evidence to conclude that the Truckform Property was a source of the soil or groundwater contamination at the Litgo Property.

3.     The Mian Property

63.  The United States Defendants have suggested that TCE stored and released from a tank located on the Mian Property in the 1950's is a source of the TCE-contamination.  The Mian Property was purchased by Dr. Bilal Mian and Shakila Mian on February 19, 1987.  (*See* Third Am. Compl. ¶ 46 [docket # 106]; Answer to Third Am. Compl. ¶ 46 [docket #129].)  The property was eventually transferred to Defendant Mian Realty.  (*Id.*)  Mian is the present owner of the Mian Property.  (*Id.*)  There have been no allegations that activities on the Mian Property since Mian became the owner have caused or contributed to the soil or groundwater contamination.

64.  Analysis of an aerial photograph from 1952 showed a horizontal tank on the Mian Property.  2/3/10 Tr. 163:3-164:8.  The tank was surrounded by stained soil and was in the vicinity of MW-9 and MW-11, both of which have tested positive for TCE.  *Id.*  However, there was no evidence as to what was in the horizontal tank or what caused the staining in its vicinity.  *Id.* at 164:9-14.  Soil samples taken in the area where the staining was observed did not contain TCE.  US Ex.-1007A at LITGO-RCRA0017082-84.  The Court therefore finds that the Mian Property was not shown to be a source for the contamination at the Litgo Property and in the groundwater plumes.

29

### E.     *Plaintiffs' Acquisition of the Litgo Property*

65.  Plaintiff Goldstein first learned about the Litgo Property through Lawrence Seidman, who proposed that they invest in the property and develop it together.  1/2/10 Tr. 90:11-14; 2/5/10 Tr. 14:1-6.  On August 6, 1985, Goldstein entered into an Agreement of Sale with Alfred Sanzari to acquire the Litgo Property.  Ex. P-632.  Goldstein's intent was to have the property rezoned for residential use, get approvals to build townhouses, and then sell the property.  1/20/10 Tr. 179:25-180:13.

66.  At the time the Agreement of Sale was reached, Goldstein was aware that there was a soil contamination problem at the Litgo Property.  *Id.* at 96:20-24; 2/5/10 Tr. 13:14-23.  Goldstein was also on notice that there were materials in the JANR Warehouse that needed to be removed and dealt with, as the directive letter from the NJDEP to Alfred Sanzari Enterprises was incorporated by reference into the Agreement of Sale.  (Pls.' Proposed FOF ¶ 377 [docket # 349]; Ex. P-195 at SANZARI000798-99 [NJDEP Directive Letter].  Goldstein did not visit the property or engage in any investigation of the environmental issues.  1/20/10 Tr. 139:7-14, 179:12-24.

67.  Paragraph 15 of the 1985 Agreement of Sale, the "ECRA" provision, states:

> The parties acknowledge that the Property is subject to the provisions of N.J.S.A. 13:1K-6 ("ECRA"). . . .  [Alfred Sanzari] agrees to comply with all of the provisions of ECRA by obtaining a Negative Declaration or a Clean-up Plan from the DEP. . . .  In the event, however, that the net cost to [Alfred Sanzari] of obtaining and processing a Clean-up Plan exceeds the sum of One Hundred Thousand ($100,000.00) Dollars, [Alfred Sanzari] shall have the option of terminating this Agreement of Sale, unless [Goldstein] agrees to pay such cost in excess of One Hundred Thousand ($100,000.00) Dollars.

Ex. P-632 at LITGO-RCRA0000016.  Pursuant to Paragraph 7, Goldstein agreed to "accept conveyance of the Property . . . in [its] 'as is' condition."  *Id.* at LITGO-RCRA000008.  Alfred Sanzari assumed "the risk of loss or damage to the Property beyond ordinary wear and tear until

delivery of the deed to [Goldstein] at the closing of title." *Id.* at LITGO-RCRA0000010.

68.   After a proposed cleanup plan was rejected by the NJDEP, Alfred Sanzari attempted to exercise his right to cancel the contract pursuant to the ECRA provision.   Ex. Sanzari-105 at LITGO-RCRA0028022-23 [Complaint in *Goldstein v. Sanzari*]; 1/20/10 Tr. 187:17-188:11. Alfred Sanzari expressed concern that the cost for the required cleanup could exceed $1 million. *Id.*   In November 1987, Goldstein brought suit against Alfred Sanzari in the Superior Court of New Jersey, seeking specific performance of the Agreement of Sale.   Ex. Sanzari-105 at LITGO-RCRA0027969-70.

69.   In connection with the suit, Goldstein and Seidman hired EWMA to review the ECRA compliance documents and cost estimates prepared by Sanzari's environmental consultants.   *See* Ex. Sanzari-87 [EWMA Review of Documents Pertaining to ECRA Compliance]; Ex. US-246 at LITGO-RCRA0027037 [Certification of Goldstein in *EWMA v. Litgo*].   In February 1989, EWMA issued a report that criticized the existing cleanup proposals for failing to fully delineate the soil contamination and not addressing potential groundwater issues.   Ex. Sanzari-87 at LITGO-RCRA0025258-59.   EMWA found that the actual cost of an ECRA-compliant cleanup could not be accurately estimated because there had been no groundwater sampling or delineation of contaminated areas.   *Id.*.   EWMA also concluded that the actual cost could be far greater than the existing estimates.   *Id.*

70.   On April 10, 1989, Alfred Sanzari and Goldstein reached a settlement agreement ("1989 Settlement Agreement") regarding the sale of the Litgo Property.   Ex. P-744 [Stenographic Settlement Agreement].   The Settlement Agreement provides that:

> Goldstein shall elect to move forward with the transaction at issue by assuming all
> ECRA compliance costs in excess of $100,000 in writing delivered within 10 days of

receipt by Goldstein's counsel of a copy of test results issued by Accutest regarding the water samples taken from the five monitoring wells on April 7, 1989. . . . It is expressly understood that Goldstein's election shall be made after those tests results are received and not on any subsequent testing or sampling, provided, however, that the test must give results on all five wells.

*Id.* at SANZARI003221-3222. In addition, Alfred Sanzari agreed to, upon closing, "assign to Goldstein any and all of his rights to pursue reimbursement claims against tenants and others including insurance carriers, if any." *Id.* at SANZARI003224-3225.

71. The five monitoring wells mentioned in the 1989 Settlement Agreement were tested for VOCs, including TCE, as well as metals, PCBs, pesticides, and cyanide. Ex. P-382 at LITGO-RCRA0002343-83. In fact, the preliminary test results for VOCs were analyzed and available on April 11, 1989, a day before the preliminary results for metals, PCBs, pesticides, and cyanide became available. *Id.* However, the fax sent to Goldstein's attorney on April 18, 2009 included only the preliminary results for metals, PCBs, pesticides, and cyanide. *See* Ex. P-646 [4/18/89 Faxed Test Results]; 2/8/10 Tr. 131:24-132:6. The Sanzari Defendants failed to deliver a full set of preliminary test results to Goldstein before he reelected to proceed with the transaction.

72. In addition, the Sanzari Defendants did not disclose to Goldstein that they had been informed in 1988 that there were concerns about TCE in a well on the Finderne Farm, which is immediately downgradient of the Litgo Property. 2/8/10 Tr. 143:21-146:18.

73. On April 27, 1989 Goldstein elected to proceed with the transaction and acquire the Litgo Property. Ex. P-751 [4/27/89 Letter Exercising Option to Purchase]. However, Plaintiffs subsequently took the position that they were not actually required to close until the Sanzari Defendants completed an ECRA-compliant cleanup of the Litgo Property. Ex. Sanzari-204 at

SANZARI002486 [6/12/89 Letter from Judge Diana].  Upon cross-motions by both parties, in June 1989 the Superior Court held that the plain language of the parties' agreement provided that the closing should take place after either receipt of a "negative declaration" under ECRA or upon the NJDEP's approval of a cleanup plan.  *Id.* at SANZARI002487.  The Superior Court gave Goldstein ten days from its Order to again decide whether he would proceed with the transaction. *Id* at SANZARI2488.

74.  Around this time, Seidman decided not to proceed in the partnership due to concerns about the potential environmental costs.  2/5/10 Tr. 40:17-41:17.  On June 21, 1989, Goldstein reelected to proceed with the transaction.  Ex. Sanzari-201 [6/21/89 Letter Electing to Proceed]; 1/20/10 Tr. 101:23-25, 104:4-7.

75.  The results of the preliminary tests of the monitoring wells were first discussed in an addendum to a sampling plan report authored by the Sanzari Defendants' environmental consultant, Fred C. Hart Associates, Inc.[11] ("Hart"), which was published sometime after June 23, 1989 ("1989 Hart Addendum").  *See* Ex. P-650 [6/23/89 Horstman Letter] (June 23rd letter providing comments to Hart on *draft* of the report).  According to the 1989 Hart Addendum, "analytical data indicates that . . . levels of volatile organic compounds, and most significantly TCE, exceeded NJDEP guidelines in MW-2, MW-4, and MW5, located on the western and eastern boundaries of the site."  Ex. P-382 at LITGO-RCRA0002272.  It is unclear precisely when Goldstein received a copy of the 1989 Hart Addendum.[12]

---

[11]Fred C. Hart Associates, Inc. later became McLaren/Hart Environmental Engineering Corp.  McLaren/Hart will likewise be referred to as "Hart" in this opinion.

[12]Goldstein's own certification in one of the many instances of litigation that proceeded this matter asserts that the 1989 Hart Addendum was one of the reports provided to EWMA for review in connection with Goldstein's suit against Alfred Sanzari for specific performance of the

76.  On October 31, 1989, the NJDEP approved a cleanup plan for the Litgo Property.  Ex. P-651 [Letter Conditionally Approving Cleanup Plan].  The NJDEP's approval letter noted that although remediation for groundwater contamination was not warranted at that time, data indicated that operations on the property may have contributed to offsite groundwater contamination and that additional groundwater investigation was necessary.  *Id.* at LITGO-RCRA0000039.  The approval letter required Alfred Sanzari Enterprises to remediate "all environmental contamination" and was binding on all of Alfred Sanzari Enterprises' successors in interest.  *Id.* at ¶ 15.

77.  Goldstein refused to take title to the Litgo Property after the cleanup plan was approved.  1/20/10 Tr. 105:5-7.  Alfred Sanzari went back to the Superior Court for relief under the 1989 Settlement Agreement, and on December 15, 1989, the Superior Court issued an Order and Judgment in Enforcement of Settlement ordering Goldstein to take title to the Litgo Property.  *Id.* at 109:12-19; Ex. P-652 at LITGO-RCRA0000044 [12/15/89 Order and Judgment in Enforcement of Settlement in *Goldstein v. Sanzari*].  Goldstein ultimately took title to the Litgo Property on February 14, 1990.  Ex. P-393 [Deed from Sanzari to Goldstein].  The deed specified that Goldstein assumed all of Alfred Sanzari's obligations under the cleanup plan that had been approved by the NJDEP.  *Id.* at LITGO-RCRA0000054.

78.  Goldstein transferred title of the Litgo Property to Litgo in April 1990.  1/20/10 Tr. 87:12-24.  Litgo is a single-purpose entity that owns only the Litgo Property.  *Id.* at 87:7-9.

---

1985 Agreement of Sale.  Ex. US-246 at LITGO-RCRA27038.  However, at trial Goldstein could not recall if this report was provided to EWMA.  1/21/10 30:9-35:12.  It seems unlikely that the 1989 Hart Addendum was provided to EWMA few review at that time as the EWMA Review of Documents Pertaining to ECRA Compliance was published in February 1989, while the 1989 Hart Addendum was not published until June 1989.  *See* Ex. Sanzari-87; Ex. P-382.

Goldstein is Litgo's sole shareholder.  *Id.* at 88:3-12.

####    F.    *Remedial Actions at the Litgo Property*

79.   Remediation of the Litgo Property was begun by the Sanzari Defendants and has continued during Plaintiffs' ownership of the property.  In 1985 and 1988, Earth Technology Corporation ("Earth Tech") and Hart, both of whom had been hired by the Sanzari Defendants as environmental consultants, performed several rounds of soil sampling which indicated the presence of metals and petroleum hydrocarbons.  Ex. Sanzari-42 at LITGO-RCRA004855-56.  In 1989, EWMA performed several rounds of excavations for the Sanzari Defendants to remove soil contaminated with petroleum hydrocarbons and metals.  *Id.* at LITGO-RCRA4864-68.

80.   After obtaining title to the Litgo Property, Plaintiffs retained EWMA as an environmental consultant to carry out the NJDEP-approved cleanup plan.  1/20/10 Tr. 117:14-21.  Plaintiffs have been investigating and conducting remedial activities at the Litgo Property under the supervision of the NJDEP since 1990.  *See id.* at 117:14-21; 130:20-131:3.  EWMA performed rounds of sampling and soil excavation in 1994, 1995, 1996, and 1998.  Ex. Sanzari-42 at LITGO-RCRA0040855-59.  Comprehensive sampling for VOCs was not conducted until 1997, when EWMA completed a soil gas survey that found high levels of TCE in the eastern portion of the Litgo Property.  *Id.* at LITGO-RCRA0004862.  In March 2000, EMWA excavated 5,586 tons of TCE-contaminated soil from the southeastern portion of the Litgo Property, removing the soil down to the bedrock.  *Id.* at LITGO-RCRA0004870; 1/20/10 Tr. 118:14-19; 1/21/10 Tr. 59:19-24, 60:22-61:8.

81.   JM Sorge, Inc. ("Sorge") was hired by Plaintiffs to replace EWMA in 2000.  1/21/10 Tr. 62:7-16.  Soil sampling conducted by Sorge indicated that there were no VOCs present in the

soil at the Litgo Property above the NJDEP Residential Direct Contact Soil Cleanup Criteria.  Ex. Sanzari-42 at LITGO-RCRA00-4859-60.  On August 2, 2001, the NJDEP issued a letter informing Plaintiffs that "no further action" was necessary in regards to contaminated soils.  *Id.* at LITGO-RCRA0004849.

82.  Concerns about groundwater contamination, however, were not resolved.  The NJDEP "no further action" letter stated that Plaintiffs would need to carry out additional tests of the groundwater to rule out the Litgo Property as a source of off-site contamination.  Since 1989, thirty-nine groundwater monitoring wells have been installed on or near the Litgo, Mian, and Truckform Properties.  *See* Ex. US-697.  Plaintiffs have made efforts to delineate the extent of the groundwater contamination, but have not engaged in any field work to remediate the contamination.

83.  In Sorge's review of the remedial work already completed on the Litgo Property, Sorge discovered that MW-4 had been improperly installed by Hart.  2/4/10 Tr. 51:3-52:15, 54:23-56:20.  Expert testimony at trial established that this faulty seal likely increased the zone of contamination.  *Id.* at 56:21-58:2.  Sorge installed a properly sealed replacement well in the location of MW-4 in or about 2000 or 2001.  *Id.* at 183:8-19.

84.  Goldstein personally hired EWMA and Sorge on behalf of Litgo and approved all remedial activities at the Property.  1/20/10 Tr. 148:7-150:8.

     ***E.***     ***Other Related Litigation***

          1.     *NJDEP v. ACE Service Corp.* ("ACE Litigation")

85.  In May 1994, the NJDEP and the Spill Fund Administrator sued Alfred Sanzari Enterprises, along with a number of other defendants, under the Spill Act and the New Jersey

Solid Waste Management Act, N.J.S.A. 13:1E-1 *et. seq.*, seeking recovery of costs incurred to remove materials from the JANR Warehouse—approximately $3.2 million dollars.  Ex. Sanzari-90 [Am. Compl. in *NJDEP v. ACE Service Corp.*]; 1/26/10 Tr. 107:7-11.  Alfred Sanzari Enterprises resolved the cost recovery action in 1997 by entering into a consent order ("1997 Consent Order") with the NJDEP.  Ex. Sanzari-85 [Consent Order in *NJDEP v. ACE Service Corp*].

86.  Pursuant to the consent order, Alfred Sanzari Enterprises paid $350,000 to the NJDEP.  *Id.* at LITGO-RCRA0025102.  The NJDEP agreed to surrender its right to make any claim against Alfred Sanzari Enterprises under "any other applicable law or regulation which . . . could have been asserted by the . . . [DEP] in litigation . . . related to the discharge, release, threatened discharge or threatened release of Hazardous Substance(s) and/or removal or disposal of Solid or Hazardous Waste(s) and/or any other materials at the [JANR Warehouse].  *Id.* at LITGO-RCRA0025106-07.

87.  According to Paragraph 9 of the 1997 Consent Order:

"It is the intent of the parties to this Consent Order to fully resolve [Alfred Sanzari Enterprises'] alleged liability for the discharge, release, threatened discharge or threatened release, cleanup and removal of Hazardous Substances and/or Solid or Hazardous Wastes and/or other materials at the site and any and all costs associated with such discharge, release, threatened discharge, threatened release, cleanup and removal.  It is, therefore, ordered that by entering into this Consent Order and fully performing all obligations contained herein, [Alfred Sanzari Enterprises'] liability, whether direct or by assertion of a cross claim or third party claim, shall be fully extinguished, and the settling defendant shall be immune from claims for contribution which may be initiated by any entity, whether or not such entity is a party to this action.

*Id.* at LITGO-RCRA25108-09.

2.      *Goldstein v. Wausau Ins. Co.*

37

88.  In 1996, Goldstein initiated a lawsuit in the New Jersey Superior Court against, among others, Earth Tech, Hart, Alfred Sanzari, Alfred Sanzari Enterprises, and Dande Plastics. Ex. US-231.   Goldstein claimed that the Sanzari Defendants breached their obligations under the 1989 Settlement Agreement and related assignment of rights by failing to cooperate with him in his efforts to get reimbursement from their insurers.  *Id.* at LITGO23290-94.  The claims against the Sanzari Defendants were ultimately dismissed without prejudice and Goldstein received $30,000 in settlement from Wausau Insurance Co., the Sanzari Defendants' former insurer. 1/20/10 Tr. 160:7-162:1.

89.  Goldstein's claims against Earth Tech and Hart asserted that they had failed to properly investigate and remediate TCE contamination at the Litgo Property.  Ex. US-231 at LITGO23294-330.  Goldstein alleged that Earth Tech and Hart had identified the presence of TCE in their respective 1986 and 1988 reports but had failed to adequately investigate and delineate the contamination or identify its source.  *Id.* at LITGO23296.  The New Jersey Superior Court granted summary judgment in favor of Hart and Earth Tech, finding that before Goldstein purchased the property he was aware, based on the report of his own consultant, EWMA, that the existing sampling plans were incomplete and inadequate.  Ex. Sanzari-106 at LITGO-RCRA0028282 [Opinion on Mot. for Summ. J. in *Goldstein v. Wausau Ins. Co.*].

90.  Goldstein also asserted a Spill Act claim against Dande Plastics to recover costs incurred to remediate hazardous substances at the property.  In granting Dande Plastics' motion to dismiss in part, the Superior Court found that Goldstein should have known of the presence of TCE on the property based on the reports issued by Earth Tech and Hart in April 1986 and May 1988, respectively.  Ex. Sanzari-86 at LITGO-RCRA025116 [Opinion on Dande Plastics' Mot to

Dismiss in *Goldstein v. Wausau Ins. Co.*].  Dande Plastics settled the remainder of Goldstein's

claims for a sum of $105,000.  1/20/10 Tr. 160:3-6.


### III.    Conclusions of Law

#### A.    *CERCLA*

##### 1.    General Legal Standard

CERCLA provides two distinct causes of action.  *United States v. Atlantic Research

Corp.*, 551 U.S. 128, 138 (2007) (quoting *Cooper Industries, Inc. v. Aviall Servs., Inc.,* 543 U.S.

157, 163 (2004).  Section 107(a) provides for a right to recovery of costs incurred in cleaning up a

site, while § 113(f) provides a defendant in a § 107(a) suit a right to contribution from other

potentially response parties ("PRPs") with whom the defendant shares common liability.  *Id.* at

138-39.

Plaintiffs seek to recover costs under § 107(a) of CERCLA from the United States

Defendants and the Sanzari Defendants.[13]  In addition, Plaintiffs seek a declaratory judgment

under § 113(g)(2) of CERCLA regarding the parties' liability for future response costs.  The

United States Defendants and the Sanzari Defendants have asserted counterclaims for

contribution against Plaintiffs and crossclaims for contribution against each other and Mian

pursuant to § 113(f) of CERCLA.[14]

---

[13]In the course of this litigation, Plaintiffs had also asserted § 107 CERCLA claims against Mian and Kirby.  As previously noted, Plaintiffs have settled all their claims with Mian and the claims against Kirby were dismissed at the close of trial.

[14]In the event that it was found to be a liable party, Mian asserted crossclaims against the other defendants in this matter.  Because the Court concludes that Mian is not liable, *see infra* Section III.A.4, the Court will not address Mian's CERCLA or Spill Act crossclaims.

To establish liability pursuant to § 107(a) of CERCLA, a plaintiff must prove: (1) that hazardous substances were disposed of at a "facility," (2) that a release or threatened release of a hazardous substance from the facility into the environment has occurred, (3) that the "release" or "threatened release" has caused or will require Plaintiffs to incur necessary response costs that are consistent with the National Contingency Plan ("NCP"), and (4) that the defendant falls within one of the four classes of PRPs established in § 107(a). *New Jersey Turnpike Auth. v. PPG Indus., Inc.*, 197 F.3d 96, 103-04 (3d Cir. 1999). Section 113(f)(1) of CERCLA allows a party to "seek contribution from any other person who is liable or potentially liable" under § 107. 42 U.S.C. § 9613(f)(1).

### a.      The Facility

The definition of "facility" includes "A) any building, structure, installation, equipment, . . . landfill, storage container, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." 42 U.S.C. § 9601(9). "Disposal" is defined as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3); *United States v. CDMG Realty Co.*, 96 F.3d 706, 714 (3d Cir. 1996) (CERCLA defines "disposal" by incorporating the RCRA definition). The following describes at least two facilities that can be identified in this matter.[15]

_____

[15]The Court recognizes that it previously held that it would consider the "facility" in question to be the Somerville Iron Works site, including the Litgo, Mian, and Kirby properties. (12/31/09 Opinion at 12.) However, this conclusion was based upon Plaintiffs' assertion that a landfill in which hazardous substances had been disposed of stretched across all three of the

The Litgo Property is a "facility" for the purposes of CERCLA.  TCE, a hazardous substance, was likely deposited, stored and disposed of at the Litgo Property by Columbia Aircraft.  *Supra* FOF ¶¶ 15-20.  TCE, PCE, and other VOCs were stored and disposed of in the JANR Warehouse at the Litgo Property.  *Id.* at ¶¶ 36, 44-46.  In addition, spills and leaks that occurred during the NJDEP/Clean Venture cleanup resulted in the disposal of TCE, PCE and other VOCs at the Litgo Property during the NJDEP/Clean Venture cleanup.  *Id.* at ¶¶ 47-54.  The Litgo Property is therefore a "facility because it is a "site or area" where hazardous substances were deposited, stored, disposed of, or placed.  *See* 42 U.S.C. § 9601(9).

The second relevant "facility" is the vapor degreasers likely used by Columbia Aircraft.  As noted above, releases of TCE were inherent in the use of vapor degreasers.  *Supra* FOF ¶ 16.  The vapor degreasers thus fall within the "equipment" portion of the definition of "facility."  *See* 42 U.S.C. § 9601(9).

b.      *Release or Threatened Release*

Plaintiffs have established that there has been a release or threatened release of hazardous substances from the above discussed facilities into the environment.  A release includes "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment . . . ."  42 U.S.C. § 9601(22).  Sampling of

_____

properties.  (*See id.* at 10-12.)  Since there was a genuine question of material fact as to the boundaries and existence of the landfill, the Court chose at that point to expansively define the "facility."  However, the evidence at trial was insufficient to support a finding that a landfill existed on all three properties.  *Supra* FOF ¶¶ 13-14.  In addition, it became clear at trial that the issue was not contamination from the landfill but VOCs generated from other sources such as Columbia Aircraft and the materials at the JANR Warehouse.  The Court has thus identified more specific and accurate "facilities" to aid it in its analysis.  It is worth noting that both of these facilities would have fallen within the Court's prior understanding of the "facility" as the Somerville Iron Works.

the soil and groundwater on the Litgo Property has identified the presence of TCE, PCE and other

VOCS.  *Supra* FOF ¶¶ 1, 79-80.  In addition, the presence of TCE in the two groundwater plumes

remains an ongoing concern.  *Id.* at ¶¶ 1, 82.

Plaintiffs have identified several releases which caused or contributed to the

contamination.  TCE was likely released at the Columbia Aircraft site due to the company's use

of vapor degreasers and the common practice of disposing of TCE by dumping it on the ground in

uninhabited areas, causing or contributing to the Eastern Groundwater Plume.  *Id.* at ¶¶ 16-20.

There was a threatened release of TCE, PCE, and other VOCs during the time period that those

substances were stored at the JANR Warehouse.  *Id.* at ¶ 36.  In addition, TCE, PCE, and other

VOCs were likely released into the environment in the "exclusion zone" during the NJDEP/Clean

Venture cleanup of the JANR Warehouse, causing or contributing to both the Eastern and

Western Groundwater Plumes.  *Id.* at ¶ 54.  Thus, Plaintiffs have met their burden of proof that

there was a release or threatened release from the facilities into the environment.

c.      *Response Costs*

The release of hazardous substances at the Litgo Property has caused Plaintiffs to incur

response costs.[16]  Plaintiff need not prove that a specific defendant's waste caused it to incur

costs; they only need to show that there was a release that required Plaintiffs to incur response

costs.  *United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 264 (3d Cir. 1992).  Plaintiffs

incurred costs to have contaminated soil sampled and removed from the Litgo Property.  *Supra*

FOF ¶¶ 80-81.  In addition, Plaintiffs have incurred costs to sample and test the groundwater in

---

[16]The Court decided at the time of trial that the a determination of the amount of costs
incurred and whether those response costs were incurred in a manner consistent with the NCP
would be addressed in a later bifurcated proceeding, after a determination on liability.

the area in order to delineate the contamination in the Eastern and Western Groundwater Plumes. *Id.* at ¶ 82. Future response costs are anticipated as the groundwater contamination has not yet been remediated. *Id.*

### d.    Potentially Responsible Parties

Because all of the other elements are satisfied, the liability of the United States Defendants, the Sanzari Defendants, and Mian under CERCLA turns primarily on whether or not they fall into one of the classes of PRPs. Section 107(a) sets out four classes of PRPs: (1) current owners and operators of a facility; (2) any party that owned or operated a facility at the time that hazardous substances were disposed of at that facility; (3) any party that arranged for the disposal, treatment, or transport for disposal or treatment of hazardous substances at the facility; and (4) any party that accepted hazardous substances for transport to the facility. 42 U.S.C. § 9607(a).

"Owner," as used in CERCLA, is understood to have its common meaning. *See Lansford-Coaldale Joint Water Auth. v. Tonolli Corp.*, 4 F.3d 1209, 1225 (3d Cir. 1993). The term "operator," however, has a specific meaning in the context of CERCLA. To be liable as the current or past operator of a facility, the party must be someone who manages, directs, or conducts operations at a facility that have to do with the leakage or disposal of hazardous waste or decisions about compliance with environmental regulations. *United States v. Bestfoods*, 524 U.S. 51, 66-67 (1998). Operator liability requires that the party have had actual control of either day-to-day operating or policy-making decisions at the facility. *Aluminum Co. of America v. Beazer East, Inc.*, 124 F.3d 551, 564 (3d Cir. 1997).

The Supreme Court recently addressed the issue of "arranger liability," holding that in order to be a responsible party a defendant must have had the intent, as opposed to mere

knowledge, that at least a portion of the product be disposed of during the arranged for process.

*Burlington Northern Santa Fe R.R. Co. v. United States*, __ U.S. __, 129 S. Ct. 1870, 1880

(2009).  In *Burlington Northern*, the Supreme Court noted that "under the plain language of the

statute, an entity may qualify as an arranger [] when it takes intentional steps to dispose of a

hazardous substance."  *Id.* at 1879.

2.      Claims against the United States Defendants

Plaintiffs claim that the United States Defendants are liable as an "owner," "operator," or

"arranger" based on the United States' relationship with Columbia Aircraft in the 1940's or as

either an "owner" or "arranger" of materials stored within the JANR Warehouse in the 1980's.

The Sanzari Defendants have also asserted a crossclaim for contribution against the United States

Defendants.

*a.      Columbia Aircraft*

The United States Defendants were not an owner or operator of the Columbia Aircraft

site, nor were they an owner or operator of the vapor degreasers used by Columbia Aircraft.

Furthermore, the United States Defendants did not arrange for the disposal of any hazardous

substances at the Columbia Aircraft site or the vapor degreasers.  Thus, the United States

Defendants' relationship with Columbia Aircraft provides no basis for liability under CERCLA.

I.      "Owner" Liability

Plaintiffs argue that the United States Defendants are PRPs because they owned a portion

of the equipment that was used in Columbia Aircraft's operations.  However, there was no

evidence connecting the equipment owned by the United States Defendants to TCE or other

VOCs.  The testimony and evidence at trial focused on Columbia Aircraft's use of TCE in

44

conjunction with the vapor degreasers to degrease precision aircraft parts.  The United States Defendants, however, did not own or lease vapor degreasers to Columbia Aircraft.  *Supra* FOF ¶¶ 21-22.

Plaintiffs argue that the proper "facility" for this analysis is the "process installation" operated by Columbia Aircraft, as opposed to the site as a whole or the vapor degreasers. However, the facts of this case support the Court's conclusion that the specific pieces of equipment where hazardous substances were disposed—the vapor degreasers—are the appropriate facilities for consideration.

Courts which have treated an entire process installation as the "facility" for the purposes of CERCLA have done so only after a finding that the pieces of equipment at issue were an integral part of the process installation or that s release of hazardous substances was inherent to the use of the pieces of equipment in question.  *See, e.g.*, *United States v. Saporito*, No. 07C3169, 2010 WL 489703, *9 (N.D. Ill. Feb. 9, 2010) (defendant's equipment was "heartbeat" of operation and necessary to process which resulted in releases of hazardous substance); *Elf Altochem North America, Inc. v. United States*, 868 F. Supp. 707, 709 (E.D. Pa. 1994) (government was part-owner of facility when it owned and leased most important components of process); *Reading Co. v. City of Philadelphia*, 823 F. Supp. 1218, 1237-38 (E.D. Pa. 1993) (disposal of waste was inherent to productive use of railroad cars owned by defendant).

As noted above, the evidence at trial regarding Columbia Aircraft focused on the alleged use of vapor degreasers as opposed to the operation of the entire process installation.  While the equipment owned by the United States was used to manufacture precision aircraft parts that were then degreased, nothing suggested that the United States' equipment was necessary for the vapor

degreasers to operate or vice versa.  Indeed, Columbia Aircraft could have used alkaline degreasers instead of TCE-emitting vapor degreasers.  *See Supra* FOF 13 n.7.  Similarly, there was nothing in the testimony at trial to support a finding that disposal or a release of TCE was inherent in the productive use of the machining tools owned by the United States.

The simple fact that the United States owned equipment which was used in the same building as equipment which used and released hazardous substances does not make it part-owner of a "facility."  *See Miami-Dade County v. United States*, 345 F. Supp. 2d 1319, 1340 (S.D. Fla. 2004) (no past-owner liability under CERCLA when the specific engines, parts, and containers owned by defendant were not where hazardous substances were disposed of).  Given the absence of evidence connecting the equipment owned by the United States to the disposal or release of hazardous substances, the Court concludes that the vapor degreasers or the Litgo Property are the only relevant facilities.  The United States Defendants' did not own either the vapor degreasers or the Litgo Property.  The United States Defendants are therefore not liable as past owners of a "facility."

ii.    "Operator" Liability

The United States Defendants did not manage, direct, or conduct any of the day-to-day operations or manage, direct, or conduct any activities that had to do with the leakage or disposal of hazardous wastes or use of the vapor degreasers at Columbia Aircraft.  The United States Defendants' role in the operations of Columbia Aircraft was limited to purchasing aircraft parts from the company and conducting periodic inspections to ensure that the site was maintained in compliance with industry standards.  *Supra* FOF at ¶ 23.  The mere existence of a contract between the government and a private business or a right to inspect a business for quality control

46

purposes does not make the United States Defendants an "operator" of the Columbia Aircraft site. *See East Pay Municipal Util. Dist. v. United States Dep't of Commerce*, 142 F.3d 479, 486 (D.C. Cir. 1998).

Similarly, the United States' role in regulating the distribution of TCE during WWII does not make it an "operator" of the Columbia Aircraft site.  When determining if regulatory actions create operator liability, courts use the same "actual control" test as used in traditional operator liability cases.  *See FMC Corp. v. Dept. of Commerce*, 29 F.3d 833, 843 (3d Cir. 1994).  Here, the United States' regulation of TCE did not give them control of what Columbia Aircraft would produce, how much it would produce, the manner of operation, the price at which products would be sold, or who they would be sold to.  Thus, there are none of the indicia of control commonly associated with being an operator of a facility.  *See id.*

iii.    "Arranger" Liability

There was no evidence presented at trial which suggested that the United States Defendants owned or possessed any TCE or other VOCs which were disposed of at the Columbia Aircraft site.  *Supra* FOF at ¶ 24.  Since Plaintiffs have failed to show the necessary element of ownership or possession, the Court finds that the United States Defendants did not "arrange for the disposal" of TCE or any other hazardous substances at the Columbia Aircraft site.

b.    *JANR Warehouse*

Plaintiffs argue that the United States Defendants are liable as either "owners" or "arrangers" of hazardous materials stored in the JANR Warehouse under §§ 107(a)(2) and (3) of CERCLA.  The United States Defendants are not liable as an "owner" of the materials but are nevertheless liable under § 107(a)(3) because they "arranged for disposal" of hazardous

47

substances which were disposed of at the JANR Warehouse and released into the environment during the NJDEP/Clean Venture cleanup.

I.    "Owner" Liability

Plaintiffs claim that the United States Defendants are liable as past owners of a facility is premised on their assertion that the United States Defendants owned the containers of hazardous waste which were stored at the JANR Warehouse.[17]  A significant number of the containers within the JANR Warehouse, including CRU-5 and CRU-154, originated with the United States Defendants.  *Id.* at ¶¶ 43-45.  However, at the time the containers were moved to and stored at the JANR Warehouse they were owned by Signo and/or the Colbert Brothers.[18]  *Id.* at ¶ 26, 28-29.  Because the United States Defendants did not own the containers of hazardous substances at the time of their disposal at the JANR Warehouse, the United States Defendants are not responsible persons under § 107(a)(2) of CERCLA.

ii.    "Arranger" Liability

Plaintiffs' final argument is that the United States Defendants are liable because they arranged for the disposal of the containers of hazardous wastes which ended up at the JANR Warehouse.  The United States Defendants arranged for the disposal of hazardous substances

---

[17]Containers of hazardous substances—such as CRU-5 and CRU-154—could constitute a "facility" for the purposes of CERCLA.  CERCLA defines "facility" to include "any . . . storage container . . . where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located."  42 U.S.C. § 9601(9).  Hazardous substances were deposited, stored, or placed in CRU-5 and CRU-154 as well as possibly many of the other containers moved to the JANR Warehouse.  *Supra* FOF ¶¶ 36, 39, 44-45.  The Court, however, did not list these containers in its discussion of the relevant facilities because it finds that none of the defendants owned the containers at the time they were disposed of at the JANR Warehouse.

[18]Signo's ownership interest was terminated by Order of the New Jersey Superior Court in August 1984.

through contracts with ACE or RTS. *Id.* at ¶ 27. ACE and RTS brought materials which

originated with the United States Defendants to the Signo Warehouse. *Id.* Many of these

materials appear to have been hazardous wastes which were then moved to the JANR Warehouse.

*Id.* at ¶¶ 31, 39, 43. The evidence supports a conclusion that the United States Defendants

arranged for the disposal of a number of containers of hazardous waste which ultimately ended up

at the JANR Warehouse. Notably, CRU-5—containing waste PCE—not only was generated by

one of the United States Defendants but was transported for disposal by RTS. *Id.* at ¶ 44.

Because the United States Defendants intentionally arranged to dispose of hazardous substances,

including TCE, that ended up at the JANR Warehouse, they are liable as arrangers under §

107(a)(3) of CERCLA.[19] *Burlington Northern*, 129 S. Ct. at 1880.

The United States Defendants argue that they arranged for the *storage* rather than the

*disposal* of the materials that ended up on the JANR Warehouse. (U.S. Proposed FOF 53-54

[docket # 346].) The United States Defendants argue that because the containers were placed on

pallets and on concrete floors rather than "on any land or water" they were only stored within the

JANR Warehouse. *See* 42 U.S.C. § 6903(3). They further suggest that the materials were not

"disposed of" until the cleanup of the JANR Warehouse by the NJDEP, and that it was the

NJDEP that arranged for this disposal. The United States Defendants also argue that no disposal

occurred as there is no evidence that the specific containers they originally possessed leaked or

spilled or were otherwise released into the environment.

---

[19]The United States Defendants did not make the decision to place the hazardous substances at the JANR Warehouse, or even at the Signo Warehouse. The materials were brought there by Signo, RTS and ACE. *Supra* FOF ¶¶ 27-29. However, "arranger liability is not conditioned on the defendant knowing where the waste will be dumped." *Agere Systems, Inc. v. Advanced Environmental Technology Corp.*, Civ. No. 02-3830, 2006 WL 3366167, *5 (E.D. Pa. 2006) (citing *United States v. Aceto Agr. Chemical Corp.*, 872 F.2d 1373, 1381 (8th Cir. 1989)).

The distinction between storage and disposal is not tenable in this instance. In the context of hazardous wastes, storage is defined as "the containment of hazardous waste, either on a temporary basis or for a period of years, in such a manner as not to constitute disposal of such hazardous waste." 42 U.S.C.A. § 6903(33). In light of this definition, the key difference between storage and disposal appears to be that storage is intended to be temporary. *Compare United States v. Amtreco, Inc.*, 809 F. Supp. 959, 965-66 (M.D. Ga. 1992) (mere storage when chemical was held on-site pending its use in wood-treatment operations); *with United States v. Fleet Factors Corp.*, 821 F. Supp. 707, 722-23 (S.D. Ga. 1993) (disposal when drums were placed in building for indefinite future). Here, the evidence suggests that when the United States Defendants contracted with ACE and RTS they intended to permanently get rid of what they believed to be waste products. The United States Defendants were therefore disposing of, rather than storing, hazardous substances. *See Prudential Ins. Co. v. United States Gypsum Co.*, 711 F. Supp. 1244, 1253 (D.N.J. 1989) ("The inquiry that has been most important in other CERCLA disposal cases has been whether the hazardous materials were "disposed of" in the sense that the materials were considered waste and were thrown out, got rid of or dumped.").

The Court must reject the United States Defendants' argument that they did not dispose of the products because the containers were placed on pallets and concrete floors rather than "on any land." Other courts have consistently held that depositing hazardous substances into receptacles or placing them in buildings can constitute disposal. *See, e.g., Fleet Factors*, 821 F. Supp. at 722-23; *Westwood Pharmaceuticals, Inc. v. National Fuel Gas Distribution Corp.*, 737 F. Supp. 1272, 1278 (W.D.N.Y. 1990) (depositing chemicals into subsurface receptacles was disposal even if the receptacles were structurally sound and spillage only occurred due to actions of third party);

*Amland Properties Corp. v. Aluminum Co. of America*, 711 F.Supp. 784, 791 (D.N.J. 1989) ("placement of hazardous wastes inside an enclosed manufacturing facility may constitute disposal").  The Court finds support for this interpretation in the definition of disposal, which only requires that hazardous substances be treated in a manner that they "*may* enter the environment."  42 U.S.C. § 6903(3).  Thus, placing the containers in the JANR Warehouse for an indefinite period constitutes disposal.[20]  Although a release may not have occurred until the NJDEP/Clean Venture cleanup, disposal occurred at the time the materials were moved to the JANR Warehouse.

Plaintiffs cannot prove that the TCE, PCE, or other VOCs identified in the soil and groundwater at the Litgo Property were the exact same substances previously possessed by the United States Defendants.  However, CERCLA does not impose any such burden of proof on plaintiffs.  It is sufficient that plaintiffs prove that a defendant possessed and arranged for the disposal of hazardous substances which were disposed of at the facility, and that there was a release of hazardous substances from that facility into the environment.  *Alcan*, 964 F.2d at 266 (rejecting causation requirement in favor of requiring plaintiff to prove simply "that the defendant's hazardous substances were deposited at the site from which there was a release and that the release caused the incurrence of response costs").  Here, Plaintiffs have shown that it is more likely than not that the United States Defendants arranged for the disposal of waste TCE and waste PCE, that these containers were disposed of at the JANR Warehouse, and that there was a release of TCE and PCE from containers stored in the JANR Warehouse into the environment during the NJDEP/Clean Venture cleanup.  *Supra* FOF at ¶ 27, 31, 43-46, 54.  This is sufficient

_____

[20]This is particularly true given the poor condition of the warehouse and the containers, which increased the likelihood of an actual release of hazardous substances into the environment.

proof of a connection between the hazardous substances for which the United States Defendants'

are responsible and the contamination at the Litgo Property for the purposes of liability under

CERCLA.

Because the United States Defendants arranged for the disposal of hazardous substances

which were disposed of at the JANR Warehouse and released during the NJDEP/Clean Venture

cleanup, the United States Defendants are liable to Plaintiffs under § 107(a)(3).  For the same

reasons, the United States Defendants are liable for cost contribution to the Sanzari Defendants

under § 113(f).

3.      Claims against the Sanzari Defendants

Plaintiffs have asserted a claim against the Sanzari Defendants under § 107 of CERCLA

on the grounds that they owned and operated the Litgo Property at the time that hazardous

substances were disposed of at the site.  In addition, the United States Defendants have asserted a

crossclaim for contribution against the Sanzari Defendants under § 113(f).  The Sanzari

Defendants argue they are immune to suit pursuant to the 1997 Consent Order and further assert

that the 1985 Agreement of Sale and the 1989 Settlement Agreement contractually shifted their

liability to Goldstein.[21]

a.      1997 Consent Order

The 1997 Consent Order does not immunize the Sanzari Defendants from Plaintiffs' § 107

claim or the United States Defendants' § 113(f) crossclaim.  First, the consent order does not

provide immunity from Plaintiffs' cost recovery claim as it only purports to provide immunity

---

[21]The Sanzari Defendants also suggest that Plaintiffs CERCLA claim is barred by the
applicable statute of limitations.  The Court already addressed and rejected this argument when it
resolved the earlier motions for summary judgment.  (12/31/09 Opinion at 25-31 [docket # 286].)

from claims for contribution.  *Id.* at ¶ 87.  CERCLA recognizes that a valid settlement agreement can protect a defendant from contribution claims, stating that "[a] person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement."  42 U.S.C. § 9613(f)(2).  This settlement bar, however, does not apply to § 107(a) cost recovery claims. *Atlantic Research*, 551 U.S. at 138 ("The settlement bar does not by its terms protect against cost-recovery liability under § 107(a).").  Thus, neither the terms of the 1997 Consent Order nor CERCLA's settlement bar provide grounds for immunity from Plaintiffs' cost recovery claim.

Second, the 1997 Consent Order should not be interpreted as resolving any party's liability under CERCLA.  In order for a judicially approved settlement to provide immunity under the § 113 CERCLA settlement bar, it must be clear that the settlement agreement intends to resolve the parties' potential CERCLA liability.  *See W.R. Grace & Co.-Conn. v. Zotos Intern., Inc.*, 559 F.3d 85, 91 (2d Cir. 2009) (text of consent order which made no reference to CERCLA "establishes that the DEC settled only its state law claims").  The 1997 Consent Order does not mention CERCLA.  *See* Ex. Sanzari-85.  The ACE Litigation only involved claims brought under the Spill Act and the New Jersey Solid Waste Management Act, N.J.S.A. 13:1E-1 et. seq. ("SWMA").  *Supra* FOF ¶ 85.  Indeed, because the matter was brought in a state court, the parties could not have adjudicated potential liability under CERCLA.  *See* 42 U.S.C. § 9613(b) (granting the federal courts exclusive jurisdiction over CERCLA claims).  There is only one statement in the 1997 Consent Order which could be interpreting as reaching CERCLA liability.  In the paragraph addressing the NJDEP's obligations pursuant to the settlement, the NJDEP agreed to fully surrender its right to sue Alfred Sanzari "under the Spill Act, . . . the SWMA, and *any other*

53

*applicable law or regulation which were or could have been asserted by the [NJDEP] in the Ace Litigation*.").  *Id*. at ¶ 86 (emphasis added).  The Court will not read a broad grant of immunity into such limited and ambiguous language.

Third, the "matters addressed" by the 1997 Consent Order do not appear to be the same as those currently at issue.  CERCLA's settlement bar only provides immunity from claims based on the same matters as those addressed in the judicially approved settlement.  42 U.S.C. § 9613(f)(2).  In the ACE Litigation the NJDEP was suing "for the recovery of response costs incurred . . . in connection [with] the removal of materials at [the JANR Warehouse]."  Ex. Sanzari-85 at LITGO-RCRA0025101.  The Court understands this to mean that the NJDEP was seeking only to recover the costs of the NJDEP/Clean Venture cleanup of the JANR Warehouse.[22]  The NJDEP did not appear to be concerned about potential soil or groundwater contamination caused by spills, leaks, or discharges of material.  The Court gives relatively little weight to language at the end of the 1997 Consent Order that the parties intended to "fully resolve [Alfred Sanzari Enterprise's] alleged liability for the discharge, release, threatened release, cleanup and removal of hazardous substances . . . at the Site" as this appears to be standard language that was not specific to the issue being resolved.  *See supra* FOF ¶ 87.  Overall, the consent order does not appear to have contemplated future cleanups of soil or groundwater, but rather was intended simply to resolve the Sanzari Defendants' liability for costs associated with NJDEP's completed removal of materials from the JANR Warehouse.  For these reasons, the Court finds that the 1997

---

[22]Notably, based on this understanding of the 1997 Consent Order, Plaintiffs did not have a foreseeable crossclaim, third-party claim, or claim for contribution in the ACE Litigation. Plaintiffs had no involvement with the property at the time of the removal action or any connection to the materials being removed. The United States Defendants, on the other hand, could arguably have been a named defendant in the ACE Litigation on the basis of their prior ownership or possession of the materials.

Consent Order does not resolve the Sanzari Defendants' liability for soil and groundwater contamination at the Litgo Property.

Finally, the 1997 Consent Order does not provide for any sort of notice or comment procedure, which would have been necessary if the 1997 Consent Order were to create the sort of broad immunity from environmental claims that the Sanzari Defendants are asserting. Both CERCLA and the Spill Act provide for notice and comment procedures before a judicially approved settlement which would extinguish a third-parties right to contribution may be entered. *See* 42 U.S.C. § 9622; N.J.S.A. § 58:10-23.11e2.[23]  In contrast, the 1997 Consent Order does not provide for any notice to potentially responsible parties not named in the litigation. *See* Ex. Sanzari-85. The failure to provide any such notice or opportunity to comment creates serious due process concerns. *See, e.g.*, *American Special Risk Ins. Co. v. City of Centerline*, 180 F. Supp. 2d 903, 910 (E.D. Mich. 2001). The Court therefore does not believe that the 1997 Consent Order is a valid judicially approved settlement agreement for purposes CERCLA's § 113(g) settlement bar.                         b.         1985 Agreement of Sale and the 1989 Settlement Agreement

The Sanzari Defendants suggest that they should not be liable to Plaintiffs because the 1985 Agreement of Sale and the 1989 Settlement Agreement contractually shifted responsibility for environmental remediation of the site from Alfred Sanzari to Goldstein. However, persons may not contractually shift their liability under § 107 to another party. 42 U.S.C. § 9607(e)(1); *Fisher Dev. Co. V. Voise Casecade Corp.*, 37 F.3d 104, 108 (3d Cir. 1004). Moreover, the 1985 Agreement of Sale and the 1989 Settlement Agreement do not make any mention of CERCLA,

---

[23]42 U.S.C. § 9622 only applies to the federal government, but this does not mean that the due process concerns are any less serious when a settlement agreement is reached with a state agency.

referring only to obligations under ECRA.  *See* Ex. P-632; P-744.  The existence of these

agreements therefore does not preclude a finding that the Sanzari Defendants are PRPs under

CERCLA.[24]

          c.      The Sanzari Defendants are Past Owners and Operators of a Facility

      Having determined that the 1985 Agreement of Sale, 1989 Settlement Agreement, and

1997 Consent Order present no bar to the present CERCLA claims, the Court now must turn to

whether the Sanzari Defendants are PRPs under § 107(a).  The liability of the Executors of the

Estate of Alfred Sanzari depends on whether the decedent would have been a PRP.  *See Bowen*

*Eng'g v. Estate of Reeve*, 799 F. Supp. 467, 475 (D.N.J. 1992) ("decedent's estate may be held

liable for cleanup costs").  This Court has already held that Alfred Sanzari is a PRP under

CERCLA as the past owner of a facility.  (12/31/10 Opinion 41-45.)  Alfred Sanzari owned the

Litgo Property from 1976 to 1990, during which time hazardous substances were disposed of at

the JANR Warehouse.  *Supra* FOF at ¶¶ 28, 31-32, 54, 77.

      The Court now concludes that Alfred Sanzari and Alfred Sanzari Enterprises are PRPs

under CERCLA as past operators of a facility.  Alfred Sanzari Enterprises held itself out as the

owner of the Litgo Property and was in control of day-to-day operations at the site.  *Id.* at ¶ 32;

Pls.' RFAs to Sanzari Defs., Ex. C ¶ 41.  Alfred Sanzari Enterprises was a trade name used by

Alfred Sanzari, with Alfred Sanzari controlling the operations and policy-making decisions of the

entity.  *Supra* FOF ¶ 32.  Alfred Sanzari and Alfred Sanzari Enterprises made decisions regarding

the presence of hazardous wastes at the JANR Warehouse prior to the involvement of the NJDEP

---

[24]The Court does, however, believe that the parties' intentions as expressed in the 1985
Agreement of Sale and the 1987 Settlement Agreement are relevant to the equitable allocation of
liability under § 113 of CERCLA.  The Court will consider the terms of the agreements and their
effect when equitably allocating liability between the responsible parties.

and hired environmental consultants who conducted tests and soil excavations on the Litgo Property.  *Id.* at ¶ 37-38, 79.  During this time period, hazardous substances, including TCE, were disposed of at the Litgo Property.  *Id.* at ¶¶ 31, 36, 54.  The Court therefore concludes that the Sanzari Defendants are past operators of a facility and are liable to Plaintiffs pursuant to § 107(a)(2) and to the United States Defendants pursuant to § 113(f).

### 4.     Claims against Mian

The United States Defendants and the Sanzari Defendants have asserted crossclaims for contribution against Mian.  Mian does not fall within any of the categories of PRPs established in § 107(a).  Mian is not a current or past owner or operator of either the Litgo Property or the vapor degreasers, nor did it arrange for the transportation of hazardous substances or transport hazardous substances at any of the facilities.  The United States Defendants suggest that materials in a horizontal tank historically located on the Mian Property contributed to the groundwater contamination.  However, the evidence does not support this assertion.  There was no evidence that hazardous substances were stored in the tank and soil sampling in the area of the staining seen surrounding the tank came back negative for TCE.  *Id.* at ¶ 64.[25]  Therefore, Mian is not liable in contribution to any of the defendants under § 113(f) of CERCLA.

### 5.     Claims Against Plaintiffs

The United States Defendants and the Sanzari Defendants have asserted counterclaims for contribution pursuant to § 113(f)(1) of CERCLA.  The Court previously determined that Litgo is liable under § 107 as the current owner of the Litgo Property.  (12/31/09 Order 46.)  The Court

---

[25]MW-11—which is part of the Western Groundwater Plume—is located on the Mian Property.  *Supra* FOF ¶ 4.  High levels of TCE are present in the groundwater at MW-11.  *Id.* at ¶¶ 4-5.  However, the only likely source for the TCE in the Western Groundwater Plume identified at trial was the materials stored in the JANR Warehouse.

finds at this time that Plaintiffs are also liable as the current operators of the Litgo Property.  As

the sole shareholder of Litgo, a single-purpose entity, Goldstein has actual control over the day-

to-day operations on the Litgo Property, including oversight and control over remedial activities

carried out by EWMA and Sorge.  *Supra* FOF ¶¶ 78, 80-81, 84.  Both Goldstein and Litgo are

therefore liable under § 107(a)(1) as the current operators of a facility, and Litgo is liable under §

107(a)(1) as the current owner of a facility.  Because Plaintiffs would be liable under § 107(a),

they are liable in contribution to the United States Defendants and the Sanzari Defendants

pursuant to § 113(f)(1) for an equitable portion of costs.

    **B.**    **RCRA**

        1.    <u>General Legal Standard</u>

Plaintiffs have brought a citizen suit under § 7002(a)(1)(B) of RCRA seeking injunctive

relief against the United States Defendants and the Commissioner.  The United States Defendants

and the Commissioner have asserted counterclaims under RCRA.  RCRA, like CERCLA, is a

remedial statute which is to be liberally construed.[26]  *Aceto.*, 872 F.2d at 1383.  To prevail in a

citizen suit, a plaintiff must show: (1) that defendant is a "person" as defined in 42 U.S.C. §

6903(15); (2) that the defendant has contributed to or is contributing to the handling, storage,

treatment, transportation, or disposal of solid or hazardous waste; and (3) that the solid or

---

[26]Plaintiffs also asserted a RCRA claim against the Sanzari Defendants in their Fifth
Amended Complaint.  The Court dismissed that RCRA claim as barred by the entire controversy
doctrine upon the Sanzari Defendants' motion for summary judgment.  (12/31/09 Opinion at 17-
21.)  Plaintiffs have asked us to reconsider this ruling on the basis of a recent case, *Interfaith
Comm. Org. Inc. v. PPG Indus., Inc.*, Civ. No. 09-480, 2010 WL 1371783 (D.N.J. Mar. 26,
2010), in which Judge Greenaway held that federal courts have exclusive jurisdiction over
RCRA claims.  The Court does not believe that reconsideration of its ruling is warranted at this
time.  Judge Greenaway did not address the reasoning of the Sixth Circuit case upon which this
Court relied in its opinion and the *Interfaith* decision does not constitute an intervening change
in the controlling law on the issue.

hazardous waste may present an imminent and substantial endangerment to health or the environment. *Interfaith Cmty. Org. v. Honeywell Int'l Inc.*, 399 F.3d 248, 258 (3d Cir. 2005). "Contributed to" has been interpreted to require "some level of causation between the contamination and the party to be held liable." *Hudson Riverkeeper Fund, Inc. v. Atlantic Richfield Co.*, 138 F. Supp. 2d 482, 487 (S.D.N.Y. 2001).

Both the United States Defendants and the Commissioner are subject to suit as "persons" under RCRA. RCRA allows a civil action to be brought against any person, "including the United States Defendants and any other governmental instrumentality or agency." 42 U.S.C. § 6972(a)(1)(B); *see also* 42 U.S.C. § 6903(15) (defining "person"). Thus, the Commissioner and the United States Defendants are "persons" for purposes of RCRA.

In addition, it is clear that the presence of TCE, PCE, and other VOCs in the Eastern and Western Groundwater Plumes may present an imminent and substantial endangerment to the environment or to the health of those impacted by the groundwater contamination. *Supra* FOF ¶ 1. TCE and PCE are both hazardous substances and are present in the two groundwater plumes at levels above the NJDEP's maximum acceptable contaminant levels. *Id.* at ¶¶ 1-2. Thus, the only question is whether the United States Defendants, the Commissioner, or Plaintiffs contributed or are contributing to "the handling, storage, treatment, transportation, or disposal of solid or hazardous waste." 42 U.S.C. § 6972(a)(1)(B).

2.      Claims against the United States Defendants

The same actions which make the United States Defendants a responsible person under CERCLA make them liable under RCRA.[27] The United States Defendants generated and

---

[27]Plaintiffs did not establish that the United States Defendants contributed to the handling, storage, treatment, transportation, or disposal of solid or hazardous waste at Columbia

arranged for the disposal of hazardous wastes which ended up at the JANR Warehouse.  By virtue

of these actions the United States Defendants have contributed to the storage or disposal of

wastes.  *See Aceto*, 872 F.2d at 1384; *United States v. Union Corp*., 259 F. Supp. 2d 356, 405

(E.D. Pa. 2003) ("liability under CERCLA as a person who 'arranged for the treatment or

disposal of hazardous substances' is sufficient to prove that [defendant] 'contributed to' the

disposal of wastes within the meaning of RCRA").

      Further, Plaintiffs have established a sufficient causal connection between the

contamination at the Litgo Property and the United States Defendants.  Plaintiffs must prove that

the "particular defendants' waste was of a type that could contribute to an imminent and

substantial endangerment to health or the environment that may exist."  *Hudson Riverkeeper*, 138

F. Supp. 2d at 487 (citing *Prisco v. A & D Carting Corp.*, 168 F.3d 593, 609 (2d Cir. 1999)).  In

*Hudson Riverkeeper*, the court found that standard satisfied when the plaintiff had shown that the

same contaminant used in the defendants' operations and stored at the site was found in sediment

samples at the site and the defendant had not established that the contamination came from

another source.  *Id.* at 487-88.

      Plaintiffs here have established that TCE and PCE generated by the United States

Defendants was stored in the JANR Warehouse and that TCE and PCE were found in the soil and

groundwater on the Litgo Property.  *Supra* FOF at ¶¶ 1, 44-45, 80.  Plaintiffs have shown that it is

more likely than not that the TCE generated by the United States Defendants was released into the

_____

Aircraft.  As previously discussed, there is no evidence that the United States Defendants owned
any equipment used in conjunction with solid or hazardous waste or that the United States
Defendants had any role in Columbia Aircrafts operations beyond occasional inspections.  The
United States Defendants' regulation of TCE did not require it to actually handle, transport, or
store any TCE.  However, their role in arranging for the disposal of hazardous materials which
ended up at the JANR Warehouse is sufficient for liability under RCRA.

soil and groundwater, namely through spills and leaks during the NJDEP/Clean Venture cleanup. *Id.* at ¶¶ 43-54.  Plaintiffs have thus established the requisite causal link between the United States Defendants and the contaminants at the Litgo Property.

Although the United States Defendants suggested alternative sources for the contamination at the Litgo Property, these theories were largely based on conjecture.  The United States Defendants' experts could not state with any certainty that the contamination came from any other source or prove that there was no causal connection between the contamination and the United States Defendants.  Because the United States Defendants contributed to the storage and disposal of hazardous wastes which have been linked to the contamination at the Litgo Property they are liable under RCRA and an injunction may be ordered against them on behalf of Plaintiffs.

### 3. Claims against the Commissioner

RCRA liability is appropriate upon a showing that a defendant "actively engaged in the management or disposal" of solid or hazardous waste at the site.  *Interfaith Cmty. Org. v. Honeywell Int'l, Inc.*, 263 F. Supp. 2d 796, 846 (D.N.J. 2003) (hereinafter "*Interfaith* II").  The Commissioner became actively engaged in the management or disposal of hazardous substances at the JANR Warehouse when it took the lead role in the cleanup of the warehouse.  Many of the substances at the JANR Warehouse were hazardous waste.  *Supra* FOF ¶¶ 36, 39, 34-45.  The NJDEP hired the contractor who would perform the cleanup of the warehouse and supervised its activities, which included sorting hazardous substances, creating bulk piles and pools suitable for disposal, and sending materials off-site for disposal.  *Id.* at ¶¶ 40-42.  The Commissioner therefore contributed to the handling, transportation, and disposal of solid and hazardous wastes

61

when he arranged for the cleanup of the JANR Warehouse.

Plaintiffs have also established a causal link between the Commissioner and the contamination at the Litgo Property.  Plaintiffs have established that some of the same hazardous substances present in the JANR Warehouse and handled during the NJDEP/Clean Venture cleanup were found in the soil and groundwater on the Litgo Property.  *Id.* at ¶¶ 1, 39, 44-46. Plaintiffs have further shown that it is more likely than not that these hazardous substances were released into the environment during the NJDEP/Clean Venture cleanup of the JANR Warehouse. *Id.* at ¶ 54.  The Commissioner has not been able to establish that a different party caused the contamination at the site.  Accordingly, the Commissioner is liable pursuant to RCRA and injunctive relief may be awarded to Plaintiffs.

### 4.  Claims against Plaintiffs

The United States Defendants and the Commissioner have asserted crossclaims against Plaintiffs under § 7002(A)(1) of RCRA.  The United States Defendants assert that Plaintiffs are liable under RCRA because a faulty seal at MW-4 contributed to the contamination at the site after Plaintiffs' purchase of the Litgo Property.  However, Plaintiffs cannot be liable under RCRA if there has been no action on their part which has contributed to the contamination.

The evidence at trial established that the faulty seal was installed by the Sanzari Defendants' consultants rather than Plaintiffs' consultants.  *Id.* at ¶ 83.  Once the faulty seal was discovered, Plaintiffs had their consultant replace it, ending any detrimental impact to the site. Passive migration of contaminants does not constitute disposal.  *See CDMG Realty*, 96 F.3d 711 (passive migration of contaminants does not constitute disposal)[28]; *Interfaith* II, 263 F. Supp. 2d

_____

[28]*CDMG* was a CERCLA case, but the Third Circuit was interpreting the RCRA definition of "disposal," which has been incorporated by reference into CERCLA.

at 845 (RCRA liability may not be imposed solely based on 'studied indifference' to pre-existing contamination.). The fact that contaminants may have migrated into the groundwater between Plaintiffs' purchase of the property and replacement of the faulty seal is insufficient to establish that Plaintiffs contributed to the disposal of hazardous wastes. Accordingly, Plaintiffs are not liable under RCRA.[29]

### C.    Spill Act

#### 1.    General Legal Standard

Plaintiffs have asserted a claim for contribution to costs against the Sanzari Defendants under New Jersey's Spill Act. In response, the Sanzari Defendants have asserted a counterclaim against Plaintiffs and a crossclaim against Mian Realty for cost contribution pursuant to the Spill Act. In addition, the Sanzari Defendants again raise the argument that they are immune to suit based on the 1997 Consent Order.[30]

The Spill Act provides that:

> Whenever one or more dischargers or persons cleans up and removes a discharge of a hazardous substance, those dischargers and persons shall have a right of contribution against all other dischargers and persons in any way responsible for a discharged hazardous substance or other persons who are liable for the cost of the cleanup and removal of that discharge of a hazardous substance.

---

[29]The Court notes that Plaintiffs have also asserted that the United States Defendants are precluded from bringing a RCRA counterclaim under the "citizen suit" provision of RCRA because Congress delegated the responsibility of bringing RCRA suits on behalf of the United States Defendants to the Administrator of the Environmental Protection Agency ("EPA") and the Administrator of the EPA is not involved in this matter. *See 42* U.S.C. § 6973. Because the Court finds that Plaintiffs have not taken any actions which would create liability under RCRA, it need not reach this argument.

[30]Defendants have also reasserted the argument that Plaintiffs' Spill Act claims are barred by the entire controversy doctrine. The Court rejected that argument when it was raised in the Sanzari Defendants' summary judgment motion and will not revisit it now. (12/31/09 Opinion at 21-22.)

N.J.S.A. § 58:10-23.11f(a)(2)(a).  A "discharge," as defined by the Spill Act, is "any intentional or unintentional action or omission resulting in the releasing, spilling, leaking, pumping, pouring, emitting, emptying or dumping of hazardous substances into the waters or onto the lands of the State."

1.    Claims Against the Sanzari Defendants

The Sanzari Defendants argue that the 1997 Consent Order provides them with immunity from suit under the Spill Act for claims related to releases or discharges of hazardous substances at the JANR Warehouse.  As discussed above, *supra* Section III.A.3.a., the 1997 Consent Order does not provide the Sanzari Defendants immunity from the claims in this suit because it did not resolve the Sanzari Defendants' liability for the matters currently at issue and there are serious due process concerns with using a private settlement to block a third parties' right to contribution without notice.  Accordingly, the Sanzari Defendants cannot raise the 1997 Consent Order as a defense to Plaintiffs' current Spill Act Claims.

The New Jersey Supreme Court has held that ownership or control over a property at the time of the discharge suffices to make a party "in any way responsible" for a discharge under the Spill Act.  *Marsh v. Dep't of Envtl. Prot.*, 152 N.J. 137, 150 (1997); *Dep't of Envtl. Prot. V. Ventron Corp.*, 94 N.J. 473, 502 (1983).  TCE, PCE, and other VOCs were released, spilled, or leaked at the Litgo Property during the NJDEP/Clean Venture cleanup.  *Supra* FOF ¶ 54.  Alfred Sanzari and Alfred Sanzari Enterprises are partially responsible for this discharge because they owned and controlled the Litgo Property during that time period.  *Id.* at ¶¶ 32, 70.  Plaintiffs have incurred costs to remove and cleanup this discharge.  *Id.* at ¶¶ 80-82.  The Sanzari Defendants are therefore liable to Plaintiffs for contribution to costs under the Spill Act.

64

2.      Claims against Mian

The Sanzari Defendants have brought a crossclaim against Mian for cost contribution.

Under the Spill Act, any current property owner who acquired the property on or after September

14, 1993 and who knew or had reason to know of a discharge of hazardous substances at the

property is strictly liable.  N.J.S.A. § 58:10-23.11g(c)(3).  Mian, however, is not liable as a

current owner of real property because there has been no discharge of hazardous substances on

the Mian Property.

There is no evidence that TCE or other VOCs were discharged at the Mian Property.  The

evidence regarding the horizontal tank was inconclusive at best, as no expert was able to identify

what had been in the horizontal tank and there was no TCE found in the soil samples taken from

the area of the tank.  *Supra* FOF ¶ 64.  There were no other activities at the Mian Property which

have been alleged to be a source of the contamination at the Litgo Property.  Passive migration of

hazardous substances is insufficient to create liability under the Spill Act.  *White Oak Funding,*

*Inc. v. Winning*, 341 N.J. Super. 294, 299 (App. Div. 2001); *Interfaith Cmty Org. v. Honeywell*

*Int'l., Inc.*, 215 F. Supp. 2d 482, 495 (D.N.J. 2002) (hereinafter "*Interfaith* I").  Mian cannot be

liable merely because TCE has migrated from the Litgo Property to the groundwater underlying

the Mian Property.  The Court thus concludes that Mian is not liable under the Spill Act.[31]

3.      Claims against Plaintiffs

_____

[31]In addition, Dr. Bilal Mian and Shakila Mian did not know and had no reason to know
of the presence of hazardous substances at the time they acquired the property in 1987.  MW-11,
which is the monitoring well located on the Mian Property where TCE has been identified, was
not put into place until after Goldstein's purchase of the property in 1990.  *See supra* SOF ¶ 82.
The soil investigations which found low levels of TCE in some soil samples on the Mian
Property did not take place until after Goldstein had hired Sorge in 2000.  *See id* at ¶ 81; 2/4/10
Tr. 196:1-197:14 (Sorge was the consultant that carried out the study of the Mian property).

The Sanzari Defendants brought a counterclaim against Plaintiffs for cost contribution under the Spill Act.  The Court finds that Plaintiff Litgo falls within the broad category of "other persons who are liable."  N.J.S.A. § 58:10-23.11f(a)(2)(a).  The Spill Act, as enacted by the New Jersey legislature, is structured so that the current owners of a property purchased before September 14, 1993 are liable for removal and cleanup costs unless they can prove that they: (1) acquired the property after the discharge occurred, (2) did not know or have any reason to know of the discharge when they acquired the property, (3) are not in any way responsible for the discharge, and (4) gave notice of the discharge to the NJDEP upon discovery.  *See* N.J.S.A. § 58:10-23.11g(d)(2).

Litgo cannot prove the second necessary element necessary to avoid liability—that "at the time the person acquired the real property, the person did not know and had no reason to know that any hazardous substance had been discharged at the real property."   N.J.S.A. § 8:10-23.11g(d)(2)(b)(I).  Goldstein knew that hazardous substances had been discharged on the Litgo Property when he agreed to purchase it and accounted for this, at least in part, when he negotiated the ECRA clause in the 1985 Agreement of Sale.  *Supra* FOF ¶ 66-67.  In addition, the reports of the Sanzari Defendants' environmental consultants, which were provided to Goldstein prior to his closing on the property, put him on notice that the soil and groundwater had been impacted by TCE.  *Id.* at ¶¶ 75, 89-90.  As the sole shareholder of Litgo, Goldstein's knowledge at the time that the property was transferred from Goldstein to Litgo must be imputed to Litgo.  Thus, Litgo does not qualify for the narrow protection provided by the Spill Act to current owners of real property.  Plaintiff Litgo is therefore liable to the Sanzari Defendants for contribution to costs under the Spill Act.

Plaintiff Goldstein cannot be liable under the Spill Act on the same grounds as Litgo because he is not the current owner of the Litgo Property.  Goldstein only owned the property for a short period before transferring it to Litgo.  *Supra* SOF ¶¶ 77-78.  There have been no allegations that a discharge of hazardous substances occurred during that brief period.  Any passive migration of hazardous substances that occurred during those months would not be sufficient to make Goldstein liable for response costs under the Spill Act.  *White Oak*, 341 N.J. at 299; *Interfaith* I, 215 F. Supp. 2d at 495.  There are therefore no grounds for holding Plaintiff Goldstein liable in contribution to the Sanzari Defendants under the Spill Act.

>    **D.    *Counterclaims Based on the 1985 Agreement of Sale and the 1989 Settlement Agreement***

>        1.    Commissioner's Counterclaim

The Commissioner has asserted that Plaintiffs, as owners of the Litgo Property, are responsible to the NJDEP for remediation of the property under ECRA/ISRA, N.J.S.A. § 13:1K-6 to -35.  This claim relies on the 1985 Agreement of Sale and the 1989 Settlement Agreement, under which Goldstein agreed to accept the responsibility and costs of complying with ECRA—which otherwise would have fallen on Alfred Sanzari—to the extent the costs exceeded $100,000.00.  *Id.* at ¶¶ 67, 70.

New Jersey courts have recognized that buyers and sellers of property may contractually shift their ECRA/ISRA obligations.  *See Dixon Venture v. Joseph Dixon Crucible Co.*, 122 N.J. 228, 232 (1991); *206-36TH Street, LLC v. Wick*, 2009 WL 2253226, *4 (N.J. App. Div. Jul. 30, 2009).  The Commissioner, however, was not party to either of these agreements.  He thus may not enforce the terms of the agreements unless he is an intended third party beneficiary to the

contract.  *Broadway Maint. Corp. v. Rutgers*, 90 N.J. 253, 270 (1982).

A party is only a third-party beneficiary of the contract if the contracting parties intended that third party should receive a benefit which could be enforced in court.  *Werrmann v. Aratusa, Ltd.*, 266 N.J. Super. 471, 476 (App. Div. 1993).  Making this determination requires an examination of the contract and a consideration of the circumstances surrounding execution of the agreements.  *Reider Cmtys. Inc. v. Twp. of N. Brunswick*, 227 N.J. Super. 214, 222 (App. Div. 1988).  The NJDEP is not named as an intended third-party beneficiary in either the 1985 Agreement of Sale or the 1989 Settlement Agreement.  Further, the Commissioner has not presented any other evidence which suggests he was an intended third-party beneficiary to the contract.  The Court therefore concludes that the Commissioner lacks standing to enforce the contractual agreement shifting ECRA/ISRA obligations from Alfred Sanzari to Goldstein and will dismiss this counterclaim.

### 2.  Sanzari Defendants' Counterclaim

The Sanzari Defendants have brought a counterclaim against Plaintiffs for failure to reimburse Alfred Sanzari for his share of the cleanup costs in accordance with the 1989 Settlement Agreement**.**  The 1989 Settlement Agreement requires Goldstein to pay Alfred Sanzari a proportionate share of any "net recovery" received if he exercises his assigned rights to pursue reimbursement claims.  Ex. P-744 at SANZARI003224-26.  Parties which have breached a material term of a contract cannot thereafter enforce the contract's terms.  *See Nolan by Nolan v. Lee Ho*, 120 N.J. 465, 472 (1990).   The Sanzari Defendants effectively breached a material clause of the 1989 Settlement Agreement when they failed to provide Goldstein with a full set of preliminary test results from the monitoring wells.  *Supra* FOF ¶ 71.  Because the Sanzari

Defendants materially breached the 1989 Settlement Agreement, they cannot rely on its terms as the basis for a counterclaim.[32]  Thus, the Sanzari Defendants' counterclaim against Plaintiffs based on the 1989 Settlement Agreement must be dismissed.

### E.    Common Law Contribution and Indemnification Claims

The Sanzari Defendants and Mian have asserted common law contribution and indemnification counterclaims against Plaintiffs and the other defendants.  These must be dismissed, as any claim for contribution or indemnification under common law is preempted by CERCLA.  *Morton Intern., Inc. v. A.E. Staley Mfg. Co.*, 343 F.3d 669, 685 (3d Cir. 2003); *Rhodia Inc. v. Bayer Cropscience Inc.*, Civ. No. 04-6424, 2007 WL 3349453, *11 (D.N.J. Nov. 7, 2007).

### F.    Closure Act

Plaintiffs sought rescission of the contract by which they purchased the Litgo Property and consequential damages from the Sanzari Defendants pursuant to the New Jersey Closure Act. The Closure Act requires the seller of any land which has been utilized as a sanitary landfill facility to inform the buyer of that fact and the period of time that the land was so utilized. N.J.S.A. § 13:1E-116(a).  Any contract which does not provide this information is voidable. N.J.S.A. § 13:1E-116(b).  Plaintiffs allege that a sanitary landfill was once present on the Kirby, Mian, and Litgo Properties and that this fact was not disclosed to them when they purchased the

---

[32]The Sanzari Defendants suggest that Plaintiffs cannot now raise any arguments based on the Sanzari Defendants' breach of the 1989 Settlement Agreement because any contract-based claims could have been raised during the 1996 *Wausau* litigation and are now foreclosed by New Jersey's entire controversy doctrine.  The entire controversy doctrine requires that all claims which arise from related facts or the same transaction or series of transactions be joined together.  *DiTrolio v. Antiles*, 142 N.J. 253, 267 (1995).  The doctrine does not apply here, however, because Plaintiffs have not brought any *claim* based on the 1989 Settlement Agreement, but rather are simply pointing out that the Sanzari Defendants themselves are also precluded from bringing contract claims premised on the terms of the 1989 Settlement Agreement.

Litgo Property from the Sanzari Defendants.  The Court, however, determined that there was

insufficient evidence to find that a sanitary landfill facility had been present on the Litgo

Property.  *Supra* FOF ¶ 14; 2/12/10 Tr. 113:14-115:3.  Accordingly, Plaintiffs claims against the

Sanzari Defendants under the New Jersey Closure Act were dismissed at the close of trial.

2/12/10 Tr. 113:14-115:3.

IV.    **Damages / Injunctive Relief[33]**

    *A.*    ***CERCLA***

        1.    <u>General Legal Standard</u>

Responsible parties under § 107 of CERCLA are liable for:

(A) all costs of removal or remedial action incurred by the United States
Government or a State or an Indian tribe not inconsistent with the national
contingency plan;

(B) any other necessary costs of response incurred by any other person consistent
with the national contingency plan;

(C) damages for injury to, destruction of, or loss of natural resources, including the
reasonable costs of assessing such injury, destruction, or loss resulting from such a
release; and

(D) the costs of any health assessment or health effects study carried out under §
9604(I) of this title.

42 U.S.C. § 9607(a)(4).  When there are multiple responsible parties and claims for contribution,

"the court may allocate response costs among liable parties using such equitable factors as the

---

[33]The Court will not determine an amount of damages at this time, as it determined at trial
that a bifurcated proceeding would be necessary to adequately address the sufficiency of
Plaintiffs' proofs regarding damages and whether or not the incurred costs were recoverable
under either CERCLA or the Spill Act.  The terms of Mian's settlement with Plaintiffs will be
accounted for in determining the amount of damages recoverable by Plaintiff.

court determines are appropriate." 42 U.S.C. § 9613(f)(1).  After allocating responses costs, a

court must issue a binding declaratory judgment regarding liability for response costs.  42 U.S.C.

§ 9613(g)(2); *United States v. USX*, 68 F.3d 811, 819 (3d Cir. 1995).

The inability to assign an ideal measure of monetary responsibility to an otherwise

responsible party gives rise to an "orphan share."  *United States v. Kramer*, 953 F. Supp. 592, 595

(D.N.J. 1997).  The Court has identified one orphan share in this matter.  The Commissioner,

although immune from CERCLA claims for costs recovery or cost contribution due to the

Eleventh Amendment, would otherwise be a responsible person as either a past operator of a

facility or a person who arranged for the disposal of hazardous wastes at the facility.[34]  A court

may equitably allocate orphan shares among liable parties at its discretion.  *Stearns & Foster*

*Bedding Co. v. Franklin Holding Corp.,* 947 F.Supp. 790, 801 (D.N.J. 1996).

Courts have frequently looked to what are referred to as the "Gore factors" for guidance in

allocating liability.  *See, e.g.*, *Kramer*, 644 F. Supp. 2d 479, 493 (D.N.J. 2008) ("hereinafter

"*Kramer* II"); *Lenox Inc. v. Reuben Smith Rubbish Removal*, 91 F. Supp. 2d 743, 747 (D.N.J.

2000).  The "Gore factors" are as follows:

(1) ability of the parties to demonstrate that their contribution to a discharge, release or

disposal of a hazardous waste can be distinguished;

---

[34]The Commissioner oversaw the cleanup of the JANR Warehouse and had the authority
to oversee and control the day-to-day decision during the cleanup.  *Supra* FOF ¶ 42.  Indeed, the
NJDEP and its contractor Clean Venture had exclusive control over the exclusion zone during
the cleanup.  *Id.* at ¶ 41.  The Commissioner thus conducted operations at a facility having to do
with the management or disposal of hazardous wastes.  In addition, the NJDEP arranged for
hazardous waste to be removed from the JANR Warehouse and disposed of elsewhere.  *Id.*
Some of these hazardous wastes were released during the bulking and process by which they
were prepared for removal.  *Id.* at ¶ 54.  The Commissioner thus "arranged for the disposal" of
hazardous substances that were released at the facility.

(2) amount of the hazardous waste involved:

(3) degree of toxicity of hazardous waste involved:

(4) degree of involvement by the parties in the generation, transportation, treatment, storage or disposal of hazardous waste;

(5) degree of care exercised by the parties with respect to the hazardous waste concerned; and

(6) degree of cooperation by the parties with the Federal, State, or local officials to prevent any harm to the public health or the environment.

*Kramer* II, 644 F. Supp. 2d at 493 n.13.

The Gore factors are not mandatory or exclusive. District courts have the flexibility to consider as many or as few factors as necessary to make an equitable allocation. *New Jersey Turnpike Authority*, 197 F.3d at 104. Of the Gore factors, the fourth and fifth factors are the most important in this matter. The experts that testified at trial could not distinguish a definite source for the contamination in either of the two groundwater plumes or quantify the amount of hazardous waste released, discharged, or disposed of by any party. There is therefore no rational way to equitably allocate response costs based on the first and second Gore factors. Similarly, liability cannot be allocated based on the degree of toxicity as all of the claims in this matter involve releases of TCE.

The Court finds that several additional factors are relevant in this case to the equitable allocation of response costs. In considering the totality of the circumstances, the Court will consider the extent to which the parties voluntarily accepted liability and responsibility for environmental remediation of the site, the extent to which a party stands to financially benefit

from remediation, and the extent to which a liable party's actions may have exacerbated or mitigated the contamination at the Litgo Party.

2.    <u>Commissioner</u>

Although the Commissioner is not a responsible party under CERCLA, he would have been responsible for a share of the response costs if he did not have Eleventh Amendment immunity.  The Commissioner was directly involved in the discharge or release of hazardous substances at the site.  The NJDEP oversaw the faulty cleanup of the JANR Warehouse which resulted in releases of TCE and other VOCs at the Litgo Property.  *Id.* at ¶¶ 42, 54.  In addition, the Commissioner was indirectly involved in the disposal of hazardous substances at the JANR Warehouse as it was due to the inattention of NJDEP employees and the inadequate inspection of materials at the Signo Warehouse that hazardous substances were allowed to be shipped to the JANR Warehouse.  *Id.* at ¶¶ 29-30.

The Commissioner failed to exercise an adequate level of care in regard to the hazardous substances.  NJDEP employees ignored improper and inadequate labeling of materials at the Signo Warehouse, allowing hazardous wastes which were stored in deteriorating containers to be improperly shipped out of the Signo Warehouse and disposed of in the JANR Warehouse.  *Id.* at 29-30, 36, 39.  In addition, there were a number of spills and leaks at the NJDEP-supervised cleanup of the JANR Warehouse.  *Id.* at ¶ 51.

The Court gives some note to the fact that the Commissioner became involved with the JANR Warehouse as a "good Samaritan" in an attempt to rectify a problematic situation that others were not responding to.  *Id.* at ¶¶ 37-40.  However, as noted above, the situation at the JANR Warehouse was partly attributable to the NJDEP's own lack of care at the Signo

73

Warehouse.  *Id.* at ¶¶ 29-30.  Having considered all the relevant factors, the Court will assign the Commissioner an orphan share of 23%.

3.    United States Defendants

After consideration of the relevant equitable factors, the Court will allocate 2% of the response costs to the United States Defendants.  First, although the Court found that some hazardous substances were previously possessed by the United States Defendants and that they arranged for the disposal of those materials, the United States Defendants were not directly involved in the transportation of substances to the Litgo Property, their storage at the site, or their treatment and disposal.  The only role the United States Defendants played in contributing to the contamination is that they generated some of the hazardous substances which may have been released.

Second, the United States Defendants exercised a reasonable degree of care in regard to those substances by giving them to RTS, who at the time was believed to be a reputable contractor for the disposal of hazardous waste.  1/22/10 Tr. 122:1-6.  The United States Defendants had no knowledge that RTS and/or Signo would fail to properly dispose of those wastes.  For these reasons, the Court finds that the United States Defendants should only be allocated 2% percent of the response costs.

4.    The Sanzari Defendants

The Sanzari Defendants are responsible persons in this matter based on their ownership and operation of the Litgo Property at the time that hazardous substances were stored at and removed from the JANR Warehouse.  The Sanzari Defendants were not directly involved in the generation, storage, treatment or disposal of hazardous substances.

74

However, the Sanzari Defendants failed to exercise a reasonable degree of care once they were notified of the presence of hazardous substances at the JANR Warehouse. The Sanzari Defendants took no action to remediate the conditions at the JANR Warehouse other than moving to evict JANR, leaving the hazardous wastes in precarious conditions until the NJDEP decided to take control of the cleanup. *Supra* FOF ¶ 37-38. In addition, during the Sanzari Defendants' ownership and operation of the property, a faulty seal was installed in MW-4 by one of the Sanzari Defendants' environmental contractors. This faulty seal, which was discoverable and fixable, likely increased the extent of the groundwater contamination. *Id.* at ¶ 83.

Finally, the Sanzari Defendants faltered by failing to provide Goldstein with a full set of preliminary test results from the monitoring wells or with the information regarding TCE contamination at the nearby Finderne well prior to Goldstein's final election to proceed with the transaction. *Id.* at ¶¶ 71-72. The Sanzari Defendants were the only party that had notice of the full extent of the contamination prior to Goldstein's election yet acted in a manner which would ensure that someone else—Goldstein—would have to take the responsibility for the remediation. After consideration of all of these factors, the Court finds that the Sanzari Defendants should be allocated 25% of the response costs.

<u>5.</u>     <u>Plaintiffs</u>

Plaintiffs are responsible parties under CERCLA based solely on their current ownership and operation of the Litgo Property. They have not been directly involved in the generation, storage, treatment or disposal of hazardous substances at the site. Indeed, Plaintiffs only operations on the site have been those necessary to remove and remediate the soil and groundwater contamination.

In regard to the soil remediation, the Court believes that Plaintiffs have exercised a reasonable degree of care.  However, Plaintiffs have consistently put off taking any steps to remediate the groundwater contamination.  Indeed, although Goldstein was aware of the existence of groundwater contamination when he purchased the property, there has not yet been any field work to remediate the groundwater contamination.  *See id* at ¶¶ 76, 82.  Because the groundwater contamination continues to migrate downstream, Plaintiffs' lack of action over the past twenty years may well have increased the threat to the environment and public health.

In addition, the Court notes that in both the 1985 Agreement of Sale and the 1989 Settlement Agreement Goldstein voluntarily agreed to remediate the property in accordance with ECRA and accepted financial responsibility for the remediation beyond the first $100,000.00, which was to be paid by Alfred Sanzari.[35]  *Id.* at ¶¶ 67, 70.  Experts at trial testified that an ECRA and CERCLA cleanup would be largely identical.  2/2/10 Tr. 35:22-36:2.

Further, Plaintiffs knew that there were significant environmental issues at the site when they acquiesced to undertake the ECRA remediation.  In 1985, Goldstein was already aware that there was some soil contamination at the site.  *Supra* FOF ¶ 66.  By the time the 1989 Settlement Agreement was reached, Goldstein was on notice that there were serious contamination issues, including TCE-contamination, at the Litgo Property.   By that point, Alfred Sanzari had tried to back out of the Agreement of Sale due to concerns about how high the ECRA-remediation costs would be, specifically expressing his worry that remediation costs might be as high as several

---

[35]Although the 1989 Settlement Agreement is not enforceable against Plaintiffs based on the Sanzari Defendants material breach of that agreement, *see supra* Section III.D.2, the Court finds that the intent and substance of the agreements may still be weighed in its consideration of the equitable factors relevant to allocation of response costs.

million dollars.  *Id.* at ¶ 68.  In addition, Goldstein had been provided with all of the reports written by the Sanzari Defendants' environmental consultants, which noted the possibility of TCE-contamination at the site.  *Id.* at ¶ 90.  Goldstein's own environmental consultant, EWMA, stressed the inadequacy of the current cleanup plans and cost estimates to him around the time of the 1989 Settlement Agreement.  *Id.* at ¶ 69.  Despite these warnings, Goldstein forced the Sanzari Defendants to proceed with the sale and repeatedly elected to undertake the transaction, voluntarily accepting liability for completing an ECRA-compliant remediation of the Litgo Property.  *Id.* at ¶¶ 68, 74.

The Court does not believe that it would be equitable if Plaintiffs were to avoid responsibility for all response costs at this point—twenty years after they purchased the property and voluntarily accepted the responsibility for any necessary environmental remediation.  In addition, Plaintiffs are the only parties that stand to benefit financially from the remediation of the Litgo Property.  For these reasons, and after consideration of all the relevant factors, the Court finds that Plaintiffs are responsible for 50% of the response costs.

### 6.     Allocation of the Orphan Shares

Courts that have addressed the equitable allocation of orphan shares under CERCLA have concluded that it is most equitable to divide the Commissioner's orphan share between the responsible parties according to their relative equitable shares.  *See, e.g.*, *United States v. Compaction Systems Corp.*, 88 F. Supp. 2d 339, 353 n.10 (D.N.J. 1999); *Miami-Dade*, 345 F. Supp. 2d at 1336.  Apportioning the orphan share of the Commissioner among Plaintiffs, the Sanzari Defendants, and the United States Defendants based on their relative equitable shares, the Court finds that the parties are liable for the already-incurred portion of response costs as follows:

77

65% to Plaintiffs, 32% to the Sanzari Defendants, and 3% to the United States Defendants.

**B.     RCRA**

The Court may grant Plaintiffs injunctive relief against the parties liable under RCRA, namely the Commissioner and the United States Defendants. 42. U.S.C. § 6972(a) ("The district courts shall have jurisdiction . . . to restrain any person who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous . . . or to order such person to take such other actions as may be necessary."). However, the Court notes that neither the Commissioner nor the United States Defendants are currently taking any actions at the site that pose an imminent and substantial endangerment to health or the environment and thus there is no need to "restrain" the Commissioner and the United States Defendants. The Court will not enter an order other injunctive relief at this time as it does not feel that the issue of what injunctive relief would be appropriate has been sufficiently addressed by the parties.[36]

**C.     Spill Act**

Because of CERCLA's "petroleum exclusion," there is not an exact overlap between relief available under CERCLA and the Spill Act. *See* 42 U.S.C. § 9601(14). Plaintiffs have asserted that they have incurred costs to remediate petroleum-related soil contamination at the Litgo Property. The Sanzari Defendants are liable for response costs incurred by Plaintiffs that are recoverable under the Spill Act. However, Plaintiff Litgo is also liable to the Sanzari Defendants' for contribution to costs. The Court must therefore allocate responsibility for response costs which are recoverable only under the Spill Act. The Court believes that the most equitable way

---

[36]This issue of what, if any, injunctive relief is appropriate should be addressed at the hearing on damages.

to do this is to allocate costs recoverable under the Spill Act based on the parties' respective equitable shares assigned by the Court for the purposes of CERCLA.  Based on the parties previously determined equitable shares, the Court concludes that Plaintiff Litgo is responsible for 67% of the petroleum-related response costs recoverable under the Spill Act while the Sanzari Defendants are liable for 33% of those costs.

## V.      Attorney's Fees

RCRA authorizes a court to award reasonable attorney and expert witness fees to a prevailing or substantially prevailing party when the court determines that such an award is appropriate.[37]  42 U.S.C. § 6972(e).  If Plaintiffs prevail on their RCRA claims against the United States Defendants and the Commissioner they may seek to recover reasonable attorneys fees and litigation expenses.  However, the Court is not included to think this will be warranted given the history of this case.

## VI.     Conclusion

For the foregoing reasons, the Court will find that the United States Defendants, the Sanzari Defendants and Plaintiffs are liable under either  § 107 or § 113 of CERCLA and order an equitable allocation of costs as follows: 65% to Plaintiffs, 32% to the Sanzari Defendants and 3% to the United States Defendants.  In addition, the Court will find that the United States Defendants and the Commissioner are liable persons under RCRA but will defer the order of any

---

[37]In contrast, CERCLA does not provide for the award of attorney's fees or expenses associated with the cost of bringing a § 107(a) cost recovery claim.  *Key Tronic Corp. v. United States*, 511 U.S. 809, 819 (1994).

injunctive relief until it can hear further argument on the matter.  The Court will also find that the Sanzari Defendants and Plaintiff Litgo are liable for contribution to costs under the Spill Act and will order an equitable allocation of petroleum-related response costs as follows: 67% to Plaintiff Litgo and 33% to the Sanzari Defendants.

The Court will dismiss all common law claims for contribution and indemnification, Count V of the Sanzari Defendants' counterclaim, the Commissioner's ECRA/ISRA counterclaim, and Plaintiffs' Closure Act Claim against the Sanzari Defendants.  An appropriate order and judgment will follow.

/s/ Anne E. Thompson
_____
ANNE E. THOMPSON, U.S.D.J.

Dated:              June 8, 2010