NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| LITGO NEW JERSEY, INC, and Sheldon GOLDSTEIN, | : : : : | |
| Plaintiffs, | : : | 06-2891 (AET) |
| v. | : : | **OPINION & ORDER** |
| Bob MARTIN, in his official capacity as the Commissioner of the New Jersey Department of Environmental Protection, et al., | : : : : : | |
| Defendants. | : : | |

THOMPSON, U.S.D.J.

    This matter has come before the Court on the Sanzari Defendants'[1] Motion for

Reconsideration [docket # 360] and Plaintiffs' Motion for Reconsideration [361] of the Court's

June 10, 2010 Memorandum Opinion & Order (hereinafter, "Opinion") [358 & 359].  The Court

has decided the motions after considering the submissions of all the parties and after hearing oral

argument on January 3, 2011.  For the reasons set forth below, the Sanzari Defendants' motion is

granted in part and denied in part, and Plaintiffs' motion is denied.

## BACKGROUND

    The Court presumes that all parties are familiar with the procedural history and facts of

---

    [1]The abbreviations used throughout this opinion are the same as those used in the Court's
June 10, 2010 Memorandum Opinion [358].

this case and therefore will not discuss them in detail at this time.  It suffices to note that the primary issue in this matter is the presence of TCE and other hazardous substances at and emanating from the Litgo Property and the Defendants' alleged responsibility for these hazardous substances.  Following a seventeen-day bench trial, on June 10, 2010, the Court entered findings of fact and conclusions of law regarding the parties' liability under CERCLA, RCRA, the New Jersey Spill Act, and the New Jersey Closure Act.  The Court found that the United States Defendants, the Sanzari Defendants, and Plaintiffs are liable under CERCLA, that the Sanzari Defendants and Plaintiff Litgo are liable under the Spill Act, and that the United States Defendants and the Commissioner are liable under RCRA.  The Court dismissed all claims brought under the Closure Act.

After making its determination on liability, the Court went on to consider how damages should be equitably allocated under § 113 of CERCLA and the Spill Act.  The Court determined that, under § 113, the following allocation of CERCLA-recoverable costs was equitable: 65% to Plaintiffs, 32% to the Sanzari Defendants, and 3% to the United States Defendants.[2]  The Court further found that Plaintiffs were responsible for 67% of costs recoverable only under the Spill Act, while the Sanzari Defendants were responsible for 33% of those same costs.  Injunctive relief against the United States Defendants and the Commissioner is available under RCRA, but the Court deferred a determination of what injunctive relief would be appropriate until further argument could be heard on the subject.  The Court did not set an amount of damages, as it had

---

[2]The Court originally assigned equitable shares of 50% to Plaintiffs, 25% to the Sanzari Defendants, 2% to the United States Defendants, and an orphan share of 23% to the Commissioner.  The final allocation was determined after distributing the Commissioner's orphan share pro rata between Plaintiffs, the Sanzari Defendants, and the United States Defendants.

been decided at trial that the damages portion of the proceeding would be bifurcated and resolved after a determination on liability had been reached.

Plaintiffs and the Sanzari Defendants have now asked the Court to reconsider its Opinion on liability and the equitable allocation of costs. Both Plaintiffs and the Sanzari Defendants have set out a number of reasons why they believe that the Court's equitable allocation of costs is misguided. In addition, both argue that the Court was mistaken in its failure to allocate an orphan share to Columbia Aircraft. Plaintiffs further argue that the Court incorrectly concluded that Plaintiff Goldstein is liable as a current operator under § 113 of CERCLA and that the Court should have held a separate allocation hearing.

<u>LEGAL STANDARD</u>

A motion for reconsideration may be brought on three grounds: (1) an intervening change in controlling law, (2) evidence not previously available, or (3) to correct a clear error of law or prevent manifest injustice. *North River Ins. Co. v. CIGNA Reins. Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995). Reconsideration is an extraordinary remedy which is to be granted "very sparingly." *Interfaith Cmty. Org. v. Honeywell Intern., Inc.*, 215 F. Supp. 2d 482, 507 (D.N.J. 2002).

The parties here do not argue that there has been an intervening change in controlling law or discovery of new evidence. Rather, their arguments rely on the contention that the Court has ignored key facts or elements of the law so as to result in manifest injustice. A motion for reconsideration on these grounds may focus only on those matters—factual or legal—which it believes the Court has overlooked. *See* L. R. Civ. P. 7.1(I). A motion for reconsideration is not an opportunity to raise new matters or arguments that could have been raised before the original decision was made. *Bowers v. NCAA*, 130 F. Supp. 2d 610, 613 (D.N.J. 2001). Nor is it an

3

opportunity to ask the Court to rethink what it has already thought through. *Oritani S & L v. Fidelity & Deposit*, 744 F. Supp. 1311, 1314 (D.N.J. 1990). Thus, reconsideration may be granted only if there is a dispositive factual or legal matter that was presented but not considered which would have reasonably resulted in a different conclusion by the court. *Champion Labs., Inc. v. Metex Corp.*, 677 F. Supp. 2d 748, 750 (D.N.J. 2010).

<u>ANALYSIS</u>

**1.       Goldstein's  Liability as a Current Operator of a Facility**

Plaintiffs argue that the Court was mistaken when it reached the legal conclusion that Goldstein is liable under CERCLA as a current operator of a facility. Plaintiffs contend that Goldstein's involvement in remedial activities at the Litgo Property is insufficient to make him a responsible party pursuant to 42 U.S.C. § 9607(a)(1). The Court agrees that, to the extent that liability under CERCLA is premised on a party's actions as a *past* operator according to 42 U.S.C. § 9607(a)(2), involvement solely in remedial activities is not sufficient to establish liability. However, CERCLA clearly distinguishes between past owners and operators of a facility and current owners and operators of a facility. Past owners and operators of a facility are liable under CERCLA only if they owned or operated the site "at the time of disposal of any hazardous substance." 42 U.S.C. § 9607(a)(2). The statute includes no such qualification for current owners or operators, establishing simply that "the owner and operator of a vessel or a facility" is a responsible party. 42 U.S.C. § 9607(a)(1). Plaintiffs do not challenge the proposition that Litgo, as the current owner of the facility, is strictly liable under CERCLA for environmental contamination on the property. Indeed, the fact that CERCLA imposes strict liability on current owners of a facility is a well established principle. *See, e.g.*, *New York v.*

4

*Shore Realty Corp.*, 759 F.2d 1032, 1044 (2d Cir. 1985); *Hercules Inc. v. E.P.A.*, 938 F.2d 276, 281 (D.C. Cir. 1991); *see also General Elec. Co. v. Jackson*, 610 F.3d 110, 114 (D.C. Cir. 2010) (CERCLA imposes strict liability on current owners, current operators, and arrangers).  There is nothing in the structure or language of CERCLA which gives the Court any reason to believe that it should distinguish current operators from current owners in this regard.

The cases cited by Plaintiffs to support their proposition either discuss only the liability of past operators or are inapposite.  Plaintiffs contend that *ITT Corp. v. Borgwarner Inc.*, is an example of a case where a district court rejected current operator liability based solely on participation in remedial activities.  No. 05-CV-674, 2009 WL 2242904, at *4 (W.D. Mich. Jul. 22, 2009).  However, the Court believes that a more appropriate interpretation of that case is that the district court found that the parties' "role in facilitating access to the . . . site for remediation activities," *id.*, did not amount to the management or control of operations necessary for operator liability under *United States v. Bestfoods,* 524 U.S. 51 (1998).[3]  In contrast, Plaintiffs have been involved with the property for two decades and were responsible for environmental compliance decisions and the decisions not to proceed with remediation.  As stated in the Opinion, we believe the decisions to delay remediation may have increased the threat to the environment and public health.  Plaintiffs also rely on *Universal Paragon Corp. v. Ingersoll-Rand Co.*, in which a district court rejected the contention that a current operator could be liable when it had only

---

[3]*Bestfoods* established that a party could be liable as the operator of a facility only if it managed, directed, or conducted operations at the facility that have to do with the leakage or disposal of hazardous waste or decisions about compliance with environmental regulations.  524 U.S. 51, 66-67 (1998).  A party whose role at a site is limited to facilitating access would not appear to manage, direct, or conduct any of the relevant operations for CERCLA operator liability.

directed remedial efforts.  No. CO5-03100, 2007 WL 518828, at *5 (N.D. Cal. Feb. 13, 2007).

However, not only is that opinion not binding on this Court, the district court in that case cites

only to § 9607(a)(2), which establishes liability only for *past* operators.  Given these

considerations, the Court is not persuaded that it should reconsider its decision as to Goldstein's

liability.

### 2.      Separate Allocation Hearing

Plaintiffs argue that the Court should hold a separate allocation hearing at which the

issues that may be relevant to an equitable allocation of costs can be more fully addressed.  The

Court does not believe that this is necessary.  There is a close overlap between the factors that are

relevant to an equitable allocation of costs and the facts that were presented at trial to establish

liability.  Plaintiffs have not identified in their briefs any relevant new evidence that would be

presented if such a hearing were to be held.[4]  The parties had an opportunity to fully address what

they believed would be an appropriate allocation of costs in their post-trial briefs, and many of

them, including Plaintiffs, did so.  (Plaintiffs' Proposed Findings of Fact 170-182 [349]; Sanzari

Defendants' Proposed Findings of Fact 55 [347]; United States Defendants' Proposed Findings

of Fact 70-74 [346].)  In addition, no party at trial ever requested a separate allocation hearing.

_____

[4]Plaintiffs contend that they had no opportunity to present rebuttal evidence against the
United States Defendants on allocation because the United States Defendants never put on a §
113(f) case.  However, as already noted, the evidence relevant to an equitable allocation of costs
and a determination of liability is closely intertwined, and Plaintiffs had a full and fair
opportunity to submit rebuttal evidence on any evidence the United States Defendants raised on
those issues at trial.  In addition, Plaintiffs argue that they had no opportunity to present their
CERCLA and Spill Act damages at trial because the Court bifurcated resolution of damages, and
that the Court then resolved the "benefit" analysis in favor of the United States Defendants and
others.  As noted further below, the "benefit" analysis relevant to the United States Defendants
was a totally separate inquiry from any damages suffered by Plaintiffs.

The Court thus believes that it was adequately apprised of the relevant facts at trial and that no party was prejudiced by the Court's decision to equitably allocate costs at the same time that it made a determination on liability.  *See Acushnet Co. v. Mohasco Corp.*, 191 F.3d 69, 82 (1st Cir. 1999) (no separate allocation hearing necessary when parties did not object to unified proceedings and did not specify what additional evidence would be submitted on remand).

Plaintiffs also suggest that a separate allocation hearing is necessary because the United States Defendants have not provided sufficient evidence to support the Court's decision to allocate only three percent of the costs to them.  The Court believes that this argument is misguided.  While a party claiming that costs are divisible bears the burden of proving that its contribution to the contamination is distinguishable from that of other parties, there is no comparable burden when a court is equitably allocating costs between responsible parties pursuant to 42 U.S.C. § 9613.  *See id.* at 78 (defendant invoking divisibility bears heavy burden of proof compared to less demanding burden on defendant seeking to limit his liability based on equitable considerations).  The Court made its own determination of what allocation was appropriate based on a consideration of all the relevant equitable factors rather than adopting any of the proposed allocations.  Therefore, it is inappropriate to view any singular party as bearing the burden of proof on this issue.  *Cf. Am. Color & Chem. Corp. v. Tenneco Polymers, Inc.*, 918 F. Supp. 945, 959 (D.S.C. 1995) (party seeking to convince a court to adopt its proposed allocation of costs may bear the burden of proving that allocation is appropriate).

Under CERCLA, a court may allocate response costs among liable parties using such factors as the court determines are appropriate based on the totality of the circumstances and equitable considerations.  42 U.S.C.A. § 9613(f)(1); *New Jersey Turnpike Auth. v. PPG Indus.,*

7

*Inc.*, 197 F.3d 96, 104 fn. 7 (3d Cir. 1999).  The Court reached its decision by considering the totality of the evidence presented at trial as well as the parties' post-trial submissions and sees no benefit at this point in having a separate allocation hearing.

**3.      Allocating an Orphan Share to Columbia Aircraft**

Both Plaintiffs and the Sanzari Defendants argue that, based on the Court's findings of facts, the Court erred in not allocating an orphan share to Columbia Aircraft.  In particular, they note that the Court found that operations at Columbia Aircraft provided the most likely posited explanation for the DNAPL present in the Eastern Groundwater Plume.  Both parties further argue that after assigning an orphan share to Columbia Aircraft, the Court should then allocate 100% of the responsibility for that share to the United States Defendants because they were the only party with any connection to Columbia Aircraft's operations.

Identification and allocation of orphan shares is something that lies within a district court's discretion.  *United States v. Kramer*, 953 F. Supp. 592, 595 (D.N.J. 1997); *Stearns & Foster Bedding Co. v. Franklin Holding Corp.*, 947 F. Supp. 790, 801 (D.N.J. 1996).  The Court first notes that, even if the Court were to assign an orphan share to Columbia Aircraft, it would be more appropriate to apportion that share pro rata among the other responsible parties than to assign 100% of it to the United States Defendants.  The Court found that the United States Defendants' relationship with Columbia Aircraft provided no basis for liability under CERCLA. (Opinion 44-47.)  The Court believes it would be inappropriate to assign the United States Defendants a large portion of costs based on conduct—here, their relationship and interactions with Columbia Aircraft—that would not subject them to CERCLA liability.

Plaintiffs argue that it is unfair to make them bear the burden of costs that would

otherwise be attributable to Columbia Aircraft given that they are not responsible as owners, operators or arrangers for any WWII-era contamination. However, none of the parties liable under CERCLA in this case are responsible as owners, operators, or arrangers for WWII-era contamination. All of the responsible parties' CERCLA liability stems from actions related to the storage and cleanup of hazardous substances in the JANR Warehouse in the 1980's. However, since the WWII-era contamination cannot be differentiated and divided from the JANR Warehouse-era contamination, that portion of the costs is not divisible and therefore all parties liable under CERCLA may ultimately bear some of these costs. Given that Plaintiffs have not established that any of the Defendants are responsible under CERCLA for any contamination resulting from Columbia Aircraft's operations, the Court believes that a pro rata allocation of any orphan share assigned to Columbia Aircraft would be most appropriate.

Once it is assumed that any orphan share assigned to Columbia Aircraft would be divided pro rata among the remaining parties, it becomes clear that there is no need to assign an orphan share because it would make absolutely no difference in the ultimate equitable allocation of costs. Columbia Aircraft's hypothetical orphan share would be divided pro rata among the JANR Warehouse-era responsible parties based on their relative equitable shares. The Commissioner's orphan share would then be divided pro rata among Plaintiffs, the Sanzari Defendants, and the United States Defendants. Assuming that assigning an orphan share to Columbia Aircraft does not shift the relative magnitude of the shares of responsibility of Plaintiffs, the Sanzari Defendants, the United States Defendants, and the Commissioner, the percentages ultimately assigned to Plaintiffs, the Sanzari Defendants, and the United States Defendants do not shift no matter what percentage is assigned to Columbia Aircraft. Given that

9

there would be no real change in the ultimate equitable allocation of costs even if the Court amended its opinion to assign Columbia Aircraft an orphan share, the Court sees no reason to reconsider or amend its opinion.

### 4.    The United States Defendants' Role as the Sole Identified Generator of TCE

In addition to the issues discussed above, Plaintiffs and the Sanzari Defendants raise a number of reasons why they find the Court's equitable allocation of costs unjust, many of which simply re-raise arguments that the parties made either during trial or in their post-trial briefings. Both Plaintiffs and the Sanzari Defendants seek to reduce their equitable share in favor of increasing the other's equitable share and that of the United States Defendants.

For example, Plaintiffs argue that the Court should have assigned a higher percentage of costs to the United States Defendants because they were the sole identified generator of the contaminants at the site.  The Court considered this factor, but found that this did not justify a higher percentage.  A number of other potential sources of the contamination were identified and could not be ruled out, including activities at Columbia Aircraft.  There was no evidence that TCE generated by the United States Defendants had in fact caused all or even a majority of the contamination at the site nor was there any concrete evidence that the bottles holding the TCE generated by the United States had broken and spilled.  (*Id.* at 21-23.)  Further, the United States Defendants were not directly involved in the contamination activities but were only connected to the contamination at the Litgo Property based on the fact that they had arranged for disposal of the containers of waste materials.  (*Id.* at 74.)  The Court thus considered the United States Defendants' role as the only identified generator of TCE but found that, based on the totality of the circumstances, only a minimal allocation of costs was justified.

10

**5.**     **Benefit Received by the United States Defendants from Contamination-**
          **Causing Activities**

Similarly, Plaintiffs argue that the Court overlooked the fact that the United States

Defendants were the only party to benefit from the contamination-causing activities.  Again,

Plaintiffs raised this argument at trial and the Court has already considered it and taken it into

account in its decision.  The Court felt that any benefit the United States Defendants received

from activities connected to the JANR Warehouse was incidental.  The benefit alleged by

Plaintiffs is that the United States Defendants got to store the hazardous wastes they had

generated at the JANR Warehouse.  Although the United States Defendants arranged for the

disposal of these wastes, the materials they generated appear to have reached the JANR

Warehouse only due to the inappropriate and potential illegal conduct of other third-party actors

not involved in this suit.  1/22/10 Tr. 25:8-26:4.  The United States Defendants did not expect to

benefit in any way from storage of wastes at the JANR Warehouse and the Court thus did not feel

that this factor justified increasing their equitable allocation.

As for any contamination that may have occurred during Columbia Aircraft's operations,

while the United States Defendants did benefit from their contracts with that company, they are

not liable as an owner, operator, or arranger for contamination that occurred during that time

period.  *Cf. United States v. Shell Oil Co.*, 13 F. Supp. 2d 1018, 1027 (C.D. Cal. 1998)

(allocating costs to United States when government was liable as arranger for contamination

occurred during relevant time period); *FMC Corp. v. U.S. Dep't of Commerce*, 29 F.3d 833, 846

(3d Cir. 1994) (allocating cost to United States based on benefit received when government was

liable as owner, operator and arranger for wartime activities).  As mentioned above, the Court

11

believes it would be inappropriate to assign the United States Defendants a large portion of the costs based solely on facts that are insufficient to make them liable under CERCLA.

**6.   The United States Defendants Acted with Reasonable Care**

Plaintiffs also argue that the Court was mistaken when it found that the United States Defendants acted with reasonable care.  This argument was also already raised and rejected by the Court.  The Court found the testimony of NJDEP employee Bruce Comfort, who stated that RTS was considered to be a reputable contractor, credible and sufficient to establish that the United States did not breach any standard of care in their hiring of RTS given the lack of contrary evidence.  (Opinion 74.)  Further, although NJDEP employee Galen McCreary testified that he called the United States Defendants to attempt to identify the generators of the wastes at the JANR Warehouse, the testimony did not indicate that the United States Defendants were ever asked or expected to help remove the hazardous substances at that time.  1/21/10 Tr. 170:6-25.  Thus, McCreary's testimony does not establish a failure to act with care on the part of the United States Defendants.

**7.   Sanzari Defendants' Exercise of Care**

The Sanzari Defendants assert that the Court overlooked the fact that they had done all they were legally able to do in order to have the hazardous substances removed from the JANR Warehouse.  Having reconsidered the evidence and the arguments of the parties, the Court finds that the Sanzari Defendants did behave more reasonably than the Opinion suggested and that their share of costs should be adjusted slightly downward to reflect this.

A summary of the various steps the Sanzari Defendants took to have the hazardous materials removed indicates the degree of care taken.  The Sanzari Defendants were not notified

12

of the storage of hazardous materials at the JANR Warehouse until January or February of 1984, when the Borough of Somerville and the NJDEP investigated the location.  After failed attempts to get JANR to remove the materials from the warehouse, the Sanzari Defendants sued to evict JANR and obtained a judgment on May 3, 1984.  However, JANR left behind all the materials in the warehouse when it vacated the premises, and the Sanzari Defendants were forced to sue again.  In July 1984, they obtained a judgment appointing a receiver to take custody of the materials.  In short, in the six months after being notified of the hazardous materials, the Sanzari Defendants took the legal steps that a landlord could reasonably be expected to take to address a hazard on a property leased to a tenant.  For that reason, and for the reasons discussed in the next section, the Court finds that the equitable allocation of CERCLA-recoverable costs assigned to the Sanzari Defendants should be reduced by 4% from 25% to 21%.  After distributing the Commissioner's orphan share pro rata, the Sanzari Defendants are left with a final allocation of 27%.

The Court does not believe that any downward adjustment beyond 4% is warranted.  The Court's original assignment of a significant share to the Sanzari Defendants was not based solely on their failure to exercise due care.  The Court's assignment was also based on their failure to provide Goldstein with a full set of preliminary test results from the monitoring wells prior to his final reelection to proceed with the purchase of the Litgo Property.  Further, as noted in the Opinion, the Sanzari Defendants also were responsible for the installation of a faulty seal in one of the monitoring wells installed by their environmental consultant, thereby likely contributing to and increasing the extent of the contamination.  Our finding in the Opinion that the Sanzari Defendants failed to exercise due care was not dispositive of the Court's decision to allocate

13

costs to them.  Accordingly, having reconsidered the due care issue, the Court finds that the new allocation of 27% to the Sanzari Defendants is equitable.

**8.**  **Separate Allocations for Soil and Groundwater Contamination**

The Sanzari Defendants also contend that the Court erred by not coming up with two different equitable allocations of costs—one for groundwater contamination and one for soil contamination.  We note that this argument was never raised for the Court's consideration during trial or in the post-trial briefs, but we recognize that counsel for the Sanzari Defendants was, at those junctures, concerned more with addressing liability than with allocation of costs.  Thus, we are willing to consider the argument on a motion for reconsideration.  Nevertheless, we find that separate allocation of costs for groundwater and soil contamination is not warranted.  We appreciate the Sanzari Defendants' argument that, if their allocation was based in part on their failure to provide Goldstein with the test results that would reveal the full extent of the groundwater contamination, they should only be assigned a share of the costs relating to the groundwater contamination and not a share of the costs related to the soil contamination, of which Plaintiff was certainly  aware.  The Court has taken into consideration this argument as one of the factors in its decision to reduce the Sanzari Defendants' final allocation to 27%, but the Court does not believe it is necessary to separate the costs.

**9.**  **Plaintiffs' Contractual Assumption of Responsibility**

Plaintiffs contend that it was inconsistent and illogical for the Court to find both that Goldstein's knowledge of the extent of the contamination was limited by the Sanzari Defendants' failure to provide him with a full set of monitoring well test results and that Goldstein voluntarily accepted liability for environmental remediation at the Litgo Property.  However, under the

14

unique facts of this case, there is no inconsistency inherent in these findings.

As clearly laid out in the Opinion, Goldstein had knowledge of at least some of the contamination at the time of the 1985 Agreement of Sale and 1989 Settlement Agreement. (Opinion 76-77.)  Alfred Sanzari had even informed Goldstein that the cost of the cleanup might run over one million dollars.  (*Id.* at 31.)  Goldstein voluntarily accepted responsibility for these potential costs when he repeatedly reelected to proceed with the transaction after being provided with this information.  Goldstein was not dissuaded even when his partner, Seidman, withdrew from the deal and told Goldstein his concerns about the potential environmental costs.  In addition, in choosing to purchase a site on which he knew there was some environmental contamination, Goldstein also voluntarily accepted the risk that there might be additional contamination on the property that had not yet been delineated.  Indeed, Goldstein's own environmental consultants stressed to him prior to his final reelection to purchase the property that the extent of the contamination had not yet been adequately investigated and that costs may be much higher than currently estimated.  (*Id.*)  The Sanzari Defendants' failure to provide Goldstein with a full set of monitoring well test results occurred separately and after all of these other events.  (*Id.* at 31-33.)  Thus, although Goldstein was not provided with all of the data available regarding groundwater contamination when he purchased the property, it is in no way inconsistent to find that he did, in fact, voluntarily accept responsibility and liability for at least some of the necessary environmental remediation.

Plaintiffs also argue that the Court has given too much weight in its equitable allocation to Plaintiffs' voluntary assumption of responsibility.  However, the Court found it significant that, after being repeatedly warned that there could be significant contamination at the site,

Plaintiffs still executed a contract for sale under which they took full responsibility from the

Sanzari Defendants for completing any necessary environmental remediation under

ECRA/RCRA.  (*Id.* at 30-33.)  Plaintiffs chose to take responsibility for the property and its

problems, and it is not inequitable to allocate a majority of the costs to the Plaintiffs.  For this

reason, as well as the reasons set forth in the following sections, the Court believes that the 4% of

CERCLA-recoverable costs subtracted from the Sanzari Defendant's original allocation should

be assigned to the Plaintiffs, increasing their allocation from 50% to 54%.  After distributing the

Commissioner's orphan share pro rata, Plaintiffs' final allocation increases from 65% to 70%.

###### 10.    Plaintiffs' Compliance with NJDEP Regulations

Another argument raised by Plaintiffs is that the Court failed to consider that Plaintiffs

have complied with all NJDEP regulations when it found that the failure to begin any field work

to remediate the groundwater contamination may have increased the threat to the environment

and public health.  The Court notes that it never suggested that Plaintiffs had failed to comply

with NJDEP regulations or orders, nor did it ignore the work that Plaintiffs have engaged in to

remediate soil contamination and to identify and delineate the extent of the groundwater

contamination.  However, despite the installation of numerous monitoring wells that have tested

positive for TCE and other contaminants, Plaintiffs have made no effort to begin removing any

of the hazardous substances from the groundwater.  The Court continues to believe that this delay

in remediation could have had the effect of spreading the scope of the contaminants' impact and

thus was an appropriate factor to consider in our original decision to assign an equitable share of

costs to Plaintiffs as well as our decision to increase the allocation as set forth in this opinion.

**11.**    **Plaintiffs' Ability to Benefit from the Remediation**

Finally, Plaintiffs argue that it was incorrect for the Court to determine and give weight to the fact that Plaintiffs are the only party that may financially benefit from environmental remediation of the Litgo Property.  Plaintiffs contend that the Court's finding was mistaken because expert testimony presented at trial established that they would suffer a loss on their purchase of the Litgo Property even after remediation is complete.  Mark Pomykacz testified that, due to the extent of the contamination, the Litgo Property was worth only $37,000 dollars when it was purchased, well below Plaintiffs' purchase price of $1 million dollars.  1/27/10 Tr. 71:25-72:14.  Pomykacz further testified that, due to the time value of money, Plaintiffs have suffered $3.9 million in consequential damages totally separate from the costs of remediation due to their inability to reinvest the money sunk into the Litgo Property since its purchase.  *Id.* at 82:20-83:1.

The financial benefit that a party may gain from remediation of a site is an appropriate factor to be considered in equitably allocating costs.  *City of Wichita v. Trs. of APCO Oil Corp. Liquidating Trust*, 306 F.Supp.2d 1040, 1101-02 (D.Kan.2003).  Plaintiffs do not dispute that the Litgo Property will be worth more once remediated than it was when they purchased it.  This analysis would typically include a consideration of whether the parties paid a reduced price for the site or whether remediation will enhance the value of the property beyond any expected appreciation.  *Hatco Corp v. W.R. Grace & Co.-Comm*, 836 F. Supp. 1049, 1091 (D.N.J. 1993). The Court, however, does not believe that Plaintiffs presented any evidence on those topics that was overlooked and would merit a reduction of Plaintiffs' share of the costs.  The Court did not find Pomykacz's testimony to be credible, as cross-examination showed that the properties with which he compared the Litgo Property were largely dissimilar and that a number of Pomykacz's

17

assumptions as to expenses and lost income may have been flawed.  Thus, the Court concludes

that its prior finding that "Plaintiffs are the only parties that stand to benefit financially from the

remediation of the Litgo Property" is correct based on the evidence presented and was relevant to

an allocation of costs.[5]

CONCLUSION

For the above reasons, and for good cause shown,

IT IS on this 7th day of January, 2011,

ORDERED that the Sanzari Defendants' Motion for Reconsideration [360] is

GRANTED in part and DENIED in part; and it is

ORDERED that Plaintiffs' Motion for Reconsideration [361] is DENIED; and it is

ORDERED that the Court's June 10, 2010 Memorandum Opinion [358] is modified to

reflect the following equitable allocation of CERCLA-recoverable costs: 70% to Plaintiffs; 27%

to the Sanzari Defendants; and 3% to the United States Defendants.


 /s/ Anne E. Thompson
ANNE E. THOMPSON, U.S.D.J.

---

[5]Plaintiffs also suggest that if the Court attaches no importance to the benefits the United States Defendants received from the contamination-causing activities then it should disregard any potential benefit Plaintiffs will receive from remediation of the Litgo Property.  However, the financial benefit Plaintiffs may receive from the remediation is a totally separate factor from the benefit other parties may have received from the activities that led to the environmental damage. *See Hatco*, 836 F. Supp. at 1090 (listing factors separately as ones to be considered in equitable allocation of costs).  The Court further notes that it did not disregard any consideration of what benefits other parties may have received from the contamination-causing activities, but simply found that there was no evidence that the United States Defendants had benefitted in any material way such that it should be reflected in the percentage of costs assigned to them.

18