NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

LITGO NEW JERSEY, INC, and
Sheldon GOLDSTEIN,

        Plaintiffs,

v.

Bob MARTIN, in his official capacity as the
Commissioner of the New Jersey Department
of Environmental Protection, et al.,

        Defendants.

Civ. No. 06-2891 (AET)

OPINION & ORDER

R E C E I V E D

JAN - 5 2012

AT 8:30_____M
WILLIAM T. WALSH
CLERK

THOMPSON, U.S.D.J.

## I.   INTRODUCTION

This matter comes before the Court after a two-day damages hearing during which Plaintiffs Litgo New Jersey, Inc. ("Litgo") and Sheldon Goldstein sought to establish the extent of Plaintiffs' recoverable past costs under the Comprehensive Environmental Response Compensation and Liability Act, ("CERCLA"), 42 U.S.C.A. § 9601, *et seq*., and the New Jersey Spill Compensation and Control Act ("Spill Act"), N.J.S. A. 58:10–23.11f(a)(2).  Plaintiffs [403] and Defendants Alfred Sanzari Enterprises, Mary Sanzari, David Sanzari, as Executor of the Estate of Alfred Sanzari, and Frank Huttle, as Executor of the Estate of Alfred Sanzari (collectively, "Sanzari Defendants") [402] have submitted proposed findings.  In addition, Defendants United States of America, United States Department of the Army, United States Department of the Air Force, and United States Department of the Navy (collectively, "United States Defendants") have filed a motion to strike a portion of Plaintiffs' proposed findings [404], which Plaintiffs have opposed [407].  The Sanzari Defendants have also filed a Letter [405],

1

objecting to certain portions of Plaintiffs' Proposed Findings which Plaintiffs have opposed [406]. Based upon the evidence produced at the damages hearing and upon consideration of the parties' written submissions, the Court adopts the findings of fact and conclusions of law set forth below.

## II. BACKGROUND

The Court presumes that all parties are familiar with the procedural history and facts of this case and therefore provides only a brief overview. This case arises out of a dispute involving the presence of TCE and other hazardous substances at and emanating from the parcel of land located at 40 Haynes Street in the Borough of Somerville, New Jersey, referred to on local tax maps as Block 50, Lots 3, 4, 13, and 14 (the "Litgo Property") and the Defendants' alleged responsibility for these hazardous substances. Following a seventeen-day bench trial, on June 10, 2010, the Court entered findings of fact and conclusions of law regarding the parties' liability under CERCLA, the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C.A. § 6901, *et seq*, the New Jersey Spill Act, and the New Jersey Sanitary Landfill Facility Closure and Contingency Fund Act ("Closure Act"), N.J.S.A. 13:1E-100. *See* (June 10, 2010 Op.) [358]. The Court found that the United States Defendants, the Sanzari Defendants, and Plaintiffs are liable under CERCLA, that the Sanzari Defendants and Plaintiff Litgo are liable under the Spill Act, and that the United States Defendants and the Commissioner are liable under RCRA. (*Id*. at 79–80). The Court dismissed all claims brought under the Closure Act. (*Id*.)

After making its determination on liability, the Court decided how damages should be equitably allocated under § 113 of CERCLA and the Spill Act. The Court initially allocated the CERCLA-recoverable costs as follows: 65% to Plaintiffs, 32% to the Sanzari Defendants, and

2

3% to the United States Defendants.[1]  The Court further found that Plaintiffs were responsible for only 67% of costs recoverable under the Spill Act, while the Sanzari Defendants were responsible for 33% of those costs.  In a later opinion following motions for reconsideration, the Court modified the equitable allocation of CERCLA-recoverable costs as follows: 70% to Plaintiffs; 27% to the Sanzari Defendants; and 3% to the United States Defendants.  (Jan. 7, 2011 Op. & Order, at 18).

The Court's Opinions, however, did not set an amount of damages, as it had been decided during the liability trial that the damages portion of the proceeding would be bifurcated and resolved at a later date.  (*Id.* at 2–3; June 10, 2010 Op., at 70 n. 33).  Following the determination of liability, the parties participated in an informal process to determine the total amount of Plaintiffs' recoverable past costs.  Plaintiffs and the United States Defendants reached an agreement and stipulated that Plaintiffs had incurred $1,729,279 in recoverable costs plus interest under § 107(a) of CERCLA.  (Letter) [392].  Plaintiffs and the Sanzari Defendants, however, were not able to reach an agreement, and consequently, the Court continued with its plan to hold a hearing to establish damages.  *See* (May 20, 2011 Order) [393].

From June 13–14, 2011, the Court held a damages hearing to determine the amount of Plaintiffs' recoverable past costs.  Plaintiffs called environmental consultants Joseph Sorge and Robert Zoch as well as Jeffrey Goldstein, the Vice President of Litgo, to testify as to the scope of the incurred expenses.

Plaintiffs' proposed findings seek to establish approximately $2.4 million in recoverable costs comprising $1,939,866 under CERCLA and $450,302 under the Spill Act.  (Pls. Proposed

---

[1]The Court originally assigned equitable shares of 50% to Plaintiffs, 25% to the Sanzari Defendants, 2% to the United States Defendants, and an orphan share of 23% to the Commissioner.  The final allocation was determined after distributing the Commissioner's orphan share pro rata between Plaintiffs, the Sanzari Defendants, and the United States Defendants.

Findings, at 17). The Sanzari Defendants oppose many of those costs on a number of grounds described below. Accordingly, the Sanzari Defendants have suggested that Plaintiffs' maximum total recoverable costs should be $955,168.77 under CERCLA and $22,646.00 under the Spill Act. (Defs.' Proposed Findings, at 19).

The Court has considered the parties' proposed findings in addition to the evidence presented at the damages hearing and throughout the course of this litigation and the Court makes the following findings of fact and conclusions of law.

III.   DISCUSSION

A. Damages

Under the New Jersey Spill Act "any person who has discharged a hazardous substance, or is in any way responsible for any hazardous substance, shall be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs no matter by whom incurred." N.J.S.A. 58:10-23.11g(c)(1). Section 58:10-23.11f(a)(2) creates a private right of action in contribution for cleanup costs against parties who are "even remotely responsible for causing contamination will be deemed a responsible party under the Act." *New Jersey Turnpike Authority v. PPG Industries, Inc.*, 197 F.3d 96, 106 (3d Cir. 1999); N.J.S.A. 58:10-23.11f(a)(2). In resolving contribution claims under the Spill At, a court may allocate the costs of cleanup and removal among liable parties using such equitable factors as the court determines are appropriate. *Id.*

Similarly, CERCLA provides two distinct causes of action. *United States v. Atlantic Research Corp.*, 551 U.S. 128, 138 (2007) (quoting *Cooper Industries, Inc. v. Aviall Servs.*, Inc., 543 U.S. 157, 163 (2004). Section 107(a) provides for a right to recovery of costs incurred in cleaning up a site, while § 113(f) provides a defendant in a § 107(a) suit a right to contribution

from other potentially response parties ("PRPs") with whom the defendant shares common liability. *Id.* 138-39.

To establish liability pursuant to § 107(a) of CERCLA, a plaintiff must prove: (1) that hazardous substances were disposed of at a "facility," (2) that a release or threatened release of a hazardous substance from the facility into the environment has occurred, (3) that the "release" or "threatened release" has caused or will require Plaintiffs to incur necessary response costs that are consistent with the National Contingency Plan ("NCP"), and (4) that the defendant falls within one of the four classes of PRPs established in § 107(a). *New Jersey Turnpike Auth. v. PPG Indus., Inc.*, 197 F.3d 96, 103-04 (3d Cir. 1999). Section 113(f)(1) of CERCLA allows a party to "seek contribution from any other person who is liable or potentially liable" under § 107. 42 U.S.C. § 9613(f)(1). The Court has already found that the Litgo Property is a CERCLA facility; that a release of hazardous substances has occurred; that Plaintiffs, the Sanzari Defendants, and the United States Defendants are liable parties; and that the release of hazardous substances has caused Plaintiffs to incur response costs. *See generally* (June 10, 2010 Op.). Additionally, the Court has already found that the Sanzari Defendants and Plaintiff Litgo are liable parties under the Spill Act. (*Id.*) The remaining question is simply whether the costs that Plaintiffs have incurred are recoverable as "necessary" and "consistent with the NCP." 40 C.F.R. § 300.700.

A response cost is "necessary" if it is "necessary to the containment and cleanup of hazardous releases." *Black Horse Lane Assoc., L.P. v. Dow Chem. Corp.*, 228 F.3d 275, 294 (3d Cir. 2000); *see also Redland Soccer Club, Inc. v. Dep't of the Army of the United States*, 55 F.3d 827, 849-50 (3d Cir. 1995) (response costs must be "monies ... expended to clean up sites or to prevent further releases of hazardous chemicals"). A response action is "consistent with the NCP" if the action is in "substantial compliance" with 40 C.F.R. § 300.700(c)(5)–(6), and results

in a "CERCLA-quality cleanup." 40 C.F.R. § 300.700(c)(3)(i). An "immaterial or insubstantial"

deviation, however, will not result in a cleanup that is "not consistent" with the NCP. 40 C.F.R.

§ 300.700(c)(4).

To be "necessary," a cost need not be the least expensive means available. *See ITT*

*Indus., Inc. v. Borgwarner, Inc.*, 700 F.Supp.2d 848, 885 (W.D. Mich. 2010). But costs will be

denied when they are "duplicative of other costs, wasteful, or otherwise unnecessary to address

the hazardous substances at issue." *Id.* (quoting *Waste Mgmt. of Alameda Cnty., Inc. v. East Bay*

*Reg'l Park Dist.*, 135 F.Supp.2d 1071, 1099 (N.D.Cal. 2001)); *Nw. Mut. Life Ins. Co. v. Atl.*

*Research Corp.*, 847 F. Supp. 389, 401 (E.D. Va. 1994) ("Costs otherwise necessary and

consistent with the NCP may nonetheless be unrecoverable if the steps taken were extravagant or

otherwise unreasonably costly."). Necessary costs include not only the cost of actual cleanup,

but also include costs for investigation, planning, and remedial design. *Id.* (quoting *City of*

*Wichita, Kansas v. Trustees of APCO Oil Corp. Liquidating Trust*, 306 F.Supp.2d 1040, 1091

(D.Kan.2003) and *Waste Mgmt. of Alameda County, Inc.*, 135 F.Supp.2d at 1099). Also

recoverable are indirect costs that are closely linked to the clean-up of a specific site, including

"office space, utilities, supplies, administrative and technical support, record keeping or time

keeping[.]" *N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp.*, No. 03–0438, 2011 WL

3471079, at *60 (N.D.N.Y. July 11, 2011); *see also United States v. R.W. Meyer, Inc.*, 889 F.2d

1497, 1503 (6th Cir. 1989) ("[T]otal response costs necessarily include both direct and indirect

costs inherent in the cleanup operation.")

Litigation-related costs, however, are generally not recoverable under CERCLA. *Black*

*Horse*, 228 F.3d at 294 (citing *Key Tronic Corp. v. United States*, 511 U.S. 809, 819-20 (1994);

*Redland Soccer Club*, 55 F.3d at 850). In *Key Tronic*, the Supreme Court of the United States

held that legal work that is "closely tied to the actual cleanup" may constitute a necessary

response cost. 511 U.S. at 820. Specifically, the Court stated that identifying other PRPs fell into that category: "Tracking down other responsible solvent polluters increases the probability that a cleanup will be effective and get paid for. . . . [S]uch efforts significantly benefited the entire cleanup effort and served a statutory purpose apart from the reallocation of costs. These kinds of activities are recoverable costs of response clearly distinguishable from litigation expenses . . . ." *Id.* On the other hand, work that "primarily protect[s] [a party's] interests as a defendant in the proceedings that established the extent of its liability" is not recoverable. *Id.* at 820–21; *see also Champion Labs. Inc. v. Metex Corp.*, No. 02-5284, 2009 WL 2496888, at *22 (D.N.J. Aug. 13, 2009) (finding costs incurred in order to avoid liability of cleanup and shift costs to other parties rather than to respond to threat from defendant's release were not recoverable).

### a.  Fred C. Hart & Associates

In or about 1987, the Sanzari Defendants hired environmental consultants Fred. C. Hart Associates, Inc. ("Hart") to perform investigative work related to contamination of the Litgo Property. (6/13/11 Tr. 170:4). Under the agreement for the sale of the Litgo Property from Alfred Sanzari to Goldstein in February 1990, Plaintiffs paid the Sanzaris $157,368 as reimbursement for investigation and remediation work done by Hart. (*Id.* 170–72); *see also* (Pls.' Demonstrative Ex. No. 2 ("PDE #2")); (Pls.' Cost Binder ("Cost Binder") Tab 1). Plaintiffs seek reimbursement of this $157,368 (split equally between CERCLA and Spill Act[1]). At the hearing Zoch testified that Hart's work was necessary to investigate the extent of contamination and plan remediation and was consistent with the NCP because it was conducted

---

[1] To delineate Spill Act and CERCLA costs, Plaintiffs simply split the pre-1997 costs 50/50 as there was insufficient documentation to permit accurate allocation between the Spill Act and CERCLA. Although the Court notes that such a split is inexact, the Court believes this split is reasonable and declines to follow the Sanzari Defendants' argument that, as a result, Plaintiff should not be permitted to recover Spill Act costs. *See* (Defs.' Proposed Findings, at 16).

at the direction of the New Jersey Department of Environmental Protection ("NJDEP") and under approved work plans. (6/13/11 Tr. 171–172.)

The Sanzari Defendants object to this cost, however, because in the past Plaintiffs have claimed that Hart performed its environmental work negligently. In prior litigation Goldstein sought damages from Hart for fraudulent concealment, negligence, and gross negligence for Hart's work on the Litgo Property. Goldstein alleged, among other things, that Hart "failed to meet the generally-accepted standards for work by environmental technical consultants." *See* (US-231); *see also* (6/14/11 Tr. 44–45 (Zoch acknowledging that Goldstein had alleged that Hart's work was negligent)).

The Sanzari Defendants also note that when Hart's cleanup plan was later submitted to the NJDEP by Environmental Waste Management Associates, Inc. ("EWMA"), the NJDEP rejected the plan. (Sanzari 159 at 9). EWMA also characterized the Hart plan as inadequate. (*Id.*) Although Zoch testified at the damages hearing that all of the Hart expenses were necessary and consistent with the NCP, this Court does not give this testimony much weight because it is inconsistent with Plaintiffs' own assertions and because Zoch noted that he lacked access to Hart's invoices so he could not analyze the services performed to verify that the work was consistent with the NCP. *See* (6/14/11 Tr. 81:11–20).

The Court finds that Hart's work was generally necessary, reasonably useful, and professional. The Court notes that Plaintiffs' litigation criticisms of Hart appear to be efforts to avoid payment of Hart's fees rather than measured statements as to the value of Hart's work. However, this Court agrees with the Sanzari Defendants that the invoices submitted do not provide sufficiently detailed entries for the Court to determine that all of the services performed are properly recoverable. Accordingly, the Court will reduce the recovery for the Hart expenses by 25%.

After reducing the expenses by 25%, the Court finds that Plaintiffs have established that they have incurred recoverable response costs of $118,026, which is split equally between CERCLA and the Spill Act.

### b. EWMA

In 1989, Plaintiffs retained EWMA as an environmental consultant. Between 1989 and 2000, EWMA performed environmental work at the Litgo Property, including investigating soil and groundwater contamination and excavating soil under the New Jersey Industrial Site Recovery Act ("ECRA/ISRA"). (June 10, 2010 Op. ¶¶ 79–80.) In 2000, EWMA supervised the removal of soil contaminated with TCE from the southeastern corner of the Litgo Property that was a continuing source of TCE contamination in the Eastern Groundwater Plume. (*Id.*) At the hearing, Zoch estimated that fifty percent (50%) of work performed by EWMA prior to 1997 was attributable to the investigation and removal of petroleum and its byproducts from soil. *See* (6/13/11 Tr. at 167:4–20). Zoch additionally testified that all of the work performed by EWMA subsequent to 1997 was attributable to the investigation and removal of hazardous substances other than petroleum and its byproducts. *See* (*id*).

Plaintiffs seek to recover $728,397 paid to EWMA ($475,453 under CERCLA and $252,944 under the Spill Act). Zoch testified at the damages hearing that the EWMA work was necessary and consistent with the NCP. (6/14/11 Tr. 46). However, as with Hart, Plaintiffs claimed that EWMA's work was "negligent and substandard" in defending a 2001 lawsuit by EWMA to recover unpaid fees. *See* (1/20/10 Tr. 150–151). Sheldon Goldstein characterized EWMA's work as "the worst case of engineering screwing ever." (Cost Binder, Tab 2 at Litgo RCRA 38208). Sorge, a later environmental consultant to Plaintiffs, produced an affidavit in the EWMA fee litigation stating that EWMA's work "fell outside acceptable professional standards." (US 128, Ex. A). He also produced a report detailing the numerous flaws in

EWMA's work and went so far as to say that "EWMA caused Litgo to essentially waste the money spent remediating the soil." (Sanzari 159, at 7–10). At the damages hearing, however, Sorge distanced himself from this critique of EWMA's work by asserting that it related to the lack of disclosure as to the extent of contamination pre-closing. *See* (6/13/11 Tr. 79:11–15; 87:19–88:14). Sorge additionally testified that the deficiencies in EWMA's work did not cause Plaintiffs to incur additional response costs, (*id.* at 85), and claimed that further investigation caused him to change some of his opinions. (*Id.* at 88). Jeffrey Goldstein, however, did not distance himself from previous statements that he and his father believed EWMA committed professional malpractice and that the environmental condition of the Litgo Property was probably harmed as a result. (6/13/11 Tr. 153); *see also* (1/21/10 Tr. 75). The Court finds that Sorge's credibility is undermined by his prior report of EWMA's work and the payment he has and will receive for his factual testimony. *See* (6/13/11 Tr. 67:16–68:12).

The Court finds that the recoverable amount for EWMA should be reduced by 30% as some of EWMA's work likely required a duplication of efforts and was therefore wasteful. *See ITT Indus., Inc. v. Borgwarner, Inc.*, 700 F.Supp.2d 848, 885 (W.D. Mich. 2010) ("duplicative . . , wasteful, or otherwise unnecessary" costs are not recoverable). Having reduced the EWMA costs by 30% and allocating the reduction proportionally between CERCLA and the Spill Act, Plaintiffs have established $509,877.90 in recoverable costs ($332,817.10 under CERCLA and $177,060.80 under the Spill Act).

### c. JM Sorge

In 2000, Plaintiffs retained environmental consultants JM Sorge, Inc. ("JM Sorge") to conduct further remediation and investigations at the Litgo Property. (June 10, 2010 Op. ¶ 31); (6/13/11 Tr. 9). From 2000 through 2006, JM Sorge performed work at the Litgo Property at times at the direction of the NJDEP. (6/13/11 Tr. 53).

10

Between 2000 and 2007, Plaintiffs paid JM Sorge over $800,000 for its work. After deducting for litigation support costs, Plaintiffs seek to establish $691,821 in payments to JM Sorge as recoverable costs. (PDE No. 2); *see also* (6/14/11 Tr. 27). The Sanzari Defendants object to two elements of those payments: (1) the "Technical Support," which the Sanzari Defendants characterize as a litigation expense; and (2) the "ISRA File Review," which they allege is duplicative of the work performed by Plaintiffs' prior environmental consultants.

The Court agrees that the "Technical Support" entry, which Sorge testified was "basically technical support, in support of [law firm Patton Boggs's] work on behalf of Litgo" in the present litigation, (6/13/11 Tr. 27, 63), is clearly litigation-related and "primarily protecting [Plaintiffs'] interests" as a party in a suit to establish liability. *Key Tronic Corp. v. United States*, 511 U.S. 809, 820 (1994). As such, it was not "closely tied to the actual cleanup" and is not recoverable. *Id*.

However, Court will not deduct the expenses for the ISRA file review. "[I]t is not necessarily unreasonable to hire a second consultant to review and check the work of a first consultant." *ITT Indus., Inc. v. Borgwarner, Inc.*, 700 F.Supp.2d 848, 886 (W.D. Mich. 2010) (citing *Norfolk Southern Ry. Co. v. Gee Co.*, Civ. No. 98-1619, 2002 WL 31163777, at *36 (N.D. Ill. Sept. 30, 2002)). Of course, if the "review" entailed re-doing the deficient work of a prior consultant, then the review could be considered duplicative. This Court is satisfied, however, that the ISRA File Review—one of the least expensive of the sub-projects JM Sorge billed Plaintiffs for—was a necessary and ordinary expense.

Having deducted the costs of Technical Support, the Court finds that Plaintiffs have established $672,489.58 in recoverable expenses, allocable entirely to CERCLA.

11

### d. Brach Eichler

In 1992, Plaintiffs retained the law firm Brach, Eichler, Rosenberg, Silver, Bernstein, Hammer & Gladstone ("Brach Eichler") to assist Plaintiffs' remedial investigation and remediation of the Litgo Property under ECRA/ISRA. Brach Eichler represented Plaintiffs in a variety of matters, both recoverable and not. Between 1992 and 1997, Plaintiffs paid Brach Eichler a total of $234,322 for services rendered to Plaintiffs related to the Litgo Property. Included within the scope of Brach Eichler's representation of Plaintiffs was its representation of Plaintiffs in a lawsuit against several defendants, including Wausau Insurance Co., in which Plaintiffs obtained a $135,000 settlement (the "Wausau Litigation").

Plaintiffs seek to recover $166,741 (roughly split equally between CERCLA and the Spill Act) in payments to Brach Eichler for its services. *See* (6/13/2011 Tr. 164:25–165:4; 6/14/11 Tr. 15:5–7, 17:16–18:1). This figure represents a reduction of $12,000 and an additional $55,581 (representing 25% of the adjusted total) for litigation fees and expenses from the total of $234,322 paid to Brach Eichler that Zoch admitted were not recoverable. *See* (6/14/11 Tr. 19:1–13).

The Sanzari Defendants raise several objections to these costs. The Sanzari Defendants object to recovery on the ground that the billing entries lack the requisite detail to determine the amount of time devoted to each task and whether a particular task relates to a recoverable cost. (Defs.' Proposed Findings, at 2). The Sanzari Defendants also object to the "arbitrary formula" applied by Zoch to reduce the bill by 25%. (*Id.*) Additionally, the Sanzari Defendants contend that at the very least, the Brach Eichler bills must be reduced by $135,000 to account for the $135,000 credit against the damages claimed for the Plaintiffs' recoveries that Brach Eichler achieved by settling environmental claims against Wausau Insurance Company ($30,000) and Dande Plastics ($105,000) as part of the Wausau litigation. (Defs.' Proposed Findings, at 4).

12

Although Zoch stated that the settlements were not "net recoveries" because the legal fees exceeded the settlement amounts, (6/14/11 Tr. 88:19–90:15), the Court agrees that $135,000 should be reduced from the total amount paid to Brach Eichler.  Having deducted the Wausau settlement monies and the $12,000 already identified by Plaintiffs as non-recoverable, this Court finds that Plaintiffs have established $87,322 in recoverable costs which is split equally between CERCLA and the Spill Act.  While it is true that the Brach Eichler billing entries lack desirable detail, this Court is satisfied that appropriate reductions were taken from the invoices in question and declines to further reduce recovery for these entries.  *See Board of County Com'rs of County of La Plata, Colorado v. Brown Group Retail, Inc.*, 768 F.Supp.2d 1092, 1113 (D.Colo. 2011) (noting that district court enjoys "wide discretion" in making decisions on fee awards).

### e.   Chadwick

Beginning in 2000, Plaintiffs retained the services of Christopher Daggett of Chadwick Management LLC ("Chadwick") to provide expert consulting services in connection with Plaintiffs' remedial investigation and remediation of the Litgo Property.  Plaintiffs seek to recover $109,250 for Chadwick's services.  The Sanzari Defendants contend that no payment for Daggett's services is recoverable because his retention was a politically motivated attempt to influence the NJDEP to diminish or eliminate the Plaintiffs' cleanup obligation, given his past experience as an EPA Administrator.  (Defs' Proposed Findings, 11).  The Sanzari Defendants note that Daggett's background is political, not environmental, and that Goldstein himself described Daggett as a "non-technical consultant" who lacked the "technical expertise to properly provide environmental consulting services."  (*Id.*)  The Court notes that Daggett did not prepare any environmental reports on the Litgo Property, nor was he charged with performing any remediation there.  (02/02/10 Tr. 11:13–18).  Having reviewed the invoices, the Court is not prepared to accept Plaintiffs' contention that Daggett's work was primarily in furtherance of

13

investigation and remediation of the site. *See also Champion Labs. Inc.*, 2009 WL 2496888, at

*22 (finding costs incurred in order to avoid liability of cleanup and shift costs to other parties

rather than to respond to threat from defendant's release were not recoverable).  Consequently,

the Court does not award any recoverable costs on the Chadwick invoices.

### f.  Financial Assurance Costs

Plaintiffs also seek recovery of $31,150 spent in connection with their financial assurance

obligations.  Plaintiffs were required to execute a performance bond with NJDEP upon

Goldstein's purchase of the Litgo Property.  *See* (Performance Bond, Cost Binder, Tab 5, at

LITGO-RCRA0038218 – LITGO-RCRA-0038220; 6/14/11 Tr. 20:21–22:1).  Plaintiffs paid

$1,000 to open a standby trust that was to be utilized to support the performance bond, *see* (Cost

Binder, Tab 5, LITGO-RCRA0038214), plus three yearly premiums of $10,050 totaling $31,150.

*See* (*id.*, LITGO-RCRA0038316–LITGO-RCRA0038231).  The Sanzari Defendants have raised

no specific objections to these costs.  Because financial assurance costs such as these are

generally recoverable under CERCLA and the NCP, *see* (6/14/2011 Tr. 20:10–14), this Court

finds that Plaintiffs have established $31,150 in recoverable costs which is split equally between

CERCLA and the Spill Act.

### g.  Fence Costs

Plaintiffs also seek recovery for costs expended to construct a fence along the boundaries

of the Litgo Property to prohibit trespassers from entering the contaminated site. *See* (6/14/11 Tr.

21:14–19).  Plaintiffs' incurred a total of $14,143 to construct the fence.  Costs associated with

security measures such as these are generally recoverable under CERCLA and the NCP.  *See* 42

U.S.C. § 9601(23); *see also* (6/14/11 Tr. 20:10–14). The Sanzari Defendants have raised no

specific objections to these costs.  Therefore, this Court finds that Plaintiffs have established

14

$14,143 in recoverable costs for these security measures, split equally between CERCLA and the Spill Act.

### h.  NJDEP Oversight Costs

Under the New Jersey Administrative Code, the person responsible for conducting remediation under ECRA/ISRA is required to reimburse NJDEP for its oversight costs. *See* N.J.A.C. 7:26C–2.3(a)(2).  Plaintiffs seek a total of $82,406 in oversight costs paid from 1994 to 2007: $69,689 for NJDEP oversight costs relating to CERCLA and $12,717 for NJDEP oversight costs relating to the Spill Act.  *See* (P-476, P-471 (providing NJDEP oversight cost invoices)).  Oversight costs are recoverable under CERCLA and the Spill Act.  *See* (6/14/11 Tr. 24:15–18).  Although the Sanzari Defendants argue that they should not be responsible for NJDEP's charges for overseeing EWMA's negligent work, (Defs.' Proposed Findings, at 8–9), to the extent EWMA was seeking to discover an off-site source, this Court finds these costs relate to PRP identification, and should thus be awarded.  Therefore, this Court finds that Plaintiffs are entitled to recovery for these costs.

### i.  Soil Interim Removal Costs

In 2000, Plaintiffs performed an interim removal action consisting of the delineation, excavation and disposal of TCE-contaminated soils located in the southeastern corner of the property.  *See* (6/14/11 Tr. 25:17–21).  Plaintiffs seek $362,186 relating to this action.  (*Id.* 26:7–9; PDE No. 2; Cost Binder 8).  Reimbursements of remediation efforts are recoverable under CERCLA.  The work performed by Plaintiffs in connection with the interim soil removal action was necessary and consistent with the NCP because it was incurred at the direction of NJDEP and according to agency-approved work plans and furthermore it likely removed source areas of TCE contamination in groundwater at the Litgo Property.  *See* (6/13/11 Tr. 25:22–26:6).  The

Sanzari Defendants have raised no specific objections to these costs. Therefore, this Court finds that Plaintiffs are entitled to recovery for these response costs.

### j. HydroQual Costs

Beginning during or before July 2007, Plaintiffs retained HydroQual, Inc. ("HydroQual") purportedly for the purpose of identifying PRPs for the release of hazardous substances at the Litgo Property, and to conduct investigations regarding the use of the Litgo Property and neighboring properties as a sanitary landfill. (Pls. Proposed Findings, at 15). Plaintiffs paid HydroQual a total of $25,514 for services rendered to Plaintiffs related to the Litgo Property. (*Id.*) The Sanzari Defendants, however, contend that HydroQual was used to perfect a claim in the litigation against the Sanzari Defendants. (6/14/11 Tr. 100:14–16). And indeed, Plaintiffs' witness Zoch conceded that "[w]hat Hydroqual did was for litigation." (1/29/10 Tr. 198:16–21). In light of these facts, the Court finds that Plaintiffs have not proved by a preponderance of the evidence that they are entitled to recover costs relating to the Hydroqual services. *See Key Tronic*, 511 U.S. at 820–21 (work which primarily consists of protecting a party's interests in proceedings to establish the extent of its liability is not a "necessary cost[] of response" recoverable under CERCLA).

### k. Miscellaneous Response Costs

Plaintiffs also seek recovery for $21,252 in additional response costs incurred in connection with the ECRA/ISRA remediation of the Litgo Property. *See* (6/14/11 Tr. 31:8–11; PDE No. 2; Cost Binder, Tab 11). These costs include payments to the following contractors: (1) Gordon & Gordon (retainer for legal services relating to review of NJDEP files for the Litgo Property); (2) Bennett & Yoskin (for legal services relating to off-site access and interfacing with NJDEP); (3) Brach Eichler (for legal services relating to off-site access and financial assurance requirements); (4) History Associates, Inc. (for PRP identification services

beginning in August 2007); CMX (for surveying the eastern edge of the Litgo Property).  *See* (6/14/11 Tr. 30:7–12, 30:18–31:7; Cost Binder, Tab 11).  The Sanzari Defendants object to several of these charges.  First, the Sanzari Defendants note that the $1,500 retainer paid to the law firm Gordon & Gordon is unsupported by any bills showing that work was actually performed.  *See* (Defs.' Proposed Findings, at 13); *see also* (6/14/11 Tr. 104:14–17 (Zoch testifying that he does not know if retainer was earned)).  Second, the Sanzari Defendants argue that the bills totaling $2,190 from the law firm of Bennett & Yoskin are not recoverable because the bills are incomplete and because the costs do not relate directly to investigation or remediation.  *See* (Defs.' Proposed Findings, at 13–14).  Third, the Sanzari Defendants object to the single Brach Eichler bill of $1,000 because 4.5 of the 5.6 hours are related to copying and file organization and are not closely related to remediation or investigation.  (*Id.* at 14).  Fourth, the Sanzari Defendants object to the $14,362 paid to History Associates because the expense was incurred after 2007 and arguably a litigation expense as the progress reports were directed to Patton Boggs.  (*Id.*)  Finally, the Sanzari Defendants object to the $2,200 paid to CMX for professional surveying services because there is no evidence that the surveying services related to the Litgo Property or that the cost was necessary or consistent with the NCP.  (*Id.* at 15)

The Court finds that Plaintiffs have not proved by a preponderance of the evidence that the invoices relating to the services of Gordon & Gordon and History Associates, Inc. are properly recoverable under CERCLA.  Reviewing the Bennett & Yoskin invoices, the Court finds that Plaintiffs have incurred recoverable costs of $75 and $459.60 (reflecting the subtraction of traveling expenses/lunch).  *See* (Cost Binder, Tab 11).  The Court finds the full costs for the CMX services to be recoverable as the Court finds that such surveying efforts were likely conducted in furtherance of remediation at the Litgo Property.  The Court also finds the Brach Eichler invoice to be recoverable as the Court finds these tasks reasonably related to the

remediation or investigation. *See U.S. v. Hardage*, 733 F. Supp. 1424, 1437–39 (W.D. Okla. 1989) (a party can obtain indirect costs under CERLA including recordkeeping linked to the remediation of a specific site); *see also U.S. v. R.W. Meyer, Inc.*, 889 F.2d 1497, 1503 (6th Cir. 1989) ("[T]he government's total response costs necessarily include both direct and indirect costs inherent in the cleanup operation.").

**l.  Litigation Settlement and Stipulation Credits**

In their proposed findings of fact, the Sanzari Defendants assert that they are entitled certain litigation settlement and stipulation credits.  In addition to the $135,000 received in the Wausau litigation settlement, Plaintiffs also received $6,000 in settlement from Mian Realty. In its June 10, 2010 Opinion this Court acknowledged that "[t]he terms of Mian's settlement with Plaintiffs will be accounted for in determining the amount of damages recoverable by Plaintiff." (June 10, 2010 Op. at 70, n.33).  Thus, the Court will reduce Plaintiffs' past costs amount by these recoveries.

Additionally, the Sanzari Defendants note that the United States Defendants stipulated to damages of $1,729,279, plus interest, of which they are liable for 3%, or $51,878.37 (exclusive of interest).  (*Id*).  The Sanzari Defendants request a credit for 3% of the difference between the two amounts if the Court finds that the total recoverable CERCLA past costs is lower than the $1,729,279 to which the United States Defendants stipulated.  The Court does not believe this request is appropriate.

**m. Total Costs**

Reviewing all the requested recovery amounts, this Court finds that Plaintiffs have proved that they incurred response costs recoverable under Section 107(a) of CERCLA in the amount of $1,566,236.78.  The Court reduces the CERCLA recovery amount by $6,000 to account for the Mian Realty Settlement for a final total of $1,560,236.78.  The Court also finds

that Plaintiffs incurred additional costs recoverable under Section 58:10-23.11f(a)(2) of the Spill

Act in the amount of $315,098.30. In view of the protracted nature of this dispute and Plaintiffs'

initial failure to meet its burden as to past costs, the Court declines to award interest on these

amounts. *See* (02/03/10 Tr. 123:8–9; June 10, 2010 Op. at 70, n.33).

**B. Plaintiffs' "Divisible Harm" Apportionment Argument**

In their proposed findings of fact, Plaintiffs raise another argument against this Court's

decision to find them liable under CERCLA.[2] Plaintiffs claim that they cannot be held jointly

and severally liable under CERCLA for any costs related to the TCE contamination, thorium

nitrate contamination, or JANR warehouse contaminants because each of these instances of

contamination constitutes a "divisible harm" and should be apportioned. (Pls.' Proposed

Findings, at 19–20.) Plaintiffs argue that because they did not in any way generate or contribute

to the release of these contaminants, only the parties who did contribute can be held jointly and

severally liable. Although the Court has already conducted an equitable allocation of shares of

liability, Plaintiffs argue that the Court must still consider apportionment of the response costs as

an entirely separate step.[3] The United States Defendants have moved to strike this argument.

Under CERCLA, a party who is liable under § 107(a) is jointly and severally liable for

the entire harm to the site, even though other parties may have contributed to the environmental

harm. A defendant can, however, avoid joint and several liability if it can prove "divisibility."

*See United States v. Twp. of Brighton*, 153 F.3d 307, 313, 319 (6th Cir.1998). "Divisibility seeks

to apportion liability based on relative contribution to harm, if such is reasonably ascertainable."

*Id*. at 320. "[A]pportionment is proper when 'there is a reasonable basis for determining the

---

[2] The Court found both Plaintiffs liable under § 107(a)(1) as the current operators of a facility and Litgo liable as the current owner. (June 10, 2010 Op. at 58).

[3] Plaintiffs point to some cases where courts have "trifurcated" the case into (1) liability, (2) determination of response costs, and (3) apportionment. (Opp'n Br. 6 n.2 (citing *U.S. v. Davis*, 261 F.3d 1, 16 and *U.S. v. Bell Petroleum Servs., Inc.*, 64 F.3d 202, 204)).

contribution of each cause to a single harm.'" *Burlington N. & Santa Fe Ry. Co. v. United States*, --- U.S. ----, 129 S.Ct. 1870, 1881 (2009) (quoting Restatement (Second) of Torts § 433A(1)(b)). The party invoking the doctrine of divisibility bears the burden of proving that a reasonable basis for apportionment exists. *Id.*

As an initial matter, motions to strike are generally directed at pleadings, *see* Fed. R. Civ. P. 12(f), not at motions, briefs, or other filings. *See Zaloga v. Provident Life and Acc. Ins. Co. of America*, 671 F. Supp. 2d 623, 633 (M.D. Pa. 2009) ("Motions to strike are decided on the pleadings alone."); *Dawson v. City of Kent*, 682 F. Supp. 920, 922 (N.D. Ohio 1988), *aff'd*, 865 F.2d 257 (6th Cir. 1988) (Rule 12(f) "relates only to pleadings and is inapplicable to other filings."). Accordingly, we will deny the United States Defendants' motion to strike arguments contained in Plaintiffs' proposed findings. Defendants' motion is unnecessary in any event because the Court finds Plaintiffs' apportionment argument both untimely and unsupported by the relevant statute and its legislative history.

Plaintiffs' apportionment argument is untimely because the damages hearing was limited to the narrow issue of how much past response costs Plaintiffs incurred and which of those costs are recoverable. To whit this Court noted that it would only consider those elements related to cost recovery. (6/13/11 Tr. 39:24–25) The Court notes that Plaintiffs have had ample opportunity to contest liability in this case. To the extent Plaintiffs wanted to raise the issue of apportionment, which is a defense to joint and several liability, those arguments should have been made at the liability phase of the trial.

Additionally, the Court finds Plaintiffs' apportionment argument to be untenable and unsupported by a plain reading of the statute. Undoubtedly, there is a distinction between apportionment and allocation: "[e]quitable considerations [applicable to allocation] play no role in the apportionment analysis; rather, apportionment is proper only when the evidence supports

the divisibility of the damages jointly caused by the PRPs." *Burlington N. & Santa Fe Ry. Co.*, 129 S.Ct. at 1882 n.9.  In short, apportionment focuses only on who caused the harm.  Plaintiffs contend that because they did not generate or contribute to any of the contaminants, no share of the response costs can be apportioned to them.  Plaintiffs, however, ignore that they were found liable under § 107(a)(1) as owners and operators—without regard to whether they generated or contributed to any of the contaminants.[4]  To accept Plaintiffs' proposal not only would allow them to escape paying any share of response costs, but also would effectively repeal owner/operator liability under § 107(a)(1) as no current owner or operator could ever be liable unless it were also a generator or contributor of contaminants.

Although this reading flies in the face of the text of § 107(a), Plaintiffs are not the first owners of a contaminated property to "seek to completely avoid liability due to the fact that they, as mere owners of the property, did not contribute to the actual release of hazardous materials." *United States v. 175 Inwood Associates LLP.*, 330 F. Supp. 2d 213, 231 (E.D.N.Y. 2004).  After noting that "apportionment is a 'special exception to CERCLA's strict liability scheme," the *175 Inwood Associates* court listed six reasons for rejecting the owners' apportionment argument. Among those reasons, the court stated:

> [T]he strict liability standard that is applied against owners and operators under CERCLA is inconsistent with the equitable principles embodied by apportionment.  The Second Circuit announced the strict liability standard in *Shore Realty*, 759 F.2d at 1044, . . . , [holding] that Section 107(a)(1) "unequivocally imposes strict liability on the current owner of a facility from which there is a release or threat of release, without regard to causation." . . . .  For this reason, to prevent the imposition of liability under CERCLA, owners must avail themselves of one of the enumerated affirmative defenses . . . .  Should one of these affirmative defenses not apply, an owner is strictly liable under CERCLA . . . . .  This statutory scheme does not provide for equitable apportionment of liability as to owners.

---

[4] The Court notes that it did find that Plaintiffs' decisions to delay remediation may have increased the threat to the environment and public health.  *See* (Jan. 7, 2011 Op. & Order at 5).  This factored significantly into the Court's equitable allocation of costs.  Plaintiffs' interpretation would lead to an absurd result, allowing them to escape liability entirely simply because they were not the original generators of the contaminants.

*Id.* at 232–33.   Similarly, this Court finds that Plaintiffs apportionment argument cannot serve as a bar to owner/operator liability.   Accordingly, this Court rejects this argument.

### C. Plaintiffs' Arguments Concerning Ownership of the Truckform Property

In their proposed findings, Plaintiffs also renew their effort to establish that the Sanzari Defendants are the previous owners of the Truckform property—a property located adjacent to the Litgo Site that the Defendants, including the Sanzari Defendants, suggested was a potential source of contamination.   (Pls.' Proposed Findings, at 17–18).   The Sanzari Defendants have requested that the Court strike these proposals.

During the damages hearing, Plaintiffs' counsel attempted to introduce a state court complaint filed by the current owners of the Truckform property that named the Sanzari Defendants as past owners.   (6/13/11 Tr. 127:1–136:18).   Plaintiffs' counsel argued that the complaint was admissible under Federal Rule of Evidence 406 as evidence of the Sanzaris' pattern and practice of dishonesty.   (*Id.* at 133:8–134:9).   The Court flatly rejected Plaintiffs' attempt, finding that the complaint was not admissible under Rule 404 and that, in any event, the complaint was not evidence but mere allegation.   (*Id.* at 134:10–135:4; 135:22–24).   Plaintiffs' renewed attempt to introduce the complaint is simply an effort to circumvent the Court's earlier ruling.   The Court sees no reason to reconsider that ruling, and therefore the Court will disregard the proposed findings relating to the Truckform property.   However, as with Plaintiffs' apportionment argument, the Court will not "strike" the proposal because Rule 12(f) does not contemplate striking filings other than pleadings.   *See* Fed. R. Civ. P. 12(f).

### IV. CONCLUSION

For the foregoing reasons, IT IS on this ⁓5ᵗʰ⁓ day of January, 2012,

ORDERED that Defendants United States of America, United States Department of the Army, United States Department of the Air Force, and United States Department of the Navy's Motion to Strike a Portion of Plaintiffs' Proposed Findings [docket #404] is DENIED; and it is

ORDERED that the Sanzari Defendants' Letter Request to strike a portion of Plaintiffs' proposed findings [405] is DENIED; and it is further

ORDERED that $1,560,236.78 of Plaintiffs' response costs are recoverable under CERCLA and $315,098.30 in response costs are recoverable under the Spill Act; and it is further

ORDERED that the Sanzari Defendants are liable for $421,236.93 of the response costs under CERCLA and $103,982.44 of the response costs under the Spill Act as outlined in the Court's January 7, 2011 Opinion & Order [382]; and it is further

ORDERED that the United States Defendants pay their pro rata share of the response costs under CERCLA as outlined in the Court's January 7, 2011 Opinion & Order and as stipulated by the parties [392]; and it is further

ORDERED that Plaintiffs are liable for the remaining recoverable costs under CERCLA and the Spill Act.

_Anne E. Thompson_

ANNE E. THOMPSON, U.S.D.J.